

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.:

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RISHI KAPOOR;
LOCATION VENTURES, LLC;
URBIN, LLC;
PATRIOTS UNITED, LLC;
LOCATION PROPERTIES, LLC;
LOCATION DEVELOPMENT, LLC;
LOCATION CAPITAL, LLC;
LOCATION VENTURES RESOURCES, LLC;
LOCATION EQUITY HOLDINGS, LLC;
LOCATION GP SPONSOR, LLC;
515 VALENCIA SPONSOR, LLC;
LV MONTANA SPONSOR, LLC;
URBIN FOUNDERS GROUP, LLC;
URBIN CG SPONSOR, LLC;
515 VALENCIA PARTNERS, LLC;
LV MONTANA PHASE I, LLC;
STEWART GROVE 1, LLC;
STEWART GROVE 2, LLC;
LOCATION ZAMORA PARENT, LLC;
URBIN CORAL GABLES PARTNERS, LLC;
URBIN COCONUT GROVE PARTNERS, LLC;
URBIN MIAMI BEACH PARTNERS, LLC; and
URBIN MIAMI BEACH JJ PHASE 1, LLC,

Defendants.

_____/



**SECURITIES AND EXCHANGE COMMISSION'S EMERGENCY**
***EX PARTE* MOTION FOR ASSET FREEZE AND OTHER**
**RELIEF AGAINST DEFENDANT RISHI KAPOOR**
**AND MEMORANDUM OF LAW**

## I.     INTRODUCTION

Plaintiff Securities and Exchange Commission ("Commission") files this emergency motion for an asset freeze and other relief (the "Motion") against Defendant Rishi Kapoor ("Kapoor") to ensure that a disgorgement award can be satisfied and to prevent further dissipation of investor funds. As alleged in the Complaint, from approximately January 2018 through March 2023 (the "Relevant Period"), Kapoor—through Location Ventures, LLC ("LV"), URBIN, LLC ("URBIN"), and their subsidiaries and affiliated entities[1] (collectively, "Defendants")—raised approximately $93 million from more than 50 investors purportedly to invest in residential and mixed-use real estate projects in South Florida. To induce investors, Kapoor represented that he and his partner made a $13 million cash investment in LV through Patriots United, LLC ("Patriots United), a company owned by Kapoor, his partner, and members of Kapoor's family. At no point during the Relevant Period, however, did Patriots United contribute any cash to LV.

Kapoor's false claims about his investment was just one in a series of material misrepresentations and omissions Defendants made to investors. For instance, as part of the offering materials provided to prospective investors, Defendants included *pro forma* budgets that projected costs for each of the projects. Kapoor intentionally understated construction and other

---

[1] Patriots United; Location Properties, LLC ("L. Properties"); Location Development, LLC ("L. Development"); Location Capital, LLC ("L. Capital"); Location Ventures Resources, LLC ("L. Resources"); Location Equity Holdings, LLC ("L. Holdings"); Location GP Sponsor, LLC ("L. GP Sponsor"); 515 Valencia Sponsor, LLC ("515 Valencia Sponsor"); LV Montana Sponsor, LLC ("LV Montana Sponsor"); URBIN Founders Group, LLC ("URBIN Founders"); URBIN CG Sponsor, LLC ("URBIN CG Sponsor"); 515 Valencia Partners, LLC ("515 Valencia"); LV Montana Phase I, LLC ("LV Montana"); Stewart Grove 1, LLC ("Stewart Grove 1"); Stewart Grove 2, LLC ("Stewart Grove 2"); Location Zamora Parent, LLC ("L. Zamora Parent"); URBIN Coral Gables Partners, LLC ("URBIN Gables"); URBIN Coconut Grove Partners, LLC ("URBIN Grove"); URBIN Miami Beach Partners, LLC ("URBIN Miami Beach"); and URBIN Miami Beach II Phase 1, LLC ("URBIN Miami Beach II") (together with LV and URBIN, the "Company Defendants").

estimated costs used in the *pro formas* to represent higher returns to prospective investors. When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Kapoor withheld that and other information from investors, directed employees to revise or remove financial data from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital.

In addition, Defendants represented to investors that LV, URBIN, and each of the projects were separate and distinct investments, possessing their own members, designated capital, and corporate identities. Defendants, however, regularly ignored corporate formalities and commingled investor funds. More than $60 million in intercompany transfers occurred during the Relevant Period, which included a $14 million transfer from LV to URBIN recorded internally as an intercompany loan.

As Defendants shuffled investor funds among the various companies and accounts, Kapoor and other insiders misappropriated at least $6 million of investor funds—$4.3 million of which Kapoor misappropriated for himself. During the same period, Kapoor purchased a 2023 68-foot yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.

Through their fraudulent conduct, Kapoor, LV, and URBIN violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(2)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Exchange Act Rule 10b-5(b) [7 C.F.R. § 240.10b-5(b)]. Kapoor and the Company Defendants violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)]. Kapoor also, directly and indirectly, violated Exchange Act Section 10(b) and Rule 10b-5 thereunder as a

3

control person of the Company Defendants under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

Kapoor misappropriated at least $4.3 million from investors for his own benefit. To prevent him from dissipating or moving what is remaining of those funds and potentially other assets out of the Court's reach, the Commission seeks an asset freeze and other emergency relief against Kapoor.

## II.    DEFENDANTS

1.      Kapoor is a resident of Coral Gables, Florida. Kapoor is the founder of LV.[2] From January 2016 until a majority of LV's members removed him in July 2023,[3] Kapoor served as the CEO and manager of LV.[4] From May 2018 until he resigned in August 2023, Kapoor was the Managing Partner[5] and manager of URBIN through URBIN Founders.[6] Kapoor owns a 47.917% membership interest in LV through Patriots United and a 7.14% membership interest in URBIN through Kapoor Capital, LLC ("Kapoor Capital").[7] Kapoor has business degrees in finance, marketing, and management, and a law degree but has never been a licensed attorney.[8] During the Relevant Period, Kapoor claimed to be responsible for leading the development of a $4 billion real estate portfolio.[9] At all times material to the Complaint, Kapoor managed and controlled the Company Defendants.[10]

---

[2] Index of Investigatory Evidence ("**Exhibit 1**") (Ex. W at p. 33).

[3] *Id.* (Ex. EE); Declaration of Clifford Losh ("**Exhibit 2**") ¶ 14.

[4] **Ex. 1** (Ex. W at p. 33).

[5] *Id.*

[6] **Ex. 2** ¶ 3.

[7] **Ex. 1** (Exs. GG, HH).

[8] *Id.* (Ex. W at p. 33).

[9] Declaration of Marguerite Cook ("**Exhibit 3**") ¶ 6(j).

[10] **Ex. 1** (Exs. GG - ZZ); **Ex. 3** ¶ 5; Declaration of Greg Brooks ("**Exhibit 4**") ¶¶ 3, 5.

2.      LV is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[11] Kapoor and others formed LV for the purpose of investing in and developing real estate.[12] LV is owned by certain investors in LV and Patriots United, a Florida limited liability company partly owned and controlled by Kapoor.[13]

3.      URBIN is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[14] LV owns approximately 40% of URBIN.[15] Kapoor managed and controlled URBIN through LV and URBIN Founders[16] until he resigned in August 2023 and was replaced by LV's chief development officer.[17] URBIN is an affiliate of LV that Kapoor and others formed for the purpose of investing in and developing real estate.[18]

4.      Patriots United is a Florida limited liability company formed in September 2017 with its principal place of business in Coral Gables, Florida.[19] Patriots United is partly owned and controlled by Kapoor.[20] Patriots United owns a 47.917% membership interest in LV[21] based on a purported $13 million cash capital contribution by Kapoor, his partner, and two members of Kapoor's family.[22] As detailed in the Complaint, Patriots United never made a cash capital contribution to LV.[23]

---

[11] **Ex. 1** (Ex. A).
[12] Declaration of Melissa Davis ("**Exhibit 5**") (App. 1 at Article 2.1).
[13] *Id*. at App. 1 at bate number LV00010565.
[14] **Ex. 1** (Ex. B).
[15] **Ex. 5** ¶ 30.
[16] *Id*.
[17] **Ex. 2** ¶ 14.
[18] **Ex. 5** (App. 10 at Article 2.1).
[19] **Ex. 1** (Ex. C).
[20] **Ex. 5** p. 8, *Figure 1* – Ownership Structure of LV.
[21] *Id*.
[22] *Id*. at ¶ 33.¶
[23] *Id*. at ¶ 52.

5.      L. Properties is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[24] L. Properties is a wholly owned subsidiary of LV through which LV operates.[25] L. Properties is described on LV's website as a full-service real estate sales and marketing team.[26]

6.      L. Development is a Florida limited liability company formed in February 2016 with its principal place of business in Coral Gables, Florida.[27] L. Development is a wholly owned subsidiary of LV through which LV operates.[28] L. Development is described on LV's website as a company focused on developing architecturally significant living experiences in key markets in South Florida.[29]

7.      L. Capital is a Florida limited liability company formed in January 2016 with its principal place of business in Coral Gables, Florida.[30] L. Capital is a wholly owned subsidiary of LV through which LV operates.[31] LV's website describes L. Capital as a private real estate investment and asset management division that raises capital to invest in premium locations and premier developers.[32]

8.      L. Resources is a Florida limited liability company formed in September 2019 with its principal place of business in Coral Gables, Florida.[33] L. Resources is a wholly owned

---

[24] **Ex. 1** (Ex. D).
[25] **Ex. 5** ¶ 27(b).
[26] **Ex. 1** (Ex. W at p. 1).
[27] *Id*. at Ex. E.
[28] **Ex. 5** ¶ 27(c).
[29] **Ex. 1** (Ex. W at p. 1).
[30] *Id*. at Ex. F.
[31] **Ex. 5** ¶ 27(a).
[32] **Ex. 1** (Ex. W at p. 1).
[33] *Id*. at Ex. G.

subsidiary of LV through which LV operates and purportedly provides human resource services to LV.[34]

9.      L. Holdings is a Florida limited liability company formed in April 2020 with its principal place of business in Coral Gables, Florida.[35] L. Holdings is a wholly owned subsidiary of LV through which LV operates and purportedly holds LV's projects.[36] L. Properties, L. Development, L. Capital, L. Resources, and L. Holdings, collectively, shall be referred to as the "Operational Entities."

10.     L. GP Sponsor is a Florida limited liability company formed in February 2020 with its principal place of business in Coral Gables, Florida.[37] L. GP Sponsor is a wholly owned subsidiary of LV through which LV owns the sponsor entities formed to own an interest in and manage LV's projects.[38]

11.     515 Valencia Sponsor is a Florida limited liability company formed in February 2018 with its principal place of business in Coral Gables, Florida.[39] 515 Valencia Sponsor is a wholly owned subsidiary of L. GP Sponsor.[40] 515 Valencia Sponsor is the manager of the 515 Valencia project.[41]

12.     LV Montana Sponsor is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[42] LV Montana Sponsor is a wholly

---

[34] **Ex. 5** ¶ 27(d).
[35] **Ex. 1** (Ex. H).
[36] *Id.* at Ex. FF at bate number LV00010749.
[37] *Id.* at I.
[38] *Id.* at Ex. FF at bate number LV00010749.
[39] *Id.* at Ex. J.
[40] *Id.* at Ex. OO; **Ex. 5** (App. 1 at bate number LV00010572).
[41] **Ex. 5** (App. 4 at Article 7.1).
[42] **Ex. 1** (Ex. K).

owned subsidiary of L. GP Sponsor.[43] LV Montana Sponsor is the manager of the LV Montana project.[44]

13.    URBIN Founders is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[45] URBIN Founders is an affiliate of LV and the manager of URBIN.[46]

14.    URBIN CG Sponsor is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[47] URBIN CG Sponsor is an affiliate of URBIN and the manager of the URBIN Gables project.[48] L. GP Sponsor, 515 Valencia Sponsor, LV Montana Sponsor, URBIN Founders, and URBIN CG Sponsor, collectively, are referred to as the "Manager Entities."

15.    515 Valencia is a Florida limited liability company formed in February 2018 with its principal place of business in Miami, Florida.[49] 515 Valencia is managed by 515 Valencia Sponsor.[50] 515 Valencia is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.[51]

16.    LV Montana is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[52] LV Montana is managed by LV Montana

---

[43] *Id.* at Ex. FF at bate number LV00010749.
[44] *Id.* at Ex. RR at Article 1.47 and 1.72).
[45] *Id.* at Ex. L.
[46] **Ex. 5** (App. 10 at Article 7.1).
[47] **Ex. 1** (Ex. M).
[48] **Ex. 5** (App. 16 at Article 7.1).
[49] **Ex. 1** (Ex. N).
[50] **Ex. 5** (App. 4 at Article 7.1).
[51] *Id.* at Article 2.
[52] **Ex. 1** (Ex. O).

Sponsor.[53] LV Montana is an affiliate of LV that Kapoor and others formed for the purpose of owning and developing real property located in Columbia Falls, Montana.[54]

17.     Stewart Grove 1 is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida.[55] Stewart Grove 1 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[56]

18.     Stewart Grove 2 is a Florida limited liability company that was formed in March 2016 with its principal place of business in Coral Gables, Florida.[57] Stewart Grove 2 is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[58]

19.     L. Zamora Parent is a Florida limited liability company formed in April 2023 with its principal place of business in Coral Gables, Florida.[59] L. Zamora Parent is a wholly owned subsidiary of L. Holdings that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.

20.     URBIN Gables is a Florida limited liability company formed in May 2018 with its principal place of business in Coral Gables, Florida.[60] URBIN CG Sponsor is the manager of

---

[53] *Id.* at Ex. RR at Article 7.1.
[54] *Id.* at Ex. RR at Article 2.
[55] *Id.* at Ex. P.
[56] *Id.* at Ex. SS at Articles 7.1 and 2.
[57] *Id.* at Ex. Q.
[58] *Id.* at Ex. TT at Articles 7.1 and 2.
[59] *Id.* at Ex. R.
[60] *Id.* at Ex. S.

URBIN Gables.[61] URBIN Gables is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Coral Gables, Florida.[62]

21.    URBIN Grove is a Florida limited liability company formed in August 2018 with its principal place of business in Coral Gables, Florida.[63] URBIN is the manager of URBIN Grove.[64] URBIN Grove is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami, Florida.[65]

22.    URBIN Miami Beach was a Florida limited liability company formed in October 2019 with its principal place of business in Coral Gables, Florida, which was converted to a Delaware limited liability company in July 2022.[66] URBIN Miami Beach is managed by URBIN.[67] URBIN Miami Beach is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida.[68]

23.    URBIN Miami Beach II is a Florida limited liability company formed in August 2022 with its principal place of business in Coral Gables, Florida.[69] URBIN Miami Beach II is managed by URBIN.[70] URBIN Miami Beach II is an affiliate of URBIN that Kapoor and others formed for the purpose of owning and developing real property located in Miami Beach, Florida.[71] 515 Valencia, LV Montana, Stewart Grove 1, Stewart Grove 2, L. Zamora Parent, URBIN Gables,

---

[61] **Ex. 5** (App. 16 at Article 7.1).
[62] *Id*. at Article 2.
[63] **Ex. 1** at Ex. T.
[64] **Ex. 5** (App. 12 at Article 7.1).
[65] *Id*. at Article 2.
[66] **Ex. 1** at Ex. U.
[67] **Ex. 5** (App. 14 at Article 7.1).
[68] *Id*. at Article 2.
[69] **Ex. 1** Ex. V.
[70] *Id*. at Ex. V at Article 7.1.
[71] *Id*. at Ex. V Article 2.

URBIN Grove, URBIN Miami Beach, and URBIN Miami Beach II, collectively, are referred to as the "Project Entities."

## III.   JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§77t(b), 77t(d), and 77v(a)]; and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

25.     This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida because: (a) Kapoor resides in the District; (b) the principal place of business of each of the Company Defendants is in the District; and (c) a substantial part of the events or omissions giving rise to the violations of the Securities Act and the Exchange Act occurred in the District.

## IV.   FACTUAL ALLEGATIONS

### A.     The Real Estate Investment Scheme

26.     LV is a real estate development and investment company that Kapoor and others formed in January 2016 to develop new luxury single-family homes, multi-family redevelopment projects, and boutique condominiums.[72]

27.     In May 2018, Kapoor and others formed URBIN, an affiliate of LV, to develop communal live/work properties in Miami Beach, Coral Gables, and Miami's Coconut Grove neighborhood, with plans to expand into Fort Lauderdale and cities nationwide.[73]

---

[72] **Ex. 1** (Ex. W at p. 3).
[73] *Id*. at Ex. W at p. 9.

28.     LV and URBIN essentially are two distinct brands.[74] LV fits squarely in South Florida's luxury real estate market, while URBIN targets young professionals desiring to live and work in city centers and urban neighborhoods.[75]

29.     From approximately January 2018 until at least March 2023, Defendants offered investors passive real estate investment opportunities in LV, URBIN, and their respective portfolios of real estate projects.[76]

30.     Prospective investors could invest at the "company level" by purchasing membership units in LV and/or URBIN, which earn revenue from fees they charge their real estate projects, including acquisition, development, management, marketing, and loan guarantor fees.[77] In addition to earning fees, LV and URBIN own an interest in each of their projects, such that an investment in LV or URBIN is an indirect investment in their respective projects.[78]

31.     Prospective investors also could invest at the "project level" by purchasing membership units directly in the companies created to own the projects, which would pay investors upon the completion or sale of the projects, assuming they were profitable.[79]

32.     LV owns 40% of URBIN, placing investors in LV at the top of a multi-level corporate structure with a percentage of the profits at each level flowing to the top.[80]

---

[74] *Id.* at Ex. W, *generally.*

[75] *Id.*

[76] **Ex. 1** (Ex. X at page/line 107;6-13); **Ex. 4** ¶ 6.

[77] **Ex. 4** ¶¶ 5-6

[78] *Id.*

[79] *Id.*

[80] **Ex. 1** (Ex. X at page/line 171:19 – 173:6); **Ex. 5** (App. 10 at bate number LV00010882).

**Figure 1 - Location Ventures' Organizational Chart**



33.     Kapoor used each of the Company Defendants in the scheme to defraud investors, including: the Operational Entities through which Kapoor operated the scheme and funneled investor funds; the Manager Entities through which Kapoor managed and controlled the companies and projects used in the scheme; and the Project Entities through which Kapoor raised money from investors, and misappropriated and misused investor funds.[81]

34.     At all times material to the Complaint, Kapoor had the power to control the general affairs of the Company Defendants and had the requisite power to directly or indirectly control or influence the specific company policy which resulted in the Company Defendants' violations of the anti-fraud provisions of the federal securities laws.[82] Through the Manager Entities, Kapoor

---

[81] **Ex. 1** (Exs. GG - ZZ); **Ex. 3** ¶ 5; **Ex. 5**, generally.
[82] *Id.*

13

had control over the Company Defendants, their respective bank accounts and finances, and all key aspects of their business operations.[83] From approximately January 2018 to July 2023, Defendants raised at least $93 million from more than 50 external investors.[84]

**B.      Defendants' Material Misrepresentations, Omissions, and Misuse of Investor Funds**

35.      Defendants solicited investors through in-person and virtual investor presentations, as well as by telephone, email, and through LV's website.[85] Investors were provided with materials that typically included an offering memorandum with information regarding the projects, a sponsor resume with information regarding LV, as well as the operating agreements and *pro forma* budgets for their preferred investment.[86] The operating agreements and budgets not only contain the terms upon which prospective investors agreed to invest but made a series of representations regarding capitalization, expenses, corporate governance, use of investor funds, among many others.[87]

*(i)      Patriot United's $13 Million Cash Capital Contribution*

36.      To induce prospective investors to invest, Kapoor represented to investors that made an initial $13 million cash investment in LV through Patriots United, an entity owned by Kapoor, Kapoor's business partner, and two of Kapoor's family members.[88]

37.      By contributing his own capital, Kapoor not only gained the confidence of prospective investors, many of whom are high-wealth individuals, but received a 47.917% membership interest in LV and, combined with the interest held by other insiders, effective control

---

[83] *Id.*
[84] **Ex. 4** ¶ 7; **Ex. 5** ¶¶ 32-45.
[85] **Ex. 1** (Ex. W at p. 3; Ex. X at page/line 44:24 – 45:25, 58:8 – 59:22); **Ex. 2** at ¶ 10; **Ex. 6** ¶¶ 5-7.
[86] **Ex. 4** ¶ 6; **Ex. 6** ¶ 6.
[87] **Ex. 1** (Exs. GG - ZZ; Ex. X at page/line 193:3-10); **Ex. 2** ¶¶ 5-6; **Ex. 3** ¶ 6(c); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16); **Ex. 6** ¶¶ 6-7.
[88] **Ex. 4** ¶ 7(A); **Ex. 5** (App. 1 at bate number LV-00010565).

over the company.[89] LV then used the capital it raised, including Patriots United's purported $13 million, to purchase membership units in LV's projects and in URBIN.[90]

38.     Despite Kapoor's representations to investors, Patriots United never contributed any cash to LV.[91] Defendants attempted to conceal the $13 million deficit within a web of companies, subsidiaries, and affiliates that grew to at least 36 companies and 15 real estate projects at various stages of acquisition and development.[92] See *Figure 1 – Location Ventures' Organizational Chart* on page 13.

### (ii)     Pro Forma Budgets & Spending Controls

39.     Central to the scheme were the *pro forma* budgets Defendants provided to prospective investors, which estimated the costs to acquire, construct, manage, and sell the projects, as well as estimated investor returns.[93]

40.     Kapoor intentionally understated construction and other estimated costs used in the *pro formas* to represent higher returns to prospective investors.[94] When actual costs for the projects greatly exceeded those forecasted in the *pro formas*, Defendants withheld that and other information from investors, directed employees to revise or remove financial data from reports and meeting minutes, and, in some instances, continued to use the *pro formas* to raise additional capital.[95] In the words of one LV company officer, "the budgets were a fiction."[96]

---

[89] **Ex. 1** (Ex. X at page/line 99:5-14); **Ex. 5** ¶¶ 25-26.

[90] **Ex. 1** (Exs. GG - ZZ); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).

[91] **Ex. 4** ¶ 7(A); **Ex. 5** ¶¶ 46-62.

[92] **Ex. 1** (Ex. FF at bate number LV00011015).

[93] **Ex. 6** ¶ 6.

[94] **Ex. 3** ¶ 6(c).

[95] *Id.*

[96] *Id.*

41.     For example, certain LV board members instructed Kapoor not to use investor funds to engage in projects outside of Florida unless returns for those projects exceeded those of existing projects in South Florida.[97] Kapoor used investor funds toward the acquisition of property in Colombia Falls, Montana, referred to herein as LV Montana.[98] Kapoor directed the president of LV's Single Family Division to modify the estimated costs in the LV Montana's *pro forma* budget to ensure the estimated returns were as high as those in South Florida.[99]

42.     As another example, LV's budget set limits to employee salaries.[100] Kapoor's annual salary was capped at $350,000, which could increase to no more than $400,000 with board approval.[101] In 2021, Kapoor paid himself $629,600 as compensation.[102] In 2022, Kapoor paid himself $1,686,303 as compensation.[103] The budget also capped LV's chief development officer's annual salary at $350,000, but she received $363,333 as compensation in 2020, $534,999 in 2021, and $743,333 in 2022.[104] None of these payments was approved by LV's board.[105]

43.     In addition to the budgets, the operating agreements Defendants provided to prospective investors included express controls on how investor funds could be used.[106] For example, increases to LV's annual budget greater than 7.5% required board approval.[107] Increases

---

[97] *Id.* at ¶ 6(e).
[98] *Id.*
[99] *Id.*
[100] **Ex. 4** ¶ 7(D); **Ex. 5** ¶¶ 105-106.
[101] **Ex. 5** ¶¶ 105-106.
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] **Ex. 4** ¶ 7(D).
[106] **Ex. 1** (Exs. GG - ZZ); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).
[107] **Ex. 5** ¶ 102.

greater than 10% to URBIN Miami Beach's annual budget required approval by a majority of its members.[108]

44.     Defendants, however, failed to seek board approval when LV's budgets for 2021 increased by 68%.[109] And upon receiving updated cost estimates for the URBIN Miami Beach and 551 Bayshore projects exceeding 110% of their approved budgets, Kapoor caused construction to begin on those projects without obtaining member approval, despite knowing the costs were substantially greater than what investors relied upon when electing to invest.[110]

### (iii)     Commingling of Investor Funds

45.     Defendants also represented to investors that LV, URBIN, and each of their projects were separate and distinct entities, with their own members, budgets, and corresponding capital, and that investor funds would be used solely for their intended project or projects.[111] Defendants, however, regularly commingled investor funds among the various Company Defendants and other entities, with more than $60 million of intercompany transfers during the Relevant Period.[112]

46.     For instance, LV received approximately $14.7 million from the URBIN entities, and the URBIN entities received $25.2 million from the LV entities, including a $14 million transfer from LV to URBIN that was recorded internally as an intercompany loan (the "Intercompany Loan") without notice to, or approval from, LV's members or board of directors.[113]

47.     Also, it was not uncommon for Kapoor to use investor funds from one project to pay for the expenses of another.[114] For example, on January 3, 2022, URBIN Grove received $4.2

---

[108] **Ex. 4** ¶ 7(J).
[109] *Id*. at ¶ 7(D); **Ex. 5** ¶¶ 102-104.
[110] **Ex. 4** ¶ 7(J).
[111] **Ex. 1** (Ex. X at page/line 99:17-22, 123:22 – 124:4); **Ex. 5** (Apps. 1-2, 4, 6, 8, 10, 12, 14, 16).
[112] **Ex. 5** ¶¶ 63-66.
[113] *Id*.; **Ex. 1** (Ex. X at page/line 120:18 – 121:8); **Ex. 4** ¶ 7(M).
[114] **Ex. 5** ¶¶ 83-98.

million from Investor 14, and on January 4, 2022, $1 million from Investor 49.[115] The balance in
URBIN Grove's bank account prior to receiving these funds was $68,000.[116] Between January 4,
2022, and January 6, 2022, URBIN Grove transferred $1,847,000 to URBIN, of which URBIN
transferred $1.69 million to URBIN Gables, which URBIN Gables used to purchase the "Minorca
Parking Lots."[117] URBIN Gables recorded the purchase of the parking lots as a land asset on its
balance sheet.[118]

48.     Defendants' complete disregard for corporate formalities included the use of
approximately $4.5 million of customer sales deposits—deposits made by customers toward the
purchase of condominium units—for purposes other than the construction and development of that
condominium project.[119]

49.     For instance, on October 31, 2022, URBIN Grove received approximately $1.2
million[120] in customer sales deposits from its escrow company.[121] A few days later, URBIN Grove
transferred $1 million to URBIN, which URBIN used to pay down the Intercompany Loan.[122]

50.     Customer sales deposits in URBIN Grove and URBIN Miami Beach were
systematically transferred away from the projects and used for any number of purposes, including,
but not limited to:

---

[115] **Ex. 5** ¶ 84.
[116] *Id.*
[117] *Id.* at ¶¶ 86-87.
[118] *Id.*
[119] **Ex. 4** ¶ 7(K); **Ex. 5** ¶¶ 67-82.
[120] The combined balance in URBIN Grove's bank accounts prior to receiving these funds was $452,347.
[121] **Ex. 5** ¶ 71.
[122] *Id.*

     a.     $220,000 from URBIN Grove to Kapoor, personally, for purported "loan guarantor fees";[123]

     b.     $556,000 from URBIN Miami Beach to a title company for an investment called "Pipeline Montana";[124]

     c.     $300,000 from URBIN Miami Beach toward the "Minorca Parking Lots" purchase;[125] and

     d.     $1 million from URBIN Miami Beach to L. Capital, after which L. Capital made a series of disbursements that were unrelated to URBIN Miami Beach.[126]

### (iv)  *Kapoor's Background and Experience*

51.     Kapoor also made material misrepresentations and omissions concerning his background and experience that made certain statements on LV's website and in offering materials either false or materially misleading.[127]

52.     As of January 4, 2023,[128] LV's website included a biography page touting the experience and expertise of its officers, directors, and other key employees.[129] Kapoor's biography stated, among other things, that "[t]o date, Rishi is responsible for leading the development of a $400M portfolio including high-end, custom single-family homes; rehabilitation of multi-family properties; development of boutique condominiums …."[130]

---

[123] *Id*. at ¶ 75.
[124] *Id*. at ¶¶ 76-78.
[125] *Id*. at ¶¶ 79-80.
[126] *Id*. at ¶¶ 81-82.
[127] **Ex. 1** (Ex. at p. 33)
[128] Date of website capture of LV's website https://location.ventures/.
[129] *Id*.
[130] *Id*.

53.    The size of Kapoor's portfolio increased from $400 million to $1 billion according to a 2020 version of LV's sponsor resume, which is similar to a brochure, that LV, Kapoor, and others regularly provided to prospective investors and that included information about LV, its projects and investment opportunities, and its team of professionals.[131]

54.    Kapoor's portfolio increased again in the 2022 version of the sponsor resume—this time to $4 billion.[132]

55.    Kapoor's representation that he was responsible for leading the development of a $4 billion portfolio was false.[133] Indeed, that he was responsible for a $1 billion portfolio is, if not false, materially misleading.[134]

56.    In addition to inflating his portfolio, Kapoor's biography highlighted his business degrees in finance, management, and marketing, and described his day-to-day role as centering "around identifying unique opportunities, capital formation and setting the product vision for our projects while working closely with the development team on proper execution."[135] Kapoor failed to disclose, however, that his previous marketing business incurred federal tax liens for failing to remit federal payroll taxes—a practice that continued at LV, where he failed to remit approximately $1.375 million in federal payroll taxes despite deducting those amounts from employee compensation.[136]

---

[131] **Ex. 6** (Ex. C).
[132] **Ex. 3** ¶ 6(j).
[133] *Id*.
[134] **Ex. 5** ¶¶ 32-45.
[135] **Ex. 1** (Ex. W at p. 33).
[136] *Id*.; **Ex. 4** ¶ 7(F).

### C.     Defendants' Misappropriation of Investor Funds

57.     Kapoor added to LV and URBIN's financial woes by misappropriating at least $6 million from the Company Defendants, at least $4.3 million of which went to Kapoor alone.[137]

58.     As previously alleged, Kapoor's approved annual salary was $350,000.[138] Kapoor paid himself $629,600 in 2021 and $1,686,303 in 2022, which collectively represented approximately $1.6 million in excess compensation.[139] The source of these funds was derived largely from the sale of the project 800 Dixie Partners, LLC ("800 Dixie").[140] LV was an investor in 800 Dixie and was entitled to a distribution of any profits.[141] Rather than paying the proceeds from the sale to LV, on August 15, 2022, Kapoor took the entirety of the proceeds, along with additional funds belonging to LV, and paid himself $1,328,000.[142] LV recorded the payment to Kapoor in its books as compensation.[143]

59.     Further, LV and URBIN were entitled to fees from the development of their respective projects.[144] Rather than pay LV and URBIN, which would then determine whether distributions to their members were appropriate, in many instances Kapoor paid these fees directly to himself and others.[145] Also, the amount of fees LV and URBIN charged the projects exceeded the amounts authorized in their respective operating agreements.[146] In total, Kapoor paid himself and others close to $1 million in fees belonging to LV and URBIN.[147]

_____

[137] *Id*. at 99.
[138] *Id*. at ¶ 105.
[139] *Id*. at ¶¶ 105-07.
[140] *Id*. at ¶¶ 107-12.
[141] *Id*.
[142] *Id*.
[143] *Id*.
[144] **Ex. 4** ¶ 5; **Ex. 5** ¶ 113.
[145] **Ex. 1** (Ex. W at page/line 132:6 – 133:1); **Ex. 5** ¶¶ 114-16.
[146] **Ex. 5** ¶ 113.
[147] *Id*. at ¶ 116.

60.    In addition to the above transactions, there were two significant transfers in 2021.[148]

L. Capital is a wholly owned subsidiary of LV that was used by Kapoor and others to raise

capital.[149] L. Capital's bank accounts were used to hold investor capital as well as in the operation

of the business.[150] On August 3, 2021, Kapoor transferred $1.5 million from L. Capital's bank

account directly to his personal bank account for no apparent legitimate purpose.[151] Also in 2021,

Kapoor and his partner, through Patriots United, received a distribution in the amount of

$1,247,931 in connection with the sale of the Leucadendra Drive project.[152] Patriots United

received this distribution despite never having made its initial $13 million cash capital

contribution.[153]

61.    During the same period as these transfers, Kapoor purchased a new 2023 68.7-foot

Princess Y72 yacht for over $5 million, a dock at the Cocoplum Yacht Club for $695,000, leased

a 2020 600LT Spider McLaren sportscar, and paid a private chef $10,000 per month.[154]

### D.    Defendants Buy Out Major Investor

62.    Sometime in 2022, a major investor in LV and three of its projects, referred to

herein as "Investor 20,"[155] became concerned regarding the management of LV and its projects,

including Kapoor's misappropriation and misuse of investor funds, and demanded Defendants buy

---

[148] *Id*. at ¶ 99.
[149] See FN 31-32.
[150] **Ex. 5** (Ex. B).
[151] *Id*. at ¶ 31(f)(i)(2).
[152] *Id*. at ¶¶ 99-101.
[153] *Id*. at ¶ 46.
[154] **Ex. 1** (Exs. AA, BB); **Ex. 4** ¶ 7(O).
[155] The names of investors have been replaced with numbers to protect their identities. A key associating the assigned numbers with investors names will be provided to the Court *in camera* upon request.

out the entirety of its interest.[156] In December 2022, Defendants paid Investor 20[157] $3 million to purchase its interest in the LV project Redlands Phase 1, LLC ("Redlands").[158] The source of these funds was a combination of Investor 30's capital contribution in LV and funds belonging to the URBIN Grove project and its members.[159]

63.     Shortly after the Redlands buyout, Investor 20, LV, and Kapoor, along with certain other related parties, entered into a Global Interest Purchase Agreement (the "Buyout Agreement"), dated December 31, 2022.[160] The Buyout Agreement required LV to purchase Investor 20's interest in LV and the two remaining projects for approximately $41 million, to be paid in installments over a five-month period.[161] The first installment required a payment of $2 million and was due on January 13, 2023.[162] To meet this installment payment, Defendants received $2.5 million from Investor 46 on January 13, 2023, and immediately transferred $2 million of those funds to Investor 20.[163]

64.     Defendants made the following payments under the Buyout Agreement:

a.   January 13, 2023, payment of $2 million;

b.   January 31, 2023, payment of $2,378,630;

c.   February 15, 2023, payment of $2.5 million;

d.   February 28, 2023, payment of $2.5 million; and

e.   March 13, 2023, payment of $5 million.[164]

---

[156] **Ex. 1** (Ex. X at page/line 205:16 – 213:13).
[157] The payment was made to Investor 80, which is owned by or related to Investor 20.
[158] **Ex. 5** ¶¶ 89-94.
[159] *Id.*
[160] **Ex. 1** (Ex. CC).
[161] *Id.*
[162] *Id.*
[163] **Ex. 5** ¶¶ 95-98.
[164] **Ex. 1** (Ex. X at page/line 205:16 – 213:13).

65.     In addition to the above-scheduled payments, Defendants paid Investor 20 a $500,000 extension fee, and a partial payment in the amount of $1.5 million under the Buyout Agreement for a total of $16,378,630.[165] Together with Defendants' payment to Investor 20 related to the Redlands project, the total amount paid to Investor 20 and its related entities was $19,378,630.[166]

66.     After making these payments to Investor 20 under the Buyout Agreement, LV's funds were exhausted.[167]

67.     On or around July 14, 2023, the members of LV entered into a resolution by written consent that removed Kapoor as manager of LV.[168] According to the resolution, the members determined that:

> Rishi Kapoor ("Rishi") has taken certain actions or omitted to take certain actions, including, without limitation, the following (a) Rishi has put his personal interests before the interests of the Members and the Company by taking millions of dollars from the Company and/or Company Affiliates in fees, compensation and/or other remuneration in violation of the Operating Agreement and not otherwise authorized in any Approved Budget and, in certain instances, he has admitted to taking some of these actions to some of the Members; (b) Rishi has misappropriated and misused assets of the Company and/or Company Affiliates; (c) Rishi has caused the Company and Company Affiliates to be under investigation by the United States Federal Bureau of Investigation and the United States Securities and Exchange Commission.[169]

---

[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] **Ex. 1** (Ex. EE).
[169] *Id.*

68.   In or around August 2023, Kapoor resigned as manager of URBIN.[170]

69.   Without sufficient cash, LV's and URBIN's projects have stalled, been abandoned, or are the subject of litigation.

70.   On August 30, 2023, LV's members formally replaced Kapoor as manager of LV with a retired judge, with instructions to wind down and sell substantially all the assets of LV and its projects.[171]

71.   LV's former chief development officer replaced Kapoor as the manager of URBIN.[172] URBIN has not been included as part of LV's liquidation plan.[173]

## V.   MEMORANDUM OF LAW

### A.   Standard for Obtaining an Asset Freeze

The Court may order an asset freeze "as a means of preserving funds for the equitable remedy of disgorgement." *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734 (11th Cir. 2005). The Commission's "burden for showing the amount of assets subject to disgorgement (and, therefore available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains" is all that is required. "Exactitude is not a requirement . . . ." *Id.* at 735 (citation and quotation omitted); *see also FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014). The Commission's burden to demonstrate the potential for dissipation of funds is even lighter. *FTC v. IAB Mktg. Assocs.*, LP, 972 F. Supp. 2d 1307, 1313 n.3 (S.D. Fla. 2013) ("There does not need to be evidence that assets will likely be dissipated in order to impose an asset freeze.") (citing *ETS Payphones*, 408 F.3d at 734, and *SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367, 1370 (S.D. Fla. 2006)). "[T]he

---

[170] **Ex. 2** ¶ 14.
[171] **Ex. 1** (Ex. EE).
[172] **Ex. 2** ¶ 14.
[173] **Ex. 1** (Ex. EE).

SEC must demonstrate only . . . a concern that defendants will dissipate their assets . . . ." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001).

The Commission's evidence in this case warrants entry of the requested asset freeze and other relief. The declarations, bank records, and other exhibits attached to this Motion demonstrate that Kapoor and the Company Defendants have violated the antifraud provisions of the federal securities law.

**B.**  **The SEC has Established *Prima Facie* Violations of the Securities Laws**

The Commission has established a *prima facie* showing of violations of the antifraud provisions of the securities laws as alleged in the Complaint and this Motion. As an initial matter, the alleged violations all require that the investment in question be a "security" and that interstate commerce (or the mails) have been used.

**1.**  **The Real Estate Investments are Investment Contracts and, Therefore, Securities Under *Howey***

The Complaint is premised on the allegations that Defendants offered or sold membership units in LV, URBIN, and their respective real estate projects (the "Real Estate Investments") that were "investment contracts" and therefore "securities" under both Securities Act Section 2(a)(1) [15 U.S.C. § 77b] and Exchange Act Section 3(a)(10) [15 U.S.C. § 78c]. Under the Supreme Court's *Howey* test, an investment contract exists if there is: (a) an investment of money; (b) in a common enterprise; (c) based on the expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Friendly Power Co., LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

The Real Estate Investments satisfy all three elements of the *Howey* test. First, there was an investment of money.[174] *See SEC v. Unique Fin. Concepts, Inc.,* 119 F. Supp. 2d 1332, 1337 (S.D. Fla. 1998), *aff'd,* 196 F.3d 1195 (11th Cir. 1999) ("All that is required is that the investor give up some tangible and definable consideration."). Defendants raised more than $93 million from over 50 investors who invested in LV, URBIN, and/or their respective real estate projects.[175]

Second, there was a common enterprise. *Howey*'s common enterprise prong may be satisfied by either vertical or horizontal commonality. Vertical commonality exists where "the fortunes of investors are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Unique,* 196 F.3d at 1199-1200 (internal quote omitted). Horizontal commonality exists where each investor's fortune is tied to the fortune of other investors by the pooling of interests or profits in the transaction. *Revak v. SEC Realty Corp.,* 18 F.3d 81, 87 (2d Cir. 1994). The Eleventh Circuit has held that "broad vertical commonality" is sufficient to satisfy *Howey*'s common enterprise element, finding it more "flexible" and less "stringent" than horizontal commonality. *Unique,* 196 F.3d at 1200 n.4. Broad vertical commonality requires only a finding that investors' fortunes are linked to the efforts of the promoter or third parties. *Id.*; *see also ETS Payphones, Inc.,* 408 F.3d at 732.

Here, broad vertical commonality exists because the fortunes of investors are entirely dependent on the efforts of Defendants.[176] Specifically, LV markets itself as providing comprehensive investment, development, management, marketing, and sales for residential and mixed-use properties in the South Florida market and beyond.[177] Kapoor and the Company

---

[174] Section IV.A.

[175] *Id.*

[176] *Id.*

[177] *Id.*

Defendants represented to investors that they possessed the necessary expertise and experience to develop the projects and generate returns for investors.[178] *See Unique*, 196 F.3d at 1199-1200 (finding commonality where defendant's clients "were not in a position to assume or maintain any substantial degree of control over their investment."). The role of investors here was limited to simply investing money into the venture.[179]

Third, investors had a reasonable expectation of profits based on offering materials that included estimated investor returns.[180] Since *Howey*, the law has been clarified that profits need not be derived *solely* from the efforts of others. Instead, the inquiry is "whether the efforts made by others are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Unique*, 196 F.3d at 1201. Investors here expected a return on their investment based on Defendants' efforts and expertise in identifying, acquiring, developing, marketing, and ultimately selling the projects.[181] Defendants' efforts alone determined the failure or succuss of the enterprise.[182]

### 2.    Defendants are Using Interstate Commerce

The interstate commerce requirement is satisfied by Defendants' use of the Internet to solicit investors.[183] *SEC v. Spinosa*, 2014 WL 2938487, *4 (S.D. Fla. June 30, 2014) (use of Internet satisfied interstate commerce requirement).

---

[178] Section IV.B.(iv).
[179] Section IV.A.
[180] *Id.*
[181] *Id.*
[182] *Id.*
[183] *Id.*

3.   **Defendants are Violating Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act**

Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5(a)-(c) of the Exchange Act prohibit essentially the same type of conduct. *U.S. v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979); *Unique*, 119 F. Supp. 2d at 1339. The language of these provisions is "expansive" and "capture a wide range of conduct." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-02 (2019). In *Lorenzo*, the Supreme Court recognized that there is "considerable overlap among the subsections of" Rule 10b-5 and Section 17(a), and thus same underlying conduct may establish a violation of more than one subsection.

Section 17(a) of the Securities Act makes it unlawful in the "offer or sale" of securities to: (a) "employ any device, scheme, or artifice to defraud;" (b) "obtain money or property by means of any untrue statement of a material fact or any [material] omission;" or (c) "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(1)-(3). A showing of scienter is required under Section 17(a)(1), but Sections 17(a)(2) and (a)(3) require only a showing of negligence. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Section 10(b) of the Exchange Act and Rule 10b-5 render it unlawful, "in connection with the purchase or sale" of securities, to: (a) employ any device, scheme, or artifice to defraud; (b) make any untrue statement or omission of material fact; or (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A showing of scienter is required under Section 10(b) and Rule 10b-5 thereunder. *SEC v. Corporate Relations Group*, No. 6:99-cv-1222, 2003 WL 25570113 at \*7 (M.D. Fla. Mar. 28, 2003).

Unlike private securities actions, the SEC need not prove reliance or injury under Section 17(a), Section 10(b), or Rule 10b-5. *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1244 (11th Cir. 2012).

### a)    *Misrepresentations and Omissions*

Kapoor obtained at least $93 million from more than 50 investors by making material misrepresentations and omissions of material facts to investors.[184] For instance, to induce prospective investors, Kapoor misrepresented that he and his partner made a $13 million cash capital contribution to LV.[185] Also, to induce prospective investors, Kapoor intentionally understated estimated construction and other costs in *pro forma* budgets included as part of the offering materials provided to prospective investors to forecast higher investor returns.[186] Kapoor also misrepresented to investors that LV, URBIN, and each of the projects were separate and distinct investments, possessing their own members, designated capital, and corporate identities.[187] Defendants, however, regularly ignored corporate formalities and commingled investor funds, with more than $60 million in intercompany transfers occurring during the Relevant Period.[188] In addition, Kapoor misrepresented the size of his real estate portfolio and omitted that his prior marketing business incurred tax liens for failing to remit payroll taxes, a practice that continued at LV, where he failed to remit approximately $1.375 million in federal payroll taxes despite deducting those amounts from employee compensation.[189]

---

[184] Section IV.B.
[185] Section IV.B.(i).
[186] Section IV.B.(ii).
[187] Section IV.B.(iii).
[188] *Id.*
[189] Section IV.B.(iv)

Finally, Kapoor represented to investors that the money they invested would be used to invest in real estate projects. However, Kapoor transferred approximately $6 million to insiders, $4.3 million of which he misappropriated for himself.[190]

### b)       *The Misrepresentations and Omissions were Material*

A false statement or omission must be material for a defendant to be liable for it. The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007) (citation omitted). In other words, information is material if a reasonable investor would consider it significant to making an investment decision. *Basic v. Levinson*, 485 U.S. 224, 230 (1988).

"Misrepresentations regarding the use of investors' funds are material." *SEC v. LottoNet Operating Corp.*, 2017 WL 6949289, *13 (S.D. Fla. Mar. 31, 2017) (report and recommendation), *adopted* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017); *SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor). Misappropriation of funds by the issuer's principal are material. *U.S. v. Lochmiller*, 521 Fed. Appx. 687, 691-92 (10th Cir. Apr. 15, 2013) (upholding conspiracy to commit securities fraud conviction because, among other things, defendant made material misrepresentations when he told investors he would use money for low-income housing but instead used it for personal gain) (citing *Lottonet*, 2017 WL 6949289, *13).

Misrepresentations regarding Kapoor's $13 capital contribution are material. Indeed, LV's largest investor stated that one of the reasons he decided to invest in LV was because Kapoor had invested $13 million, had "skin in the game," and would be incentivized to generate profits for

---

[190] Section IV.C.

investors.[191] Misrepresentations regarding estimated investor returns contained in the *pro forma* budgets were also material because investors decided to invest partly, if not almost entirely, on the expectations of profits.[192] Finally, how Kapoor and the Company Defendants used investor funds, including Kapoor's and others misappropriation of those funds, is material. *See LottoNet Operating Corp.*, 2017 WL 6949289, at *13; *Lochmiller*, 521 Fed. Appx. at 691-92.

### c) *Defendants' Scheme to Defraud*

Kapoor perpetuated the scheme to defraud investors through his material misstatements and omissions discussed above.[193] *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (applying *Lorenzo* to Section 17(a)(3) because it "is virtually identical to Rule 10b-5(c)").

Further, Kapoor used each of the Company Defendants in the scheme to defraud investors, including: the Operational Entities through which Kapoor operated the scheme and funneled investor funds; the Manager Entities through which Kapoor managed and controlled the companies and projects used in the scheme; and the Project Entities through which Kapoor raised money from investors, and misappropriated and misused investor funds.[194]

### d) *Defendants' Acted with Scienter*

Scienter is a state of mind embracing intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). The Commission may establish scienter for violations of Section 17(a)(1) of the Securities Act and Rule 10b-5 of the Exchange Act by "a

---

[191] **Ex. 1** (Ex. X at page/line 99:5-14).
[192] **Ex. 2** ¶ 6.
[193] Section IV.B.
[194] Section IV.A.

showing of knowing misconduct or severe recklessness." *SEC v. Monterosso*, 756 F.3d 1326, 1335 (11th Cir. 2014) (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982)). As noted above, Section 17(a)(2) and (3) of the Securities Act require a showing of negligence.

Kapoor knew or was reckless in not knowing that the representations to investors were false. Specifically, Kapoor knew that he did not contribute $13 million in cash to LV.[195] He also knew that the *pro forma* budgets misrepresented construction and other costs associated with the projects because he directed those at LV and URBIN to understate those costs to inflate estimated investor returns.[196] Kapoor also knew that the Company Defendants commingled investor funds because they were commingled at his direction.[197] He also knew funds were being misappropriated and misused because he misappropriated $4.3 million for his own benefit, and had control over how funds were used, including in ways that were not supported by the Company Defendant's operating agreements.[198]

### C.   An *Ex Parte* Total Asset Freeze is Appropriate

A total asset freeze is warranted when the assets to be frozen are worth less than the likely disgorgement award. *See SEC v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (unpublished) ("[I]f potential disgorgement is greater than the value of the defendant's assets, the district court can order a full asset freeze"); *ETS Payphones*, 408 F.3d at 735-36 (affirming order that "froze all of [defendant's] assets" when estimated disgorgement and value of frozen assets were comparable); *IAB Marketing*, 972 F. Supp. 2d at 1313 (denying defendants' motion to "unfreeze" funds for living expenses where "Defendants' monetary liability greatly exceeds the frozen

---

[195] Section IV.B.(i).

[196] Section IV.B.(ii).

[197] Section IV.B.(iii).

[198] *Id.*; Section IV.C.

funds"). Furthermore, Defendants should not be permitted to use ill-gotten gains they have received to pay attorney's fees or living expenses. *See FTC v. RCA Credit Services, LLC*, 2008 WL 5428039, *4 (M.D. Fla. Dec. 31, 2008) (defendants "may not use their victims' assets to hire counsel to help them retain the fruits of their violations"); *CFTC v. United Investors Group, Inc.*, 2005 WL 3747596, *1 n.1 (S.D. Fla. June 9, 2005) (refusing to except living expenses and counsel fees from asset freeze), *aff'd on other grounds sub nom. Levy*, 541 F.3d at 1102.

Based on the information available to the Commission, a likely disgorgement award of at least $4.3 million is in excess of Kapoor's total assets. On August 22, 2023, Kapoor appeared before the Commission in response to a subpoena for testimony. When the Commission asked Kapoor regarding all sources of income he received, Kapoor declined to answer invoking his Fifth Amendment privilege.[199] Further, Kapoor entered into the Buyout Agreement, in which LV and Kapoor personally agreed to pay Investor 20 approximately $41 million. LV and Kapoor defaulted under the terms of the Buyout Agreement on or around March 2023, with more than $20 million due and owing to Investor 20 under the agreement.[200] In addition, Kapoor testified that he owns one residence located at 7233 Los Pinos Boulevard, Coral Gables, Florida.[201] That residence, however, is the subject of a foreclosure action in Miami-Dade County Circuit Court.[202] Finally, the U.S. Marshal arrested Kapoor's yacht on or around October 31, 2023, pursuant to a civil action filed by Unibank for Savings against the vessel, Kapoor, and his wife.[203]

---

[199] **Ex. 1** (Ex. Y at page/line 25:18 – 27:1).
[200] Section IV.D.
[201] **Ex. 1** (Ex. Y at page/line 11:17 – 12:3).
[202] *Los Pinos Acquisition, LLC v. 7233 Los Pinos, LLC, et al.*, Case No. 23-ca-023102 (Fla. 11th Cir. Sep. 15, 2023).
[203] *Unibank for Savings v. M/Y Suneeta II, et al.*, Case No. 23-cv-81411-DMM (S.D. Fla. Oct. 20, 2023).

A total freeze is appropriate. If, in fact, Kapoor has liquid assets in excess of the disgorgement amount, the freeze can be adjusted accordingly.

### E.   The Court Should Require Kapoor to Provide Sworn Accountings

The Court should require Kapoor to provide a sworn accounting, which will enable the Commission and the Court to determine Kapoor's profits, the present location of proceeds, and Kapoor's ability to repay. *See SEC v. Tannenbaum*, No. 99-CV-6050, 2007 WL 2089326, *4 (E.D.N.Y. July 19, 2007); *SEC v. Lybrand*, No. 00Civ.1387(SHS), 2000 WL 913894, *12 (S.D.N.Y. July 6, 2000); *SEC v. Margolin*, No. 92 Civ 6307 (PKL), 1992 WL 279735, at *7 (S.D.N.Y. Sept. 30, 1992).

### F.   The Court Should Prohibit the Destruction of Records

An Order against Kapoor prohibiting the destruction of records is appropriate to prevent the destruction of documents before this Court can adjudicate the Commission's claims, and to ensure that whatever equitable relief might ultimately be appropriate is available. *SEC v. Shiner*, 268 F. Supp. 2d 1333, 1345-46 (S.D. Fla. 2003).

## VI.   CONCLUSION

For the forgoing reasons, the Court should grant the Commission's Emergency *Ex-Parte* Motion for Asset Freeze and Other Relief and enter the accompanying proposed Order.

### LOCAL RULE 7.1(D) CERTIFICATION

After reviewing the facts and researching applicable legal principles, I certify that this Motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated:  December 27, 2023

Respectfully submitted,

By: _____
    Russell R. O'Brien
    Trial Counsel
    Fla. Bar No.  084542
    Direct Dial: (305) 982-6341
    Email:  obrienru@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, FL 33131
Telephone:  (305) 982-6300
Facsimile:  (305) 536-4154