**UNITED STAPTES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RISHI KAPOOR; et al
,

Defendants.

_____/

# Emergency *Ex Parte* Motion for Asset Freeze and Other Relief Against Defendant Rishi Kapoor

# <u>**EXHIBIT 6**</u>

Declaration of Eduardo Muller

## DECLARATION OF EDUARDO MULLER

Pursuant to 28 U.S.C. §1746, the undersigned states as follows:

1.  My name is Eduardo Muller.  I am over the age of twenty-one (21) and I have personal knowledge of the matters set forth herein.

2.  I am a resident of Florida and at all relevant times resided in Miami-Dade County, FL.

3.  I am a manager of Vieden Grove Oz, LLC ("VG"), a Delaware limited liability company formed in February 2022 with its principal place of business in Coral Gables, Florida. VG was formed for the sole purpose of investing in URBIN Coconut Grove Partners, LLC ("URBIN Grove"), a real estate investment opportunity in Coconut Grove, Florida. VG is owned by myself and two other family members.

4.  URBIN Grove is managed by URBIN, LLC ("URBIN"), a Florida limited liability company that was managed by Rishi Kapoor until approximately August 14, 2023.  The purpose of URBIN Grove includes, among other things, acquiring, developing, leasing, and selling certain real property on Commodore Plaza in Coconut Grove, Florida.

5.  I was introduced to Kapoor in late 2021 by a friend who was the largest investor in URBIN Grove at the time.  As a result of that introduction, Kapoor pitched to me the opportunity to invest in the URBIN Grove project.  Kapoor represented he was looking for investors to invest along with him.  He stated he owned approximately one-third of URBIN Grove and was looking for investors to invest in the equity part of the project. Kapoor stated he had already acquired three properties for the project and was looking to develop the three properties into: (1) a work site consisting of co-working space with ground floor retail; (2) a live site consisting of co-living and extended stay operations; and (3) a live site consisting of a ground floor retail operation with co-living and extended stay operations on the remaining floors.  Kapoor stated the investment had tax advantages as an opportunity zone investment.  He also represented the URBIN Grove project would take two to three years to complete.  Kapoor represented to me he already had permits for construction of the URBIN Grove project.  Kapoor also represented he had construction financing with a company called Trez Capital that would close after receipt of the capital he was trying to raise at that time.  Kapoor emphasized he needed to get all of the investment capital up front so as not to delay the closing of the construction financing.

6.  Kapoor, URBIN, and URBIN Grove provided me with several documents concerning the investment opportunity.  I received and reviewed the URBIN Grove Operating Agreement and budget, some general presentations as well as the Sponsor Resume for Location Ventures.  Don't recall receiving the Offering Memorandum for URBIN Grove. True and correct copies of the URBIN Grove Operating Agreement and budget, and Sponsor Resume for Location Ventures are attached as Exhibits A, B, and C, respectively.  URBIN, URBIN Grove, and Kapoor represented in the URBIN Grove Operating Agreement, among other things, that URBIN Grove investor approval was

**EXHIBIT**

**6**

required for all "Major Decisions," which includes decisions to borrow money or to enter into any financing for URBIN Grove. URBIN, URBIN Grove, and Kapoor also represented in the URBIN Grove Operating Agreement that URBIN would provide the Members with an internal financial report at specified periods.

7.      After reviewing the documents Kapoor, URBIN, and URBIN Grove provided and based on Kapoor's representations, VG decided to participate in the capital raise, electing to invest $1.1 million in URBIN Grove. In exchange, VG received 1,100,000 Membership Units in URBIN Grove, which equated to a 9.167% ownership interest in URBIN Grove. VG decided to invest in the URBIN Grove project based on Kapoor's representations concerning the opportunity zone tax benefits associated with the investment, the location of the project, the voting rights investors had with respect to "Major Decisions," the promise to provide periodic financial reports for the project, and the estimated two to three year schedule to complete the project.

8.      Shortly after investing, I concluded a number of Kapoor's representations made were false. For example, after VG invested, Kapoor stated the construction financing could not close until he obtained all of the permits and that he was using his contacts to secure the necessary permits for the URBIN Grove development. I also soon learned the promise to provide timely periodic financial reports was false when Kapoor and URBIN did not provide the internal financial reports as promised. This occurred on multiple occasions.

9.      I subsequently also learned Kapoor had entered into debt or financing arrangements resulting in URBIN Grove incurring significant new debt, all of which was done without getting URBIN Grove member approval. Kapoor and URBIN did not disclose to me or VG that Kapoor was using the proceeds of this debt to partially buy out an investor in Location Ventures, LLC ("Location Ventures"), and who had not invested in URBIN or in URBIN Grove.

10.     I am concerned about VG's investment and the status of the URBIN Grove project. I understand Kapoor is no longer serving as Manager of URBIN or the URBIN Grove project, but I have not been included in the decisions leading up to and following Kapoor's removal. At no time has anyone from Location Ventures or URBIN contacted me concerning Kapoor's removal as manager of Location Ventures or URBIN, and whether it impacts VG's URBIN Grove investment. Nor has anyone contacted me concerning the status of and plans for the URBIN Grove project going forward or how GV's investment could be impacted.

I declare under the penalty of perjury that the foregoing is true, correct, and made in good faith. Executed on this 9 day of Ocober 2023.

Eduardo Muller

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF URBIN COCONUT GROVE PARTNERS, LLC

This Operating Agreement (this "Agreement") is the operating agreement of URBIN Coconut Grove Partners LLC, a Florida limited liability company (**"the Company"**), effective as of January 1, 2022 (the **"Effective Date"**), and is made by and among the Company, URBIN, LLC, a Florida limited liability company (the "**Sponsor**"), and those other members identified on Exhibit A (each a "**Non-Voting Member**" and collectively with the Sponsor, the "**Members**"). The Members' addresses are set forth in Exhibit A. Capitalized terms used in this Agreement and not elsewhere defined shall have the meanings set forth in Exhibit B, the provisions of which are incorporated herein by reference.

## R E C I T A L S

A.     The Company was organized as a limited liability company under Florida law on or about August 16, 2018, in accordance with the Act;

B.     The Members have entered into this Agreement for the purpose of memorializing their agreements regarding the management, operation and governance of the Company; and

C.     The Company is intended to constitute a "qualified opportunity zone business" ("**QOZB**") pursuant to Section 1400Z-2(d)(3) of the Code, and the interest of any Member that is itself a "qualified opportunity fund" pursuant to Section 1400Z-2(d) of the Code (a "**QOF**") is intended to constitute a "qualified opportunity zone partnership interest" ("**QOZPI**") under Section 1400Z-2(d)(2)(C) of the Code;.

**NOW, THEREFORE**, in consideration of the covenants set forth below, and intending to be legally bound, the parties agree that this Agreement shall be the sole and exclusive "operating agreement" of the Company for purposes of the Act, and shall revoke and replace any previously existing agreement between the Members, oral or written.

## ARTICLE 1
## FORMATION OF COMPANY

**1.1     Recitals**. The recitals set forth above are true, correct and complete and are hereby ratified, confirmed, and hereby incorporated by reference.

**1.2     Formation**. The Company has been organized as a Florida limited liability company pursuant to the Act.

**1.3     Name**. The name of the Company is "URBIN Coconut Grove Partners, LLC."

**1.4     Office**. The address of the Company's office as of the Effective Date is 299 Alhambra Circle, Suite 510, Coral Gables, Florida 33134. The Manager may change the Company's registered address and/or office address from time to time. In addition, the Company may maintain other offices or places of business as the Manager deems advisable for the conduct of the Company's business. As of the Effective Date, the registered agent of the Company is Romy



EXHIBIT

A

K. Kapoor, Esq., 299 Alhambra Circle, Suite 510, Coral Gables, Florida 33134. The Manager may change the registered agent as it deems appropriate.

**1.5    Term**. The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with the provisions of this Agreement.

**1.6    No State-Law Partnership**. This Agreement shall not create a partnership or joint venture for state-law purposes, and no Member will be considered an agent, partner or joint venturer of any other Member. It is intended that the Company will be deemed a partnership for federal tax purposes, and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. The Members will be considered partners for tax purposes only.

**1.7    Agreement; Effect of Inconsistencies with the Act**. The terms and conditions of this Agreement are intended to be the sole and exclusive "operating agreement" of the Company for purposes of the Act, and may from time to time be amended, supplemented, or restated in accordance with this Agreement. The Members intend that this Agreement shall be the sole source of the terms and conditions of the relationship among the parties and, except to the extent a provision of this Agreement expressly incorporates other laws (such as federal income tax rules by reference to applicable federal income tax laws) or is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with the Act or any other law. To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended (in the most minimal manner possible) in order to make such provision effective under the Act. This Agreement revokes and supersedes all prior operating agreements of the Company.

**1.8    Maintenance of Records at Company's Principal Office**. The Company shall keep at its principal office those records required by the Act. The Company will provide the Members and their agents, representatives and attorneys reasonable access to its records at the Company's principal office.

**ARTICLE 2**
**PURPOSES AND POWERS OF COMPANY;**
**SCOPE OF THIS AGREEMENT**

**2.1    Purposes**. The purpose of the Company is to engage in any lawful act or activity and to exercise any powers that are permitted to limited liability companies organized under the Act. Nevertheless, and without limiting the foregoing, the Members expect that the sole business of the Company will be to own 100% of the interests in a to be formed entity (the "**Mezz Entity**"), that will own 100% of the interests in URBIN Commodore SPE, LLC, URBIN Commodore Restaurant SPE, LLC, URBIN Commodore Residential SPE, LLC and other to be formed single purpose entities, all of which will do or will own various parcels of real estate on Commodore Plaza in Coconut Grove, Florida  (the "**Owners**"), which entity is expected to acquire, finance, demolish, develop, re-develop, operate, lease and sell (the "**Business**") all such Commodore Plaza parcels (the "**Property**"), all while engaged in a QOZB.  All Properties owned as of the Effective Date are described on Exhibit C to this Agreement. For the avoidance of doubt, the foregoing purposes shall be carried out in an effort that the Company shall at all times qualify as a QOZB,

and the QOZB in which the Company intends to engage is the Development, construction and management of the Property, which is in a QOZ.  Without in any way limiting the Manager's authority, it is agreed that the Manager shall have the right to create an operating agreement for Owners and the Mezz Entity and amend such operating agreements as it deems appropriate from time to time.

       **2.2**    **Title**. All assets acquired with Company funds or to effectuate the purposes of the Company shall be titled exclusively in the name of the Company or Owners. The Manager shall execute and file in all appropriate locations such documents, if any, as may be necessary to reflect the Company's ownership of any of its assets requiring public filings or other evidence of ownership. All assets owned by the Company, whether real or personal, tangible or intangible or mixed, shall be deemed to be owned exclusively by the Company as an entity, and no Member shall have any ownership interest in such assets.

       **2.3**    **Powers**. In carrying out the purposes of the Company, but subject to all other provisions of this Agreement, the Company shall have all powers and rights of a limited liability company organized under the Act and shall exercise such powers and rights in furtherance of and in compliance with the QOZ rules.

       **2.4**    **Limitations on Authority of Members and Others**. Except for the authority expressly granted or delegated in accordance with this Agreement, no Member, Manager, employee, or other agent of the Company shall have any authority to bind or act for the Company or any other Member.

       **2.5**    **Compliance with QOZ Rules.**

       (a)    <u>General</u>.  The Company is intended to operate as a QOZB and in a manner that will facilitate the ability of any Members that are QOFs to continue to treat their interests in the Company as QOZPIs (collectively, the "**QOZ Compliance Requirements**"). In furtherance of the foregoing, the Manager shall use reasonable best efforts to cause the Company to continue to qualify as a QOZB, and shall provide any QOF Member with any information reasonably requested by such Member, including any information necessary for any such Member to properly complete an IRS Form 8996. Accordingly, the Members acknowledge that the Manager, in consultation with QOZ legal counsel and with the consent of the QOF Members, may implement such amendments as are necessary in order to further this objective, subject to the applicable terms of <u>Section 12.10</u> and so long as such amendments do not adversely affect the rights, obligations or interests of any Member that does not approve of same.

       (b)    <u>Working Capital Safe Harbor</u>. The Company shall maintain (and each Member shall cooperate with reasonable requests for factual information regarding) a written schedule (the "**WCSH Schedule**"), updated from time to time in compliance with the QOZ Rules and attached hereto as <u>Exhibit E</u>, (i) setting forth the amount of working capital held by the Company and any of its subsidiaries (which may be a reasonable good faith approximation) (the "**Working Capital Reserve**"); (ii) designating such Working Capital Reserve for use in connection with the Property; and  (iii) containing a written schedule consistent with the ordinary start-up of a trade or business for the expenditure of such Working Capital Reserve in connection with the Property, which schedule shall provide that the initial Working Capital Reserve will be

spent within thirty-one (31) months of the receipt thereof (or by the end of the subsequent safe harbor period described in the following clause), and that any subsequent cash infusions will similarly be spent within thirty-one (31) months of the receipt thereof, and will form an integral part of the working capital safe harbor plan that covered the initial Working Capital Reserve. The WCSH Schedule shall be consistent with the initial Approved Budget.  The Working Capital Reserve shall be held in an interest-bearing account The schedule contemplated by this Section 2.6(b) is intended to comply with Treasury Regulations Section 1.1400Z2(d)-1(d)(3)(v) and (vi) and shall be interpreted in a manner consistent with such intent, and the schedule may reflect successive applications of the working capital safe harbor as permitted under Treasury Regulations Section 1.1400Z2(d)-1(d)(3)(v)(E). The Manager shall track the deployment of funds from the Working Capital Reserve, as well as any interest or other investment gains or losses earned on such Working Capital Reserve, and shall provide any QOF Members with a reasonably detailed report on the use of such funds and the interest earned thereon upon reasonable request

(c)     Caveat.  Notwithstanding anything to the contrary in this Agreement, the ▉▉▉ Member may, in its sole discretion, cause the Company or the Manager, as applicable, to take (or refrain from taking) any action that it reasonably determines (i) is necessary for the Company to qualify as a QOZB, (ii) will facilitate the ability of the ▉▉▉ Member to comply with (and qualify under) the QOZ Rules, and (iii) is otherwise necessary to preserve the benefits that each QOF Member or its constituent members or equity holders are or may be entitled to under the QOZ Rules.

### ARTICLE 3
### ADMISSION OF MEMBERS; INTERESTS

**3.1     Classes and Issuance of Interests**. The Company is initially authorized to issue three classes of Membership Units for a total of twelve (12) million Membership Units available for issuance to Members. The Manager shall have the discretion to issue the twelve (12) million Membership Units as either Class A or Class B Membership Units. All Membership Units shall be issued at one unit for each dollar invested by the Member in question in the Company, regardless of the class of the unit being issued. Only Class A Membership Units include voting rights. Otherwise, except to the extent (if any) required by the Act or set forth in Section 6.5(c) below, the owners of Class B Membership Units (the "**Non-Voting Members**"): (i) have absolutely no right to vote on or consent or object to any Company matter; (ii) have absolutely no appraisal or dissenter's rights (and hereby waive all similar rights to the fullest extent permitted by applicable law); and (iii) agree to execute all future amendments of this Agreement that are reasonably required by a prospective lender to the Company or Owners and which do not materially and adversely affect the economic interests of the Non-Voting Members, subject to the provisions of Section 2.5 above. The names, addresses, Membership Units issued to and initial Capital Contribution of each Member as of the Effective Date is reflected on the attached Exhibit A, which shall be amended from time to time by the Manager to reflect any changes to the Percentage Interests, Capital Contributions, or names and addresses of the Members.

**3.2     Issuance of Additional Membership Interests**. At any time the Manager deems appropriate and as approved by Member Approval, and after complying with the Preemptive Rights of the Members set forth in Section 3.4 below, the Company may authorize and issue additional Membership Units and additional classes of Membership Units, without limitation. The

Company shall not sell or issue any Membership Units to new Members without such new Members executing this Agreement.

      **3.3**    **Percentage Interests**. The Percentage Interests of the Members is expected to fluctuate over time. Initially, Class B Members will have a Percentage Interest that corresponds to the number of Membership Units issued to each such Member out of the total of twelve (12) million authorized Membership Units pursuant to Section 3.1. However, so long as no more than twelve (12) million Membership Units have been issued, the Class A Member's Percentage Interest will be calculated as the difference between one hundred percent (100%) and the total of the Percentage Interests collectively of all Class B Members. If and when the total Membership Units issued exceed twelve (12) million, then the Percentage Interests of all Members will be calculated as the total of such Member's Membership Units of any class divided by the total of all issued and outstanding Membership Units of any class.

      **3.4**    **Preemptive Rights**. All Class A and Class B Members shall have the preemptive rights described in this section (the "**Preemptive Rights**"). The Preemptive Rights shall apply to the following offerings: (i) any offering of any Membership Units of any class after the issuance of the initial twelve (12) million Membership Units authorized by Section 3.1 above.  In any situation in which the Preemptive Rights apply, all Membership Units the Company intends to offer to anyone must first be made available to all existing Class A and Class B Members, *pro rata* based on their Percentage Interests. Thereafter, to the extent the proposed new Membership Units are not all acquired by existing Class A and Class B Members within ten (10) days of being offered, such unacquired Membership Units shall be offered again in writing to those existing Class A and Class B Members who did elect to acquire new Membership Units, also *pro rata*, with seven (7) days to accept same. Thereafter, to the extent any such new Membership Units are still available, they may be offered by the Manager to others as the Manager deems appropriate, but only on the exact same terms they were offered to the existing Members in accordance with this section. If the Manager wishes to deviate from the terms on which the new Membership Units were offered to the existing Members pursuant to this section, the Manager must commence the process again from the beginning.

**ARTICLE 4**
**CAPITAL; CAPITAL ACCOUNTS; MEMBER LOANS;**
**ALLOCATIONS OF PROFITS, LOSSES AND DISTRIBUTIONS**

      **4.1**    **Initial Capital Contributions**. The minimum initial capital required by the Company to engage in the Business at the Property is Twelve Million Dollars ($12,000,000) (the "**Initial Capital**"). All Initial Capital shall be priced at One Dollar ($1.00) per Membership Unit. As of the Effective Date, each of the Members has already contributed and is committed to contribute the amounts set forth on Exhibit A to this Agreement as Capital Contributions to the Company. The Capital Contributions of the Members shall be set forth on Exhibit A, which shall be amended from time to time by the Manager to reflect any additional Capital Contributions made or committed to be made by the Members.

      **4.2**    **Additional Capital Contributions**.

(a)      In addition to the Initial Capital Contributions, if it is determined by the Manager that the Company requires additional capital for any purpose, then the Manager, in its sole discretion, may cause the Company to do any or all of the following: (i) offer additional Membership Units in accordance with Section 3.2 above but subject to the Preemptive Rights; (ii) borrow money from the Sponsor or its Affiliates in the form of an unsecured demand loan bearing interest at the rate of six percent (6%) per annum, which loan(s) must be repaid before any Distributions are made to any Members (a "**Member Loan**"); or (iii) make a call for Uncontrollable Capital Contributions in accordance with Section 4.2(b) below.

(b)      The Class A and Class B Members shall make all additional Capital Contributions that the Manager reasonably determines are required by the Company to pay for expenditures needed: (i) by reason of a bona fide emergency situation affecting the Property, which jeopardizes the development of the Property or the Property itself, and requires the immediate attention of the Company, including the cost of essential repairs to the Property in response to an imminent life-threatening need or risk of Property damage, or (ii) for any payments required to be made by the Company for (A) real estate taxes, utilities, insurance premiums or similar obligations the cost of which is mandated and fixed by applicable laws, code compliance and regulations or by the terms of any construction loan or any financings to which the Company or any of the Owners are bound, or (B) any interest or principal payment or other sum or charge due under any mortgage loan to the Company or the Owners (collectively, "**Uncontrollable Capital Contributions**"). The Uncontrollable Capital Contributions required by this section shall be made within ten (10) days of the Manager's written notification that such funds are needed as set forth above, and shall be in available U.S. cash funds, equal to the product of the total amount of such Uncontrollable Capital Contribution multiplied by such Member's Percentage Interest (as of the date on which it is determined that the Uncontrollable Capital Contribution is required).

(c)      The Company shall reasonably accommodate any request by a QOF Member that seeks to make an advance contribution of any amounts to the Company that such Member determines is necessary in order for such Member to continue to qualify as a QOF; provided that, no such additional capital contribution shall earn any return, change the Percentage Interests of the Members or in any way alter the economic rights of the Members under this Agreement.

(d)      If a Member fails to make all or part of an Uncontrollable Capital Contribution required under Section 4.2(b), on or before the date required, and such failure is not remedied within ten (10) days following receipt of written notice from the Company or another Member (a "**Defaulting Member**"), then the other Member, if it timely made its Additional Capital Contribution or Uncontrollable Capital Contribution (a "**Contributing Member**"), may, at its sole option, pay the Company the amount of any such deficiency on behalf of the Defaulting Member. The amount so advanced by the Contributing Member shall be treated as a loan by the Contributing Member to the Defaulting Member and a capital contribution by such Defaulting Member (a "**Deficiency Loan**") bearing interest, compounding annually and computed on a 365-day basis, from the date advanced until repaid, at the lower of ten percent (10%) per year or the highest rate permitted under applicable usury laws. Deficiency Loans shall be demand loans, payable on thirty (30) days' notice, and all Distributions payable to the Defaulting Member under this Agreement shall be first paid, instead, to the Contributing Member until the Deficiency Loan has been repaid (but shall, for all other purposes of this Agreement, be treated as having been

distributed to such Defaulting Member). The Contributing Member shall have all remedies available to it under applicable law with regard to collection of amounts due on Deficiency Loans. In the event that the Defaulting Member fails to repay the Deficiency Loan and all accrued and outstanding interest after a thirty (30) day written demand for same, then the Contributing Member may elect, at its sole discretion, to dilute the Defaulting Member's Membership Interest, as the Contributing Member's sole remedy and in full satisfaction of the applicable Deficiency Loan, on a two to one (2:1) basis, meaning that the Defaulting Member's interests with respect to its Capital Account and Percentage Interest shall be diluted by Two Dollars ($2.00) for every One Dollar ($1.00) contributed by the Contributing Member and the Capital Account and Percentage Interests in question will be deemed transferred to the Contributing Member; provided, however, if the "Defaulting Member" is the ███ Member and the ███ Member's share of Uncontrollable Capital Contributions of the Company during any twelve (12) month period exceeds Two Hundred and Fifty Thousand Dollars ($250,000.00), in the aggregate, then with respect to such excess, the Capital Account and Percentage Interest of the ███ i Member will only be diluted if the ███ Member fails to repay the Deficiency Loan for such excess attributable to the ███ Member within one hundred and eighty (180) days after the Deficiency Loan is advanced by a Contributing Member, and in such event, the rate of dilution will be One Dollar ($1.00) for every One Dollar ($1.00) contributed by the Contributing Member on behalf of the ███ Member.

**4.3    Intentionally Omitted.**

**4.4    No Third-Party Beneficiary**. Except as otherwise provided in this Agreement, no provision of this Agreement is intended to be for the benefit of any creditor or other Person (other than a Member in its capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members; and, no such creditor or other Person shall obtain any right under this Agreement or shall by reason of this Agreement make any claim in respect to any debt, liability or obligation (or otherwise) against the Company or any of the Members or their Membership Interests.

**4.5    Capital Accounts**. The Company shall maintain a separate capital account (**"Capital Account"**) for each Member and such Member's legal representatives, successors and permitted assigns.

(a)    The Capital Account of each Member shall be maintained in accordance with Section 1.704-1(b) and Section 1.704-2 of the Regulations as in effect on the date of this Agreement and shall be interpreted and applied in a manner consistent with such Regulations and shall also be maintained and adjusted pursuant to the provisions of Regulations Section 1.704-1(b)(2)(iv)*(f)*. If the Managers reasonably determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulation Section 1.704-1(b) and Section 1.704-2, the Managers will make such modifications.

(b)    The Capital Account of each Member shall be as set forth herein and increased by allocations of Profits pursuant to Section 4.6, and additional cash contributions and contributions of property to the extent of the fair market value of such property (net of liabilities secured by such property assumed by the Company or subject to which the Company takes the property), and decreased by allocations of Losses pursuant to

Section 4.6, and by distributions and withdrawals of cash and property (to the extent of the fair market value thereof, net of liabilities secured by such property assumed by the Member or subject to which the Member takes the property).

(c)     In the event of a Transfer of an Interest or any portion thereof in accordance with the terms of this Agreement, whether or not the purchaser, assignee or successor-in-interest is then a Member, the Person so acquiring such Interest or any portion thereof shall acquire the Capital Account or portion thereof of the Member formerly owning such Interest, adjusted for distributions made pursuant to Section 5.1 and allocations of Profits and Losses made pursuant to Section 4.6.

**4.6     Profits and Losses.**

(a)     <u>Generally</u>.

(i)     The Profits and Losses of the Company shall be determined for each Fiscal Year in accordance with the accounting method followed by the Company for federal income tax purposes. Except as otherwise provided herein, whenever a proportionate part of the Profit or Loss is credited or charged to a Member's Capital Account, every item of income, gain, loss, deduction or credit entering into the computation of such Profit or Loss shall be considered either credited or charged, as the case may be, in the same proportion to such Member's Capital Account, and every item of credit or tax preference related to such Profit or Loss, and applicable to the period during which such Profit or Loss was realized, shall be allocated to such Member in the same proportion.

(ii)     Except as otherwise provided in this Agreement, Profits and Losses shall be allocated to the Members in accordance with Section 4.6(b), as amended from time to time, and for this purpose, at the end of the month (the **"PL Effective Date"**) that includes the date on which a new Member is admitted (or deemed admitted) into the Company or a valid transfer of all or part of a Member's Interest is effected (or deemed to be effected), the books of the Company shall be closed in accordance with Section 706(d) of the Code, and consistent therewith: (A) items of income, deduction, gain, loss and/or credit of the Company that are recognized prior to the PL Effective Date shall be allocated among those Persons who were Members in the Company prior to the Effective Date in accordance with their respective Interests prior to the Effective Date; and (B) items of income, deduction, gain, loss and/or credit of the Company that are recognized after the PL Effective Date shall be allocated among the Persons who were Members after the PL Effective Date in accordance with their respective Interests after the Effective Date.

(b)     <u>Allocation of Profits and Losses</u>.

(i)     Subject to any allocation required under Section 4.6(c) or Section 4.6(d), Profits during each of the Company's taxable years shall be allocated among the Members as follows:

first, to the extent of cumulative Losses, net of Profits, allocated to the respective Members, in the reverse order that Losses were previously allocated to the respective Members; and

thereafter, to the Members *pro rata* in accordance with their respective Percentage Interests, adjusted in the discretion of the Manager to account for the actual receipt of Distributable Cash Flow for the period in question, provided that all distributions are made in accordance with the Members' respective Percentage Interests.

(ii)     Subject to any allocation required under Section 4.6(c) or Section 4.6(d), Losses during each of the Company's taxable years shall be allocated as follows:

(A)     first, to the Members in the amounts and proportions necessary to bring the respective Capital Account balances of the Members in proportion to their respective Percentage Interests;

(B)     next, to the extent of cumulative Profits, net of Losses, allocated to the respective Members, in the reverse order that Profits were allocated to the respective Members; and

(C)     thereafter, to the Members *pro rata* in accordance with their respective Percentage Interests; <u>provided</u>, that Losses will be allocated first to Members with positive Capital Accounts and after all Members' Capital Accounts are zero, then additional Losses will be allocated in accordance with their respective Percentage Interests.

(c)     <u>Special Allocation Provisions</u>.

(i)     <u>General Limitation</u>. Notwithstanding anything to the contrary contained in this Section 4.6, no allocation shall be made to a Member which would cause such Member to have a deficit balance in his, her or its Capital Account which exceeds the sum of such Member's share (if any) of the recourse debt of the Company, such Member's share of Company Minimum Gain (as defined in Section 4.6(c)(iv)) and such Member's share of Member Nonrecourse Debt Minimum Gain (as defined in Section 4.6(c)(v)). If the limitation contained in the preceding sentence would apply to cause an item of loss or deduction to be unavailable for allocation to all Members, then such item of loss or deduction shall be allocated between or among the Members in accordance with the Members' respective "interests in the Company" within the meaning of Section 1.704-1(b)(3) of the Regulations.

(ii)     <u>Qualified Income Offset</u>. In the event any Member unexpectedly receives an adjustment, allocation or distribution described in clauses (4), (5) or (6) of Regulation Section 1.704-1(b)(2)(ii)(d) that results in such Member having a negative balance in its Capital Account in excess of the amount it is obligated to restore under this Agreement or is deemed obligated to restore pursuant to the

penultimate sentences of Sections l.704-2(g)(1) and 1.704-2(i)(5) of the Regulations on a liquidation of the Company (or of the Member's Interest in the Company), then such Member shall be allocated income and gain in an amount and manner sufficient to eliminate such excess as quickly as possible. To the extent permitted by the Code and the Regulations, any special items of income or gain allocated pursuant to this Section 4.6(c)(ii) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to this Section 4.6, so that the net amount of any items so allocated and the subsequent Profits and Losses allocated to the Members pursuant to this Section 4.6(c)(ii) shall, to the extent possible, be equal to the net amounts that would have been allocated to each such Member pursuant to the provisions of this Section 4.6(c)(ii) if such unexpected adjustments, allocations or distributions had not occurred.

(iii)    Member Nonrecourse Deductions. Notwithstanding anything to the contrary contained in this Section 4.6, all items of loss and deduction and all expenditures described in Section 705(a)(2)(B) of the Code (or treated as expenditures so described pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations) (collectively, **"Member Nonrecourse Deductions"**) that are (in accordance with the principles set forth in Section 1.704-2(i)(2) of the Regulations) attributable to Member Nonrecourse Debt (as such term is defined in Section 1.704-2(b)(4) of the Regulations) shall be allocated to the Member that bears the Economic Risk of Loss pursuant to Section 1.752-2(b)-(j) of the Regulations for such Member Nonrecourse Debt. If more than one Member bears such Economic Risk of Loss, such Member Nonrecourse Deductions shall be allocated between or among such Members in accordance with the ratios in which they share such Economic Risk of Loss. If more than one Member bears such Economic Risk of Loss for different portions of a Member Nonrecourse Debt, each such portion shall be treated as a separate Member Nonrecourse Debt.

(iv)    Company Minimum Gain. Except to the extent provided in Sections 1.704-2(f)(2), (3), (4) and (5) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Company Minimum Gain (as such term is defined in Sections 1.704-2(b)(2) and (d) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member, before any other allocation under this Section 4.6 is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such Year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in Company Minimum Gain. A Member's share of the net decrease in Company Minimum Gain is the amount of such total net decrease multiplied by the Member's percentage share of the Company Minimum Gain at the end of the immediately preceding taxable year, determined in accordance with Section 1.704-2(g)(1) of the Regulations. Items of income and gain to be allocated under the foregoing provisions of this Section 4.6(c)(iv) shall consist first of gains recognized from the disposition of items of Company property subject to one or more Nonrecourse Liabilities (as defined in Section 1.704-2(b)(3) of the Regulations) of the Company, and then of a *pro-rata* portion of the other items of Company income and gain for that year.

(v)     Member Nonrecourse Debt Minimum Gain. Except to the extent provided in Section 1.704-2(i)(4) of the Regulations, if there is, for any Fiscal Year of the Company, a net decrease in Member Nonrecourse Debt Minimum Gain (as defined in Section 1.704-2(i)(2) of the Regulations, as the same may be modified in the context of limited liability companies), there shall be allocated to each Member that has a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Fiscal Year before any other allocation under this Section 4.6 (other than an allocation required under Section 4.6(c)(iv)) is made under Section 704(b) of the Code of Company items for such Fiscal Year, items of income and gain for such year (and, if necessary, for subsequent years) equal to such Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain. The determination of a Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain shall be made in a manner consistent with the principles contained in Section 1.704-2(g)(1) of the Regulations. The determination of which items of income and gain to be allocated pursuant to the foregoing provisions of this Section 4.6(c)(v) shall be made in a manner that is consistent with the principles contained in Section 1.704-2(f)(6) of the Regulations.

(vi)    Gross Income Allocation. If any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amount such Member is obligated to restore under this Agreement or is deemed obligated to restore pursuant to the penultimate sentences of Sections l.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation under this Section 4.6(c)(vi) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4.6 have been made as if Section 4.6(c)(ii) and this Section 4.6(c)(vi) were not in this Agreement.

(vii)   Curative Allocations. The allocations set forth in Section 4.6(c)(i), (ii), (iii), (iv), (v) and (vi) (collectively, the **"Regulatory Allocations"**) are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction under this Section 4.6(c)(vi). Therefore, notwithstanding any other provisions of this Article 4 (other than the Regulatory Allocations), the Manager shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated under Section 4.6(b).

(d)     Tax Allocations.

(i)     Except as otherwise provided herein, all tax items of the Company shall be allocated among the Members in the same manner as they share the correlative items of Profits and Losses.

(ii)     Any item of Company income, gain, loss, deduction or credit attributable to property contributed to the Company, solely for tax purposes, shall be allocated among the Members in accordance with the principles set forth in Section 704(c) of the Code so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time such property was contributed to the Company.

(iii)     As permitted by Section 1.752-3(a)(3) of the Regulations, the Members hereby specify that solely for purposes of determining their respective interests in the Nonrecourse Liabilities of the Company for purposes of Section 752 of the Code, such interests shall be equal to their respective Percentage Interests.

(iv)     The Manager shall have the reasonable discretion (consistent with its fiduciary duty to all Members) to deviate from the foregoing provisions of this Section 4.7 to equitable allocate Profits and Losses to (i) reflect as nearly as possible the actual flow of cash, and (ii) ensure Losses are utilized as fully as possible.

**4.7     Guaranties**.

(a)     It is acknowledged that the lender(s) to the Company and Owners may require various types of guaranties from Affiliates of the Company, including but not limited completion guaranties, environmental guaranties and bad-boy carve-outs (collectively, the "**Guaranties**," and each, individually, a "**Guaranty**"). The Sponsor agrees to cause Rishi Kapoor and Daniel Motha to serve as guarantors on the Guaranties (each person executing one or more Guaranties will be a "**Guarantor**," and collectively the "**Guarantors**").

(b)     Notwithstanding any other provision of this Agreement or the Act, it is agreed that if the Company is in default under a mortgage loan secured by all or any part of the Property, and as a result, one or more Guarantors incurs obligations under a Guaranty in any material respect, then any one of those Guarantors (or their Affiliated Members if the Guarantors are not a Member) shall have the absolute right to cause the Company to either cure such default, or if such default cannot be cured by the Company, provide a deed in lieu of foreclosure, consent to foreclosure, convey all assets of the Company or take similar actions required to mitigate the Guarantors' exposure or loss. Notwithstanding the foregoing, this Section 4.7(b) shall not apply to actions constituting fraud, bad faith, willful misconduct or gross negligence by the applicable Guarantor or Guarantors or involving a material breach of the Guaranty by or through the direct actions or inactions of such Guarantor or Guarantors which results in liability under the Guaranty, such as failure of such Guarantor or Guarantors to timely provide its financial statements to a lender (to the extent required by the terms of a Guaranty). In addition, all Guarantors are entitled to indemnification pursuant to Section 8.2 below for any liability they have under any Guaranty.

**4.8** **Use of ████████ Member Funds**.   Notwithstanding any contrary provision in this Agreement, the Manager agrees that any Initial Capital or Additional Capital Contributions made by the ████ Member shall only be used to pay items in the initial Approved Budget attached to this Agreement as Exhibit D and, by way of clarification and not limitation, shall not be used to re-pay any debt owed to any other Class B Member, Sponsor, or any Affiliate of the Sponsor, nor to refund any Capital Contribution made by the Sponsor or any other Class B Member; provided that, this Section 4.8 shall have no effect once the construction loan(s) for the following projects have closed 3120, 3138, 3162, 3166, and 3170 Commodore Plaza, in Miami, Florida,  and the lender has commenced funding of construction draws for construction of the new improvements to be built upon 3120 and 3138 Commodore Plaza, in Miami, Florida.

## ARTICLE 5
## DISTRIBUTIONS

**5.1** **Distributions**. Subject to the repayment of all Member Loans in accordance with Section 4.2, the Members shall be entitled to Distributions of Distributable Cash Flow and net proceeds from the liquidation and winding up of the Company, in accordance with the following provisions:

(a)   Non-Liquidating Distributions. Distributable Cash Flow shall be distributed to the Members at such times as determined by the Manager to be in the best interests of the Company and the Members. All Distributable Cash Flow shall be distributed to the Class A and Class B Members, *pro rata,* based on their then respective Percentage Interests.

(b)   Liquidating Distributions. Upon a Capital Transaction or upon the dissolution and liquidation of the Company, and after payment for or provision for the debts and obligations of the Company and the Owners, the net proceeds from such event shall be distributed to the Class A and Class B Members, *pro rata,* based on their then respective Percentage Interests.

(c)   Distributions In Kind. If any proceeds available for distribution consist of items other than cash as determined by the Manager, the Members shall be entitled to their respective shares of each such asset, in accordance with the aggregate amount of proceeds due them, respectively, under Sections 5.1(a) or (b). In determining the Capital Accounts of the Members for purposes of Section 4.5, the amount by which the fair market value of any property to be distributed in kind to the Members exceeds or is less than the tax basis of such assets, to the extent not otherwise recognized by the Company, shall be taken into account as if such gain or loss were recognized by the Company. A Member has no right to demand and receive any distribution from the Company in a form other than cash.

(d)   Tax Distributions. Not later than March 15th of each year, the Manager shall use its best efforts to cause the Company to make a **"Tax Distribution"** to each Member of an amount of cash equal to the excess of (i) the amount of such Member's Presumed

Tax Liability (defined below) for the previous calendar year, <u>over</u> (ii) the amount of Distributions received by the Member since March 15th of the prior year. A Member's **_Presumed Tax Liability_** for any calendar year is equal to the product of (a) the highest federal individual income tax rate for such calendar year <u>times</u> (b) the amount of Profits allocated to the Member for that calendar year. If the federal income tax return for the Company for a calendar year has not been prepared prior to March 15th of the following year, then the Manager shall estimate the Members' Presumed Tax Liability in order to make a timely Tax Distribution, and shall make an adjustment in future Distributions, if necessary.

(e)     <u>Distributions Generally</u>.

(i)     <u>Incorrect Distributions</u>. To the extent any Distributions pursuant to this Agreement were incorrectly made, as reasonably determined by the Managers, the recipients shall promptly repay all incorrect payments and the Company shall have the right to set off any such incorrectly paid amount against any current or future sums owing to such recipients.

(ii)     <u>Withholding</u>. If required by the Code or by state or local law, or with respect to any tax payments made by the Company in connection with any composite, or similar partnership tax return filed by the Company with any State or local tax authority, the Company shall withhold any required amount from Distributions to a Member for payment to the appropriate taxing authority. Any amount so withheld from a Member will be treated as a distribution by the Company to such Member. Each Member agrees to timely file any document that is required by any taxing authority in order to avoid or reduce any withholding obligation that would otherwise be imposed on the Company. To the extent any amount is required to be withheld with respect to a Member and paid over to an appropriate taxing authority which amount is in excess of the amounts distributed to such Member in respect of such withholding, the amounts paid to the taxing authority in respect of such withholding shall be treated as a distribution to such Member and a corresponding distribution shall be made to each other Member in proportion to the Capital Account registered on the Company's books in such Member's name. To the extent that cash is not available to make any of the Distributions required under this Section 5.1(e)(ii), such distribution shall be delayed and paid out of the next Distributable Cash Flow.

(iii)     <u>Compliance with QOZ Rules</u>.  For the avoidance of doubt, the Manager may, in its reasonable discretion, elect to hold back one or more Distributions due to the Members if it determines, after consulting with the applicable Member, that such distribution (or portion thereof) would have an adverse effect on the benefits available to such Member under the QOZ Rules. Each Member may elect to receive any such distribution despite the Manager's determination described in this Section 5.1(e) and failure by the Manager to make such distribution shall not constitute a breach of or default under this Agreement by the Manager.

**5.2    Nonrecourse; Deficit Capital Account**. Each Member shall look solely to the assets of the Company for the repayment of any Distributions owed to such Member by the Company and for any loans made by such Member to the Company and no Member shall have any recourse, upon dissolution or otherwise, against any other Member for the payment thereof. No Member shall be obligated to return the Capital Contributions made by any other Member, upon dissolution or otherwise. No Member shall be obligated to restore any deficit in its Capital Account that may exist as of the date of the Company's dissolution and liquidation.

**5.3    Limitation Upon Distributions**. No Distributions shall be made in violation of the Act.

## ARTICLE 6
## RIGHTS AND DUTIES OF MEMBERS

**6.1    Member Approval Not Required**. Except as otherwise expressly set forth in this Agreement or as required by the Act, all decisions of the Company for itself and Owners and the Mezz Entity shall be made by the Manager.

**6.2    Limitations on Powers of Members**. Except as expressly set forth elsewhere in this Agreement, no Member shall have the right, directly or indirectly, to (i) resign, retire, or withdraw from the Company, (ii) dissolve, terminate, or liquidate the Company, (iii) petition a court for the dissolution, termination, or liquidation of the Company, or (iv) cause any property of the Company to be subject to the authority of any court, trustee, or receiver (including suits for partition and Bankruptcy, insolvency, and similar proceedings).

**6.3    Prohibition Against Partition**. Each Member irrevocably waives any and all rights the Member may have to maintain an action for partition with respect to any property of the Company.

**6.4    Meetings of the Members**.

(a)    The annual meeting of the Members shall be held in Miami-Dade County, Florida at the time designated by the Manager. Special meetings of the Members, for any purpose, shall be held when directed by the Manager, or when requested in writing by any Member. A meeting requested by a Member shall be called for a day not less than two (2) nor more than thirty (30) days after the request is made, unless such Member designates a later date. The call for the meeting shall be issued by the Manager, unless a Member requesting a meeting designates another person to do so. Meetings of the Members shall be at the principal office of the Company or at such other location within Miami-Dade County, Florida as the Manager selects. The Manager shall determine the order of business and the procedure at the meeting, including the conduct of discussion, and shall keep a record of any action taken at the meeting.  At the discretion of the Manager, any meeting may be held via video or voice conference call.

(b)    Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than two (2) nor more than thirty (30) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager or the Member calling the meeting, to each

{W0570503.2}

Member entitled to vote at such meeting.  When any notice is required to be given to any Member, a written waiver thereof by the Person entitled to such notice, whether before or after the time stated therein, shall be equivalent to the giving of such notice.

(c)     Any Member may participate in a meeting of the Members by means of conference telephone or similar communications equipment by which all persons participating in the meeting can hear and speak to one another, and participation in the meeting by means of such equipment shall constitute presence in person at such meeting. Participation by communications equipment shall constitute presence at the meeting, unless a Member is participating in the meeting for the express purpose of objecting to the transaction of any business on the ground the meeting is not lawfully called or convened and expressly states such grounds at the inception of such meeting.

**6.5     Voting.**

(a)     If any matter shall require a vote of the Members, then except as otherwise expressly provided in this Agreement, the Members shall be entitled to vote on such matter in accordance with their Percentage Interests. A Member's right to vote shall not be assigned, delegated or otherwise granted to any other Person, except that a Member shall be permitted to give a proxy to another Member to vote his or her interests in his or her absence, which proxy shall be in writing, signed by the Member and valid for no more than thirty (30) days out of each calendar year. No Member shall be permitted to grant proxies valid for more than sixty (60) days during any twelve (12)-month period.

(b)     Action required or permitted to be taken by a vote of the Members or at a meeting of Members may also be taken without a vote of a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the requisite number of Members whose vote or approval is required for such action to be taken. If such a written consent is not signed by all Members, then a copy of the signed consent shall be provided within a reasonable time to any Member who did not sign it. Affirmation by email shall constitute a signed consent.

(c)     Notwithstanding anything implied to the contrary in this Section 6.5, except as required by the Act and except for the rights of Class B Members to vote on a Major Decision, the Non-Voting Members have absolutely no right to vote on or consent or object to any Company matter.

**6.6     Limitation on Authority of Members**. No Member is an agent of the Company solely by virtue of being a Member, and no Member has the authority to act for the Company solely by virtue of being a Member.

**ARTICLE 7**
**RIGHTS, POWERS, AND DUTIES OF THE MANAGER**

**7.1     Management and Control of Business; Appointment of Managers.**

(a)     The Company shall be "manager-managed" and the Sponsor shall have the exclusive right to appoint the manager and change the manager from time to time (the "**Manager**"). Initially, the Sponsor appoints itself as the Manager.

(b)     Subject to the requirements of the Act, and unless expressly stated to the contrary elsewhere in this Agreement, the Manager shall have the full, exclusive and complete discretion, right, power, and authority to manage, control and make all decisions affecting the Business, the Property, Owners, the Mezz Entity and the affairs of the Company (including such decisions for Owners) and their assets. All acts of the Manager within the scope of its authority and not inconsistent with this Agreement shall bind the Company. The Manager shall devote such time to the affairs of the Company as may be necessary, in the reasonable discretion of the Manager, for the proper performance of its duties hereunder.

7.2     **Signing of Documents**. The Manager shall, after obtaining the approval required by this Agreement, if any, have the authority, in the name and on behalf of the Company, to sign and deliver all contracts, agreements, leases, notes, mortgages, and other documents and instruments which are necessary, appropriate, or convenient for the conduct of the Company's affairs within the scope of its business. The Manager may from time to time delegate certain of the management and administrative duties or other functions to other Persons, including its respective Affiliates and employees of those Affiliates, and any officer of the Company that may be appointed in accordance with Section 7.4. Any Person dealing with the Company or the Manager may rely upon a certificate signed by the Manager as to:

(a)     the identity of the Manager;

(b)     the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Manager or in any other manner germane to the affairs of the Company;

(c)     the Persons who have been duly authorized by the Members or the Manager to execute and deliver any instrument or document of, or on behalf of, the Company; or

(d)     any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Manager or any Member.

7.3     **Right to Rely on Authority of Managers**. No Person dealing with the Manager shall be required to determine the Manager's authority to take any undertaking on behalf of the Company, or to determine any fact or circumstance bearing upon the existence of the Manager's authority.

7.4     **Officers of Company**. The Manager may, but shall not be obligated to, appoint one or more individuals as officers of the Company, which may consist of a president, a treasurer and a secretary, and such vice presidents, assistant vice presidents, assistant treasurers, assistant secretaries or other officers or agents. The Manager shall have the authority to remove any officer with or without cause at any time. Any two or more offices may be held by the same individual. Each officer shall act in the name of the Company and shall have such duties and responsibilities as may be assigned to him or her by the Manager. Each officer shall hold office until his or her

successor shall have been duly elected and shall have qualified or until his or her death or until he or she shall resign or shall have been removed by the Manager. The appointment as an officer or agent shall not create any contractual rights or entitlements for the individual holding such position.

     **7.5**    **Compensation of the Managers and Officers; Contracting with Affiliates**. The Manager and the officers of the Company shall be compensated by the Company and Owners. The Manager may, on behalf of the Company or Owners, contract with Affiliates of the Members to provide services to the Company or Owners. Notwithstanding the foregoing, the following fees payable to either the Sponsor or its designees or Affiliates are deemed reasonable, pre-approved, within the Sponsor's sole discretion and do not require the consent of any other Member: (i) a developer's fee of Two Million Seven Hundred And Fifty Thousand Dollars ($2,750,000) paid pro rata monthly over no less than twenty four (24) months; (ii) an acquisition fee equal to Four Hundred Thousand Dollars ($400,000) paid at closing; (iii) a marketing fee of Two Hundred And Eighty Two Thousand Dollars ($282,000) paid as billed for services; (iv) a loan guarantor fee to be determined on any recourse loan for acquisition, construction, and or permanent financing not to exceed three percent (3%) of the guaranteed amount; and (v) a property management fee of four percent (4%) of gross revenue.

     **7.6**    **Removal of Manager.**  At a meeting called expressly for that purpose, a Manager may be removed, by the affirmative vote of all Members (excluding the Sponsor), but only in the event of any of the following (each a "Removal Action"): (i) a material breach of this Agreement (but expressly excluding failure to make an Additional Capital Contribution) on the part of such Manager (either as a Manager or as a Member), which breach shall continue uncured for thirty (30) calendar days after the giving of written notice thereof to such Manager by a Member specifying the nature of such breach or, if more than thirty (30) days is reasonably required to cure such breach and if the defaulting Manager commences to cure within the original thirty (30) day cure period and diligently continues to cure such breach, such additional time as is reasonably necessary to cure the breach not to exceed an additional thirty (30) days; (ii) fraud, gross negligence or willful misconduct on the part of such Manager in management of the business or affairs of the Company; (iii) Bankruptcy of such Manager; (iv) willful misappropriation of Company funds by the Manager; (v) the transfer of a Membership Interest or a direct or indirect ownership interest in the Manager in violation of this Agreement and which results in a declared default by the Company pursuant to any loan agreement or similar document by which the Company is bound.  The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of the Manager as a Member. In the event that the Manager is removed, a new Manager shall be chosen by the majority vote of all Members.  The Member affiliated with the Manager potentially being removed shall have the right to vote on removal and on the selection of a new Manager notwithstanding its affiliation with the Manager.

## ARTICLE 8
## LIMITED LIABILITY AND INDEMNIFICATION

**8.1**   **Limited Liability**. Except as may otherwise be required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatsoever in such Member's capacity as a Member of the Company, whether to the Company, to any other Member, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, except to the extent such Member affirmatively obligates itself in a valid written instrument to be a guarantor or similar accommodation party for such debts or obligations. No Member shall be obligated to make Capital Contributions or any other payments to or for the benefit of the Company except as expressly required by this Agreement. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the Members for liabilities or obligations of the Company. Except as otherwise expressly required by law, each Member, in such Member's capacity as such, shall have no liability in excess of (a) the amount of such Member's net Capital Contributions, (b) such Member's share of any assets and undistributed profits of the Company and (c) the amount of any distributions required by the Act.

**8.2**   **Indemnification**. Subject to the limitations and conditions as provided in this Article 8, each Person ("**Indemnitee**") who is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed claim, action, suit or proceeding, whether civil, criminal, administrative or arbitrative (a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that the Indemnitee was, at the time of the incident giving rise to the Proceeding, a Member, Manager or Guarantor of the Company, shall be indemnified by the Company against judgments, penalties (including without limitation excise and similar taxes and punitive damages, but not including penalties and taxes imposed on responsible persons for failure to deposit withheld taxes unless such responsible person acted in good faith with respect to such failure), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by the Indemnitee in connection with such Proceeding; provided that the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company (and, with respect to any criminal action or proceeding, had no reasonable cause to believe the conduct in question was illegal); and, provided further, that such conduct does not constitute fraud, gross negligence or willful misconduct. The Company's indemnification obligations under this Article 8 shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to be considered an Indemnitee. No amendment, modification or repeal of this Article 8 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. In the event of any claim with respect to which the Company is obligated to indemnify a Member, Manager or officer under this Section 8.2, the Indemnitee must give the Company prompt written notice of all such claims and tender the defense thereof to the Company, to be managed and resolved as the Company determines appropriate, except that no settlement thereof can constitute an admission of liability by the Indemnitee without such Person's written consent, which may not be unreasonably withheld, conditioned, denied or delayed.

{W0570503.2}

**8.3      Advancing Expense Payments**. Reasonable expenses (including reasonable legal fees and court costs) incurred by an Indemnitee in connection with a Proceeding, including those incurred in attempting to challenge, dispute or settle a claim or charge prior to the commencement of any formal proceedings, shall be advanced by the Company prior to the final disposition of the Proceeding; provided that the Indemnitee and the Company shall first enter into an agreement containing a commitment by the Indemnitee to immediately repay such amount if it shall be determined that the Indemnitee was not entitled to be indemnified as authorized in Section 8.2.

**8.4      Non-exclusivity of Rights**. The right to indemnification and the advancement and payment of any reasonable expenses conferred in this Article 8 shall not be exclusive of any other right which a Member, Manager, officer or other Person indemnified under this Article 8 may have or hereafter acquire from any other source.

**8.5      Insurance**. The Manager may cause the Company to purchase and maintain reasonable amounts of insurance, at the Company's expense, to protect any Person who is entitled to be indemnified under this Article 8.

**8.6      Savings Clause**. If this Article 8 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, the indemnity obligations set forth in any applicable portion of this Article 8 that shall not have been invalidated shall apply to the fullest extent permitted by applicable law.

### ARTICLE 9
### BOOKS OF ACCOUNT AND REPORTS; ACCESS TO RECORDS; REPORTING REQUIREMENTS

**9.1      Books and Records**. The Manager shall keep, or cause to be kept, at the principal office of the Company, true and correct books of account, in which shall be entered fully and accurately each and every transaction of the Company. Such books and records shall be maintained in accordance with sound usual business practices. Each Member or its designated agent shall have access at any time to inspect the Company's books of account at any time and for any purpose, and all other information concerning the Company and to make copies thereof at such Member's expense.

**9.2      Banking**. All funds of the Company shall be deposited in its name in such federally insured commercial banks or in such federally insured saving and loan account or accounts, in such U.S. Treasury obligations, or in such bank certificates of deposit, as the Manager selects. All funds of the Company shall only be used for Company purposes as provided in this Agreement and in accordance with the terms hereof. All Capital Contributions, advances and loans made to the Company by the Members, and all other receipts, refunds and payments to or credits for the benefit of the Company whatsoever, shall be deposited into the Company's accounts. All checks written on said account will be signed by duly authorized agents designated by the Manager.

**9.3      Reporting Requirements**. The Manager shall cause the Company to provide the Members within one hundred twenty (120) days after the end of each Fiscal Year, and within forty-five (45) days after each calendar quarter, an internal financial report, which shall include a balance

sheet dated as of the end of such period and the related statements of operations and changes in financial position for the period then ended.

**9.4    Appointment of Partnership Representative**. The Sponsor shall have the sole authority to act on behalf of the Company as the "Partnership Representative" under subchapter C of Chapter 65 of subtitle A of the Code or in such other operative role as set forth by the Code ("**Partnership Representative**"). The Partnership Representative shall keep the Members informed of all administrative and judicial proceedings and shall furnish to each Member that requests in writing, a copy of each notice or other communications received by the Partnership Representative from the IRS. The Partnership Representative shall make a timely election provided by Section 6226 of the Code with respect to any notice of final partnership adjustment and each Member agrees to take such Member's adjustment into account in accordance with the provisions of Section 6226 of the Code. All references in this section to the Code are as amended by the Bipartisan Budget Act of 2015. All costs and expenses incurred by the Partnership Representative in the performance of its duties and privileges set forth in this Section 9.4 shall be borne by the Company.

**9.5    Member Returns**. Each Member shall file tax returns consistent with the partnership tax characterization of the Company.

**ARTICLE 10**
**TRANSFERS**

**10.1    No Right to Transfer**. Each Member agrees that it will not, directly or indirectly and whether by operation of law or otherwise, Transfer all or any part of its Membership Interest without the Manager's written approval, not to be unreasonably withheld, conditioned or delayed. Any Transfer of direct or indirect majority ownership or effective control over a Member shall be treated as a Transfer of a Membership Interest under this section. Any Transfer or attempt to Transfer in violation of this Section 10.1 shall be null and void and of no force or effect whatsoever. Each Member acknowledges that access to capital, market knowledge and reputation are material to the business and purposes of the Company, and that an unauthorized Transfer of Membership Interests could create a substantial hardship for the other Member and the Company. The Members agree that the restrictions upon Transfer are not intended as a penalty, but as a method to protect and preserve the relationship of the Members and to protect the Company's ability to continue to operate in the manner contemplated by the Members. Each Member acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationship of the Members. Accordingly, the restrictions on Transfer contained in this Section 10.1 shall be specifically enforceable, without any requirement to post a bond or other security. Each Member further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any cost, liability, or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Transfer or an attempted Transfer in violation of this Agreement. Without in any way limiting the foregoing, in the event of a Transfer in violation of this Section, all voting rights appurtenant to any Transferred Membership Interest shall be suspended until such time as the Transferred Membership Interest is once again owned by a Member who is a party to this Agreement or a permitted transferee under this Agreement.   Notwithstanding any contrary provision herein, any Transfer of Membership

Interests held by URBIN, LLC which would result in URBIN, LLC holding less than thirty-five (35%) percent of all outstanding Percentage Interests in the Company must be approved by an affirmative vote of Members holding at least seventy (70%) percent of all outstanding Percentage Interests in the Company.

**10.2    Permitted Transfers to Certain Affiliates.**

(a)    Notwithstanding Section 10.1, a Member shall have the right to voluntarily Transfer its Membership Interests, without the Manager's approval, if such transfer is (i) pursuant to a good faith plan designed to accomplish legitimate tax planning, estate planning or asset protection goals and to an Affiliate of the transferring Member and those individuals with control over the Member prior to the Transfer have control over the transferee after the Transfer, or (ii) to one or more of the other Members or an Affiliate of a Member.

(b)    Notwithstanding the foregoing, no Transfer shall be permitted if: (i) the effect thereof would be to cause the termination of the Company for income tax purposes or violate any covenants to which the Company or the Owners are bound; or (ii) such Transfer would prevent any Member from qualifying under the QOZ Rules or would be reasonably expected to result in a failure to comply with QOZ Compliance Requirements.

(c)    As a further condition of any such Transfer, any such permitted Transferee shall sign a counterpart of this Agreement and affirmatively agree to be bound by the terms and conditions hereof. Any Transfer of an Interest permitted under this Agreement shall entitle the Transferee to be only an "assignee" within the meaning of the Act, and such Transferee shall have none of the rights and privileges of a Member under this Agreement or the Act, and shall have no right to participate in any Member votes. The Transferee may become a substituted member of the Company with respect to the Interest only with the Manager's approval and after satisfying such other terms and conditions as may be established by the Manager.

(d)    Transfer of direct or indirect majority ownership or control of a Member shall be treated as transfer of a Membership Interest under this section.

## ARTICLE 11
## CORPORATE OPPORTUNITIES; DISSOLUTION

**11.1    Corporate Opportunities**. Because the Company's business is limited to the Property and the Business, it is agreed that the Company has no other business opportunities. It is further agreed that any Member or Manager is free to pursue any other business opportunities that arise, even if they compete with the Property or the Business.

**11.2    Dissolution.**

(a)    The Company shall be dissolved only upon the occurrence of any of the following events:

(i)      the sale, transfer or other disposition of all or substantially all of the assets of the Company;

(ii)     at any time there are no Members; provided, however, the Company will not be dissolved if one or more successor Members are admitted into the Company within the time period and according to the other terms provided in the Act for continuing the Company in such an event; or

(iii)    judicial dissolution in accordance with the Act.

(b)     Notwithstanding the dissolution of the Company, prior to the complete winding up and termination of the Company's existence, the business of the Company and the affairs of the Members shall continue to be governed by this Agreement in order to wind-up and liquidate the Company's business and affairs in compliance with the Act.

**11.3     Winding Up, Liquidation and Distribution of Assets.**

(a)     A Person selected by the Manager shall wind-up the Company's affairs (a "**Liquidating Trustee**").

(b)     Upon dissolution, an accounting shall be made of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Liquidating Trustee shall immediately proceed to wind-up the affairs of the Company.

(c)     If the Company is dissolved and its affairs are to be wound up, the Liquidating Trustee shall:

(i)      sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to the Members in kind);

(ii)     allocate any Profit or Loss resulting from such sales to the Members' Capital Accounts in accordance with the provisions of this Agreement;

(iii)    discharge all liabilities of the Company, including liabilities to Members who are creditors of the Company to the extent permitted by law, and establish any necessary Reserves; and

(iv)    distribute the remaining assets to the Members in accordance with Section 5.1(b).

(d)     Notwithstanding anything to the contrary in this Agreement, if any Member has a deficit balance in its Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the deficit balance shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

{W0570503.2}

(e)     Upon completion of the winding up, liquidation and distribution of the assets of the Company, the Company shall be deemed terminated.

(f)     The Liquidating Trustee shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

**11.4    Articles of Dissolution; Post Dissolution Actions**. Articles of Dissolution shall be executed by one or more authorized Persons as provided by the Act, and filed with the Department of State of Florida, at such time the Liquidating Trustee determines is required under the Act. The Liquidating Trustee shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company, in the manner provided in the Act.

**11.5    Other Company Obligations; Nonrecourse to Other Members**. Each Member shall look solely to the assets of the Company for payments due under this Agreement upon the dissolution and liquidation of the Company, including fees and other compensation payable by the Company hereunder. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to make such payments, the Members so affected shall have no recourse against any other Member.

**ARTICLE 12**
**MISCELLANEOUS**

**12.1    Successor Agencies, Laws**. Any reference in this Agreement, by name or number, to a governmental department, agency, statute, law, regulation, program or forum shall include any successor or similar department, agency, statute, regulation, program or forum.

**12.2    Notices**. All notices, demands or other communications to be given or delivered under or by reason of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient, or when sent to the recipient by reputable overnight courier service with a reliable delivery tracking system (charges prepaid). Such notices, demands and other communications shall be sent to the Company at its principal offices, and to each Member at the address set forth in Exhibit A for such Member or such other address as such Member or the Company may hereafter specify by notice to the others delivered in accordance with the provisions of this Section 12.2. All approvals under this Agreement shall be given in writing.

**12.3    Governing Law**. All questions concerning the internal affairs of the Company, the liabilities and obligations of the Members and Manager, the construction, validity, and interpretation of this Agreement, and the performance of the obligations imposed by this Agreement, shall in each case be governed by the Act and any other applicable substantive laws of the State of Florida, without regard to any of its choice of law provisions to the contrary.

**12.4    Successors**. Except as herein otherwise specifically provided, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, personal representatives, successors and assigns.

**12.5    Usage**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, feminine and neuter.

**12.6    Captions Not Part of Agreement**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

**12.7    Severability**. If any provision of this Agreement or the application of such provision to any Person or circumstances shall be held invalid, the remainder of the Agreement, or the application of such provision to Persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

**12.8    Counterparts**. This Agreement may be executed in several counterparts (including by means of electronic signature pages), each of which shall be deemed an original and all of which shall constitute one and the same instrument.

**12.9    Exhibits**. All exhibits attached to this Agreement and referred to herein are hereby incorporated by reference as if fully set forth herein.

**12.10   Entire Agreement and Amendment**. This Agreement constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto. No covenant, representation or condition not expressed in this Agreement shall affect or be deemed to interpret, change or restrict the expressed provisions hereof. This Agreement constitutes the sole and exclusive "operating agreement" of the Company for purposes of the Act. The Manager shall have the right to make non-material amendments this Agreement without Member consent in order to implement the reasonable requirements of a lender, provided that such amendments do not materially or adversely impact the rights of the Members, but all other amendments must be approved by all Members.

**12.11   Further Assurances**. Each Member shall execute and deliver all certificates and other documents and shall do all such filing, recording, publishing and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company. Each Member shall execute and deliver any and all such other and additional instruments and documents and do any and all such other acts and things as may be reasonably necessary or expedient to more fully effectuate this Agreement and carry on the business contemplated hereunder.

**12.12   No Third-Party Rights**. Except as expressly provided in this Agreement, the provisions of this Agreement are for the exclusive benefit of the Company and the Members, and no other Person (including, without limitation, any creditor of the Company) shall have any right or claim against the Company or any Member by reason of those provisions or be entitled to enforce any of those provisions against the Company or any Member.

**12.13   Construction**. The parties have participated jointly in the negotiation on drafting this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of

proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. There shall be no presumption that this Agreement was drafted by or on behalf of any one Member and, therefore, ambiguities shall not be construed against any particular Member.

**12.14 Waivers**. No failure by any party to insist upon the strict performance, duty, agreement, or condition hereof or to exercise any right or remedy upon breach thereof shall constitute a waiver of any such breach of such or any other covenant, agreement, term or condition. Any party hereto, by notice pursuant to this Agreement, may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant with any other party. No waiver shall affect or alter the remainder of this Agreement but each and every covenant, agreement, term and condition hereof shall continue in full force and effect with respect to any other then existing or subsequent breach.

**12.15 Authority**. Each Person signing this Agreement in the capacity as an agent of a business organization or other entity represents to the others and to the Company that he or she, and such organization and entity, has been duly authorized to execute and deliver this Agreement by and through such signing Person.

**12.16 Litigation**. In the event of Litigation, the parties (a) agree that suit must be exclusively brought in the federal or state court courts situated in Miami-Dade County, Florida; (b) irrevocably and unconditionally consent to the exclusive jurisdiction of each such court in any such suit, action or proceeding; (c) waive any objection which any party may have to the laying of venue of any such suit, action or proceeding in any of such courts; (d) agree that service of any court paper may be effected on a party by mail, as provided in Section 12.2 hereof, or in such other manner as may be provided under applicable laws or court rules; (e) AGREE THAT THERE SHALL BE NO RIGHT TO AND NO PARTY SHALL MAKE DEMAND FOR TRIAL BY JURY, ALL RIGHTS THERETO BEING IRREVOCABLY WAIVED BY THE PARTIES; (f) recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages may not be an adequate remedy, as a result of which, the parties agree that the court shall liberally grant injunctive relief and specific performance where appropriate and hereby waive any right they may have to seek or require the moving party to post a bond or security; and (g) agree that Prevailing Party Attorney's Fees shall be awarded by the court against all non-prevailing parties. In no event shall any Member initiate Litigation against the Company or the Manager or any of the Manager's Affiliates without first making a demand upon all Persons it intends to join as parties to such Litigation to participate in non-binding mediation before a Person certified in such mediation under Florida law. All parties to this Agreement agree to participate in any such mediation, if and when demanded, on a prompt basis and in good faith, failing which, the Person refusing to do so shall be precluded from asserting any claim or defense in the Litigation.

**12.17 Legal Counsel**. Legal counsel for a Member or one of its Affiliates may be selected by the Manager to represent the Company in connection with future matters. Each Member recognizes and acknowledges that any such counsel will be acting as legal counsel for the Company with respect to each such matter and not acting as the legal counsel of any individual Members. Each Member acknowledges that in the event of any future dispute or litigation between or among the Members and/or between any of the Members and the Company, such counsel may

continue to represent its Member client, notwithstanding any such dispute and its representation of the Company.

**12.18   Additional Members**. As a condition precedent to any Person being admitted as a substitute, additional or successor Member of the Company, the Person must execute a counterpart to this Agreement (as amended) in form acceptable to the Manager and agree to be bound by all of the terms and provisions hereof; provided, however, that no such counterpart shall be binding until the provisions of Article 10, as applicable, shall have been satisfied.

**12.19   Confidentiality**. Except as required in the normal conduct of a Member's or Manager's business or by law or court process, no Member or Manager, without the written approval of the other Members, during continuance of the Company or after its termination shall at any time during the term of this Agreement or thereafter divulge to any person not a Member or Manager, other than its attorneys, accountants, employees and professional advisers, any information concerning the business of the Company or the content of this Agreement or any other contract or agreement entered into by the Company. A Member or Manager may, however, disclose to third parties the existence of the Company and the names of the Members.

**12.20   Accredited Investor, KYC and Related Representations**. All Non-Voting Members hereby represent that they are an "accredited investor," as defined in Rule 501(a) of Regulation D promulgated under the Securities Act, and further represent the following, all of which may also be specifically relied upon by any lender to the Company:

(a)     Such Member is acquiring its Membership Units for its own account for, and for investment purposes only and not with a view to or for sale in connection with any distribution of such Membership Units;

(b)     Such Member understands that the Membership Units have not been registered under any federal and state securities laws, in part based on representations made by such Member, and such Membership Unit cannot be resold, transferred or otherwise disposed of unless it is registered as required by federal law and all applicable state laws, or an exemption from registration is available therefrom;

(c)     Such Member understands that the Company is not obligated to register the Membership Units for resale under the Securities Act or applicable federal or state securities laws and that the Company is not obligated to supply such Member with information or assistance in complying with any exemption under the Securities Act or applicable federal or state securities Laws;

(d)     Such Member, by reason of its business or financial experience, has the capacity to protect its own interest in connection with the transaction and to evaluate the merits and risks of the proposed investment;

(e)     Such Member (i) has received all information that such Member deems necessary to make an informed investment decision with respect to an investment in Membership Units; (ii) has had the unrestricted opportunity to make such investigation as such member desires pertaining to the Company and an investment in Membership Units and to verify any information furnished

to such Member; and (iii) has had the opportunity to ask questions of representatives of the Company concerning the Company and such Membership Units;

(f)      Such Member is financially able to bear the economic risk of the investment in Membership Units for an indefinite period of time and has no need for liquidity in this investment. Furthermore, the financial capacity of such Member is of such a proportion that the total costs of such Member's investment in Membership Units is not material when compared with such Member's total financial capacity; and

(g)      Such Member acknowledges that the Company is not registered as an investment company under the Investment Company Act. Therefore, such Member represents and warrants as follows: (i) it has provided and will continue to provide the Manager with any and all information the Manager requested to assist the Manager in determining the number of beneficial owners of such Member's Membership Units; (ii) shareholders, members, and other holders of equity or beneficial interests in such Member, if applicable, are not able to individually decide whether to participate or the extent of their participation in such Member's investment in the Company (*i.e.*, such shareholders, members, and other holders of equity or beneficial interests cannot determine whether their capital will form part of the capital invested by such Member in the Company); (iii) if such Member is Controlled by or under common Control with any other member or believes that such a relationship exists, such Member has identified or will inform the Manager of such relationship; (iv) such Member is not exempt from registration as an investment company pursuant to Sections 3(c)(1) or 3(c)(7) of the Investment Company Act; and (v) if any Person will have a beneficial interest in the Membership Units to be acquired hereunder other than such Member (other than as shareholder, member, or other holder of equity or beneficial interests therein), such Member has provided or will provide to the Manager any and all information the Manager requests relating to the owner of such beneficial interest.

(h)      Neither the applicable Member nor any of its investors, subsidiaries, affiliates, owners, shareholders, partners, members, indemnitors, guarantors or related persons or entities:

1)  is a Sanctioned Person (as defined below);
2)  has more than fifteen percent (15%) of its assets in Sanctioned Countries (as defined below); or
3)  derives more than fifteen percent (15%) of its operating income from investments in, or transactions with Sanctioned Persons or Sanctioned Countries.

For purposes of the foregoing, a "Sanctioned Person" shall mean (i) a person named on the list of "specially designated nationals" or "blocked persons" maintained by the U.S. Office of Foreign Assets Control ("OFAC") at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time, or (ii) an agency of the government of a Sanctioned Country, an organization controlled by a Sanctioned Country, or a person residing in a Sanctioned Country, to the extent subject to a sanctions program administered by OFAC. A "Sanctioned Country" shall mean a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx, or as otherwise published from time to time.

{W0570503.2}

(i)      In addition to the foregoing representations, upon the request of any financial institution with which the Company or its Affiliates are seeking to establish a banking relationship of any kind, the applicable Member agrees to promptly provide identification and all other information reasonably related to such institution's "know your customer" policies

IN WITNESS WHEREOF, the undersigned Members have executed this Operating Agreement of URBIN Coconut Grove Partners, LLC:

*[signatures on next page]*

*[signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC]*

**COMPANY:**

**URBIN Coconut Grove Partners, LLC:**

URBIN, LLC:

By: _____
Name: ____Rishi Kapoor____
Title: ____Manager____

**SPONSOR:**

**URBIN, LLC:**

By: _____
Name: ____Rishi Kapoor____
Title: ____Manager____

**NON-VOTING MEMBER:**

*[signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC]*

**COMPANY:**

**URBIN Coconut Grove Partners, LLC:**

URBIN, LLC:

By: _____
Name: _____
Title: _____

**SPONSOR:**

**URBIN, LLC:**

By: _____
Name: _____
Title: _____

**NON-VOTING MEMBER:**

*[signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC]*

**COMPANY:**

**URBIN Coconut Grove Partners, LLC:**

URBIN, LLC:

By: _____
Name: _____
Title: _____

**SPONSOR:**

**URBIN, LLC:**

By: _____
Name: _____
Title: _____

**NON-VOTING MEMBER:**

[*signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC*]

**COMPANY**:

**Urbin Coconut Grove Partners, LLC:**

Urbin, LLC:

By: _____
Name: _____
Title: _____

**SPONSOR**:

Urbin, LLC:

By: _____
Name: _____
Title: _____

**NON-VOTING MEMBER**:

*[signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC]*

**COMPANY:**

**Urbin Coconut Grove Partners, LLC:**

Urbin, LLC:

By: _____
Name: _____
Title: _____

**SPONSOR:**

Urbin, LLC:

By: _____
Name: _____
Title: _____

**_NON-VOTING MEMBER:_**

VIEDEN GROVE 07, LLC

By: _____
Name: EDUARDO E. MULLER
Title (if applicable): MANAGING MEMBER

[*signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC*]

**COMPANY:**

**Urbin Coconut Grove Partners, LLC:**

   Urbin, LLC:

     By: _____

     Name: _____

     Title: _____

**SPONSOR:**

   Urbin, LLC:

     By: _____

     Name: _____

     Title: _____

**NON-VOTING MEMBER:**

DocuSign Envelope ID: 9B56FECB-D35E-4E77-AD80-2D0D0D7C6D0E

*[signature page for Operating Agreement of URBIN Coconut Grove Partners, LLC]*

**COMPANY:**

**Urbin Coconut Grove Partners, LLC:**

   Urbin, LLC:

   By: _____
   Name: _____
   Title: _____

**SPONSOR:**

   Urbin, LLC:

   By: _____
   Name: _____
   Title: _____

**NON-VOTING MEMBER:**

## EXHIBIT A

### Schedule of Members
### (as of the Effective Date)

| Name/Address of Member | Initial Capital ($US) | Membership Units | Percentage Interest |
|---|---|---|---|
| Urbin, LLC<br>299 Alhambra Circle, Suite 510<br>Coral Gables, FL 33134<br>Email: rkapoor@location.ventures | $4,200,000 | 4,200,000 | 35% |
| ███████ | $4,300,000 | 4,300,000 | 35.833% |
| ███████ | $500,000 | 500,000 | 4.67% |
| ███████ | $300,000 | 300,000 | 2.5% |
| ███████ | $250,000 | 250,000 | 2.083% |
| ███████ | $450,000 | 450,000 | 3.75% |

| | | | |
|---|---|---|---|
| ███████ | $300,000 | 300,000 | 2.5% |
| Vieden Grove OZ, LLC<br>5501 Hammock Drive<br>Coral Gables, FL 33156 | $1,100,000 | 1,100,000 | 9.167% |
| ███████ | $600,000 | 600,000 | 5% |

## EXHIBIT B - DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided in this Agreement), with the understanding that the Agreement may contain defined terms that are not included in the below list:

**"Act"** means the Revised Limited Liability Company Act, <u>Florida Statutes, Chapter 605</u>, as the same may be amended.

**"Affiliate**" means as to any Person, any other Person that is in Control of, is Controlled by, or is under common Control with such Person and/or is a Managers, officer or director of such Person or of an Affiliate of such Person, and/or is related by blood, adoption or marriage to any such Person or is a trust for the benefit only of one or more of such relatives.

**"Agreement"** means the Operating Agreement to which this Exhibit is attached, as the Operating Agreement may be amended from time to time.

**"Approved Budget"** refers to any budget for the Company or its subsidiaries that has been approved as a Major Decision or otherwise amended by the Manager as permitted pursuant to this Agreement.  The initial Approved Budget is attached to this Agreement as <u>Exhibit D</u>.

**"Bankruptcy"** means with respect to any Person: (a) an assignment by such Person for the benefit of creditors or an admission in writing by such Person of an inability to pay its debts generally as they become due: (b) the entry of an order, judgment or decree adjudicating such Person bankrupt or insolvent; (c) the petition or application by such Person to any tribunal for the appointment of a custodian, trustee, receiver or liquidator of such Person or of any substantial part of its assets; (d) the commencement of any proceeding (or the entry of any order for relief) with respect to such Person or its debts under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction; or (e) the filing of any such petition or application or the commencement of any such proceeding against such Person and either (i) such Person by any act indicates its approval thereof, consent thereto or acquiescence therein or (ii) such petition, application or proceeding is not dismissed within sixty (60) days.

**"Business"** has the meaning set forth in Section 2.1.

**"Capital Account"** means the amount calculated and maintained by the Company for each Member pursuant to Section 4.1.

**"Capital Contribution"** means any contributions made to the capital of the Company pursuant to Article 4 by the Members or any class of Members or any one Member, as the case may be (or the predecessor holders of the Interests of such Members).

**"Capital Transaction**" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration (other than Capital Contributions or Member Loans or loan proceeds intended for a specific purpose, as determined by the Manager), including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

{W0570503.2}

**"Class A Member"** is a Member that owns Class A Membership Units.

**"Class B Member"** is a Member that owns Class B Membership Units.

**"Class A Membership Units"** have the meaning set forth in Section 3.1.

**"Class B Membership Units"** have the meaning set forth in Section 3.1.

**"Code"** shall mean the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, together with the Regulations promulgated thereunder.

**"Company"** has the meaning given in the heading to this Agreement. A copy of the current organizational chart of the Company is attached hereto as Exhibit F.

**"Company Minimum Gain"** has the meaning set forth in Section 4.6(c)(iv).

**"Contributing Member"** has the meaning set forth in Section 4.2(d).

**"Control"** and its derivatives means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of any Person, whether through ownership of voting securities, by contract or otherwise.

**"Defaulting Member"** has the meaning set forth in Section 4.2(d).

**"Deficiency Loan"** has the meaning set forth in Section 4.2(d).

**"Distributable Cash Flow"** means, for any specified period, an amount equal to the gross cash receipts of the Company from all sources whatsoever, less all operating expenses, expenditures and other payments in cash actually made by the Company during such period (including debt service for and repayment of Member Loans), and less any Reserves set aside by the Company in such period. Gross cash receipts shall include cash released during such period from any previously established Reserves during such period. The determination of what is available as Distributable Cash Flow shall be made by the Manager.

**"Distributions"** refers to any payments to Members pursuant to Sections 5.1(a-d).

**"Effective Date"** has the meaning set forth in the heading of this Agreement.

**"Fiscal Year"** means the calendar year or such other annual accounting period selected by the Manager for use by the Company.

**"Guaranties"** has the meaning set forth in Section 4.7(a).

**"Guarantor"** has the meaning set forth in Section 4.7(a).

**"Guaranty"** has the meaning set forth in Section 4.7(a).

**"Indemnitee"** has the meaning set forth in Section 8.2.

{W0570503.2}

"**Initial Capital**" has the meaning set forth in Section 4.1.

"**IRR**" means internal rate of return and shall be computed in accordance with the "XIRR Function" of Microsoft Excel. In computing IRR, principal funded and interest received on Member Loans shall be disregarded.

"**Liquidating Trustee**" has the meaning set forth in Section 11.3.

"**Litigation**" means any civil proceeding that arises out of this Agreement, is related to this Agreement, or is related to the rights or obligations of any party or parties to this Agreement in connection with matters related to the Company or the Act.

"**Losses**" means, with respect to any fiscal period of the Company, the net losses of the Company for such period for federal income tax purposes, including, as appropriate, each item of income, loss, deduction or credit entering into such determination, and including treating as deductions items of expenditures defined in Section 705(a)(2)(B) of the Code (or which are treated as Section 705(a)(2)(B) expenditures under Regulation Section 1.704-1(b)(2)(iv)(i)).

"**Major Decisions**" refers to any decision by the Company to take any of the following acts, all of which acts shall require Member Approval:

     (i)     materially expand the Business of the Company;

     (ii)     pay any fees or other compensation to any Affiliate of the Sponsor, other than those fees and reimbursements expressly approved in this Agreement;

     (iii)     engage in a sale of all or substantially all of the Company's assets or a transaction that involves a sale of substantially all of the equity interests in the Company; or

     (iv)     take any action or make any election that would be reasonably likely to prevent the Company from qualifying as a QOZB or would prevent a QOF Member (or its direct or indirect owners) from achieving the benefits of the QOZ Rules.

     (v)     Acquire any real or personal property or interest therein on behalf of the Company other than the Property, Commodore Plaza real estate already under contract as of the Effective Date and any personal property in the ordinary course of business.

     (vi)     Borrow money, issue evidences of indebtedness, or grant any mortgages or other encumbrances on or security interests in the assets of the Company, including without limitation, any financing or refinancing of the Property or any portion thereof, or modify, extend, renew, change, or prepay in whole or in part any borrowing, financing, or refinancing, or make any commitments to borrow funds or give any consideration to obtain a commitment for the loan of funds.

     (vii)     Enter into or amend, modify, or terminate any agreement pertaining to the sale, conveyance, exchange, or other transfer of any assets of the Company, or sell, convey, exchange, or otherwise transfer any assets of the Company, including, without limitation, all or any portion

of the Property or any interest therein, other than non-material transfers of personal, tangible, or intangible property in the ordinary course of business.

(viii)   Enter into or amend, modify, or terminate any contract for the construction, development, improvement, or rehabilitation of the Property, unless with respect to any new contract or modification of an existing contract, no Member Approval is needed because there is no change to any Approved Budget that requires Member Approval.

(ix)   Make a payment on any Member Loan or a distribution of any Distributable Cash Flow or distribute proceeds from a Capital Transaction to Members which, in any case, is inconsistent with the current Approved Budget or otherwise in contravention of this Agreement.

(x)   Establish and Approved Budget or deviate from any Approved Budget; provided that, deviations from an Approved Budget will not be a Major Decision if: (i) they are collectively less than ten percent (10%) of Approved Budget, or (ii) they consist of allocating savings on any one line item to other items of Approved Budget.

(xi)   Institution of any legal proceedings in the name of Owners, the settlement of any legal proceedings against Owners, or the confession of any judgment against Owners or any property of Owners to the extent that: (i) such legal proceedings are not in the ordinary course of business for Owners; (ii) either Member reasonably believes that such legal proceedings may have a material adverse effect upon the reputation of the Company or such Member; or (iii) the amount in controversy, or sought by Owners or the plaintiff, is at least one hundred thousand ($100,000.00) Dollars.

(xii)   Make decisions or take other actions relating to litigation or tax-related matters not included in an Approved Operating Budget; provided that undertaking the defense of any litigation matter which is fully insured (other than a deductible) with a claim of less than One Hundred Thousand Dollars ($100,000.00) shall not be a Major Decision.

(xiii)   Establish, increase, replenish, or decrease the amount of reserves held by the Company, except in accordance with the applicable Budget unless required by law or pursuant to the terms of any financing approved by the Members.

(xiv)   Permit the Transfer of any Member's interest in the Company or admit any additional Members, except for Transfers permitted under Article 10.

(xv)   Dissolve the Company.

(xvi)   Effect a merger, conversion, consolidation, or other reorganization of the Company or Owners or modify or amend this Agreement, any operating agreement, by-laws, articles of organization, or other governance documents.

(xvii)   Initiate any so called "buy/sell" or "forced sale" provision under any agreement (other than this Agreement) to which the Company or Owners is a party or commit on behalf of the Company or Owners to acquire any partnership or membership interest owned by a third party.

(xviii)  File any voluntary petition for the Company or Owners under the United States Code, the Bankruptcy Act, or seek the protection of any other Federal or State bankruptcy or insolvency law or debtor relief statute.

(xix)  Guaranty the payment of any money, or debt of another Person, or guaranty the performance of any other obligation of another Person.

(xx)  Agree to any material change to accounting and related matters material to the Company or Owners or any material changes to accounting practices or policies.

(xxi)  The appointment or designation of a new Sponsor.

(xxii)  Do any act in contravention of this Agreement.

**"Manager"** has the meaning set forth in Section 7.1.

**"Member Approval"** refers to approval by Members holding at least seventy (70%) percent of all outstanding Percentage Interests in the Company.

**"Members"** means all Persons admitted to the Company as a Member as provided herein, so long as they remain Members.

**"Member Loan"** has the meaning set forth in Section 4.2(a).

**"Member Nonrecourse Deductions"** has the meaning set forth in Section 4.6(c)(iii).

**"Membership Interest"** means a Member's entire interest in the Company, together with the (i) right to inspect the Company's books and records and (ii) the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members that may granted pursuant to this Agreement (and the Act to the extent such voting rights are required by the Act). In the case of each Member holding a Membership Interest, the quantum of such Member's Membership Interest relative to all other Members holding Membership Interests, including for purposes of voting and otherwise providing Member Approval hereunder, shall be equivalent to the Percentage Interest assigned to such Member in accordance with this Agreement.

**"Membership Unit"** refers to a single unit of equity in the Company. As of the Effective Date, the Members own the number of Membership Units reflected on Exhibit A to this Agreement.

**"Mezz Entity"** has the meaning set forth in Section 2.1.

**"Nonrecourse Liabilities"** has the meaning set forth in Section 4.6(c)(iv).

**"Non-Voting Members"** refers to the Members that own Class B Membership Interests, but no Class A Membership Interests.  As a matter of clarification, if a Member owns both Class B and Class A Membership Units, it is a Non-Voting Member only as to the Class B Membership Units.

**"Owners"** has the meaning set forth in Section 2.1.

**"Percentage Interest"** has the meaning set forth in Section 3.3.

**"Partnership Representative"** has the meaning set forth in Section 9.4.

**"Person"** means any individual, general partnership, limited partnership, limited liability partnership, limited liability company, limited liability limited partnership, corporation, joint venture, business trust, real estate investment trust, common law trust, or other trust, business trust, cooperative, association, foreign trust, foreign business organization or other enterprise (which term includes employee benefit plans), and their heirs, personal and legal representatives, successors and assigns where the context so permits.

**"Preemptive Rights"** has the meaning set forth in Section 3.4.

**"Prevailing Party Attorney's Fees"** refers to the right of a prevailing party in Litigation to recover from the non-prevailing parties in such Litigation all "Attorneys' Fees" and all "Costs" actually incurred at all levels of litigation and in all courts, whether for pre-litigation, litigation, mediation, settlement discussions, investigation of facts and law and in all courts, including post-judgment, bankruptcy and those incurred establishing an entitlement to or the amount of Attorneys' Fees or Costs to which the prevailing party is entitled. All Attorneys' Fees and Costs actually incurred by the prevailing party (and the hourly rates charged) shall be deemed reasonable absent clear and convincing evidence to the contrary presented by the party opposing any award. There shall be no reduction in the award for Attorneys' Fees incurred for (i) office conferences involving multiple attorneys (it being recognized that such conferences are necessary to coordinate positions taken in litigation), (ii) timesheet descriptions that are lacking in specificity, unless the descriptions are so vague that they cannot reasonably be determined to have been incurred in connection with the litigation (it being recognized that attorney billing practices are not always sufficiently specific to allow someone to understand exactly what was being done years later), or (iii) travel time (in being recognized that attorneys must travel to attend court, depositions, mediation and the like). In connection with the foregoing, (a) "Attorneys' Fees" shall include all attorneys, paralegals, law clerks and overtime charges for non-professional staff, and (ii) "Costs" shall include all charges for court reporters, transcripts, expert witnesses (testifying and consulting), travel, parking and other charges typically imposed by attorneys on their clients, none of which shall be limited by any uniform guidelines.

**"Proceeding"** has the meaning set forth in Section 8.2.

**"Profits"** means, with respect to any fiscal period of the Company, the net profits of the Company for such period for federal income tax purposes including, as appropriate, each item of income, gain, loss, deduction or credit entering into such determination, as determined by the regular accountants of the Company and including income exempt from tax as described in Section 705(a)(1)(B) of the Code.

**"Property"** has the meaning set forth in Section 2.1.

**"QOF"** has the meaning set forth in the Recitals hereto.

"**QOZ**" means a "qualified opportunity zone" as defined in Section 1400Z-1(a) of the Code.

"**QOZ Compliance Requirements**" shall have the meaning specified in Section 2.5(a).

"**QOZ Regulations**" means (i) the proposed Regulations (REG-115420-18) issued by the IRS and United States Department of the Treasury on Oct. 19, 2018; (ii) the proposed Regulations (REG-120186-18) issued by the IRS and the United States Department of Treasury on April 17, 2019, and (iii) the final Regulations (RIN 1545-BP04) issued by the IRS and the United States Department of the Treasury on December 19, 2019, in each case, under Section 1400Z-2 of the Code.

"**QOZ Rules**" shall mean Sections 1400Z-1 and 1400Z-2 of the Code, and any QOZ Regulations promulgated thereunder, including for the avoidance of doubt the final regulations (TD 9889) issued on December 19, 2019.

"**QOZB**" has the meaning set forth in the Recitals hereto.

"**QOZPI**" has the meaning set forth in the Recitals hereto.

"**Regulations**" means the Treasury Regulations promulgated under the Code as such regulations may be amended from time to time (including the corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth in Section 4.6(c)(vii).

"**Reserves**" means payments made or amounts reasonably allocated by the Manager for working capital consistent with any then budget or the ordinary course of the Company and the Owners' business, and to pay taxes, insurance, debt service, repairs, replacements or renewals, warranties, or other costs and expenses, incident to the ownership, management and operation of the Company and such other reasonable reserves as the Manager shall deem appropriate, including without limitation amounts allocated to future contingent expenditures as reasonably determined by the Manager.

"**Transfer**" means, when used as a noun, any voluntary or involuntary sale, hypothecation, pledge, mortgage, encumbrance, assignment, attachment, or other transfer, or otherwise disposed of, and when used as a verb, means voluntarily to sell, hypothecate, pledge, mortgage, assign, attach, or otherwise transfer, or otherwise dispose of. "Transferred," "Transferring," "Transferor" and "Transferee" shall have meanings corresponding thereto.

"**Uncontrollable Capital Contribution**" has the meaning set forth in Section 4.2(b).

"**Working Capital Reserve**" has the meaning set forth in Section 2.5(b).

"       **Member**" refers to            a Class B Member.

## <u>EXHIBIT C – THE PROPERTY</u>

- 3138 Commodore Plaza – Folio 01-4121-047-0130
- 3120 Commodore Plaza – Folio 01-4121-047-0120
- 3166 Commodore Plaza – Folio 01-4121-047-0070 (*currently under contract*)
- 3170 Commodore Plaza – Folio 01-4121-047-0060 (*currently under contract*)
- Condominium Property
  - o Units 1C, 1I, 1J,1K, 3A, 3B, 3C, 3D, 4A, 5A, 6E, 4B, 4C, 4D, 4E, 4F, 4G, 4H, 5B, 5C, 5E, 5F, 6A, 6C, 6D, 6F, 6H and 5D in the Commodore Centre Condominium

## EXHIBIT D – INITIAL APPROVED BUDGET

| Development Budget | Gross Square Footage (GSF) | | 29,842 | | |
|---|---|---|---|---|---|
| Live Site 1 | Rentable SF (RSF) | | 23,490 | | |
| URBIN Coconut Grove | Bedrooms/Ext. Stay Suites | | 62.00 | | |
| Miami, FL 33133 | Project Length (Years) | | | | |
| **Items** | **Variables** | | **Per GSF** | | **Total** |
| Total Land Purchase Price | $ | 88.72 | $ | 274.78 | $ | 8,200,000 |
| Acquisition Fee | 2.00% | | $ | 5.50 | $ | 164,000 |
| Ground Lease (Through Development) | | | | | |
| Marketing & Renders | 1.25% | | $ | 1.56 | $ | 46,627 |
| Builders Risk | 1.00% | | $ | 1.25 | $ | 37,302 |
| Flood Insurance | | | | | |
| General Liability Insurance | 1.00% | | $ | 1.25 | $ | 37,302 |
| Hard Cost (Blended parking/living area) | $ | 125.00 | $ | 125.00 | $ | 3,730,190 |
| Sustainability Program | | | $ | 6.70 | $ | 200,000 |
| Hard Cost Contingency | 10.00% | | $ | 12.50 | $ | 373,019 |
| Soft Cost Contingency | 5.00% | | $ | 3.70 | $ | 110,522 |
| Sales Office / Model | | | $ | - | $ | - |
| FF&E (Common; Units; Pool Area) | | | $ | 16.69 | $ | 498,000 |
| Developer Administration; Project Mgt | | | $ | 23.46 | $ | 700,000 |
| Impact Fees | | | $ | 3.35 | $ | 100,000 |
| Water & Sewer Fees | | | $ | 3.35 | $ | 100,000 |
| Architect; MEP & Structural Engineering | 4.00% | | $ | 10.72 | $ | 320,000 |
| Home Technology & Lighting Design | | | $ | 1.68 | $ | 50,000 |
| Landscape Architect | | | $ | 0.66 | $ | 19,800 |
| Interior Designer | | | $ | 5.03 | $ | 150,000 |
| Civil Engineer | | | $ | 1.01 | $ | 30,000 |
| Appraisal - Loans | | | $ | 0.34 | $ | 10,000 |
| Real Estate Taxes (until construction complete) | 2.00% | | $ | 8.79 | $ | 262,400 |
| Phase 1 Environmental | | | $ | 0.17 | $ | 5,000 |
| Phase 2 Environmental | | | $ | - | | |
| Soils | | | $ | - | | |
| Surveys (Acquisition) | | | $ | 0.34 | $ | 10,000 |
| Surveys (Construction) | | | $ | 1.01 | $ | 30,000 |
| Septic Tank - Purrpout HRS | | | $ | - | | |
| Inspections & Testing (Third Parties + Construction Admin) | | | $ | 7.44 | $ | 222,000 |
| Permits (City of Miami Process) | | | $ | 2.51 | $ | 75,000 |
| Permit Runner | | | $ | 0.17 | $ | 5,000 |
| Accounting / Audits | | | $ | - | $ | - |
| Miscellaneous / Admin | | | $ | 0.17 | $ | 5,000 |
| Utilities (through development) | | | $ | 0.84 | $ | 25,000 |
| Purchase Title & Recording | 1.50% | | $ | 4.12 | $ | 123,000 |
| Loan Origination Fee/Exit Fee | 1.75% | | $ | 15.60 | $ | 465,495 |
| Legal Acquisition & Loan Closing | 0.30% | | $ | 1.33 | $ | 39,804 |
| Construction Loan Interest | 8.00% | | $ | 35.09 | $ | 1,047,279 |
| Debt Fund Interest (In lieu of equity) | 15.00% | | $ | - | $ | - |
| Acquisition Loan Interest (then rolled up) | 10.00% | | $ | 47.17 | $ | 1,407,552 |
| Purchaser Interest Reserve | | | $ | 11.90 | $ | 354,990 |
| **Total Cost** | | | **$** | **635.16** | **$** | **18,954,281** |

| Development Budget | Gross Square Footage (GSF) | | 48,931 | |
|---|---|---|---|---|
| **Residential Site** | **Rentable SF (RSF)** | | **26,930** | |
| **URBIN Coconut Grove** | **Bedrooms** | | **50.00** | |
| **Miami, FL 33133** | **Project Length (Years)** | | **2.00** | |
| *Items* | *Variables* | | *Per GSF* | *Total* |
| Total Land Purchase Price (+ GF Purchase Price + Pmt. in Lieu of Rent)* | $ 51.63 | $ | 97.52 | $ 4,772,000 |
| Acquisition Fee | 2.00% | $ | 1.95 | $ 95,440 |
| Ground Lease (Through Development) | | | | |
| Marketing & Renders | 1.25% | $ | 1.88 | $ 91,746 |
| Builders Risk | 1.00% | $ | 1.50 | $ 73,397 |
| Flood Insurance | | | | |
| General Liability Insurance | 1.00% | $ | 1.50 | $ 73,397 |
| Hard Cost | $ 150.00 | $ | 150.00 | $ 7,339,698 |
| Sustainability Program | | $ | - | $ - |
| Hard Cost Contingency | 10.00% | $ | 15.00 | $ 733,970 |
| Soft Cost Contingency | 5.00% | $ | 2.70 | $ 132,189 |
| Sales Office / Model | | $ | - | $ - |
| FF&E (Common; Units; Pool Area) | | $ | 12.77 | $ 625,000 |
| Developer Administration; Project Mgt | | $ | 20.44 | $ 1,000,000 |
| Impact Fees (Coconut Grove Fee?) | | $ | 2.55 | $ 125,000 |
| Water & Sewer Fees | | $ | 2.04 | $ 100,000 |
| Architect; MEP & Structural Engineering | | $ | 6.54 | $ 320,000 |
| Home Technology & Lighting Design | | $ | 2.35 | $ 115,000 |
| Landscape Architect | | $ | 0.40 | $ 19,800 |
| Interior Designer (Gym + Common Areas + Pool Deck) | | $ | 1.53 | $ 75,000 |
| Civil Engineer | | $ | 0.72 | $ 35,000 |
| Appraisal - Loans | | $ | 0.20 | $ 10,000 |
| Real Estate Taxes (until construction complete) | 2.00% | $ | 2.42 | $ 118,447 |
| Phase 1 Environmental | | $ | 0.10 | $ 5,000 |
| Phase 2 Environmental | | $ | - | $ - |
| Soils | | $ | - | $ - |
| Surveys (Acquisition) | | $ | 0.20 | $ 10,000 |
| Surveys (Construction) | | $ | 0.61 | $ 30,000 |
| Septic Tank - Pumpout HRS | | $ | - | $ - |
| Inspections & Testing (Third Parties + Construction Admin) | | $ | 4.54 | $ 222,000 |
| Permits (City of Miami Process) | | $ | 3.07 | $ 150,000 |
| Permit Runner | | $ | 1.02 | $ 50,000 |
| Accounting / Audits | | $ | 0.41 | $ 20,000 |
| Miscellaneous / Admin | | $ | - | $ - |
| Utilities (through development) | | $ | - | $ - |
| Purchase Title & Recording | 1.50% | $ | 1.46 | $ 71,580 |
| Loan Origination Fee | 1.75% | $ | 7.12 | $ 348,585 |
| Legal Acquisition & Loan Closing | 0.75% | $ | 1.94 | $ 95,069 |
| Construction Loan Interest | 8.00% | $ | 15.94 | $ 780,126 |
| Debt Fund Interest (In lieu of equity) | 15.00% | $ | - | $ - |
| Acquisition Loan Interest (then rolled up) | 10.00% | $ | 2.35 | $ 114,800 |
| Purchaser Interest Reserve | | $ | 7.28 | $ 356,048 |
| **Total Cost** | | **$ 370.08** | | **$ 18,108,292** |

| Development Budget | Gross Square Footage (GSF) | | 125,320 | | |
| Office Site | Rentable SF (RSF) | | 68,179 | | |
| URBIN Coconut Grove | Desks | | 874.00 | | |
| Miami, FL 33133 | Project Length (Years) | | 3.00 | | |
| Items | Variables | | Per GSF | | Total |
| Total Land Purchase Price | $ | 85.38 | $ | 85.38 | $ | 10,700,000 |
| Acquisition Fee | 2.00% | $ | 1.71 | $ | 214,000 |
| Ground Lease (Through Development) | | $ | 13.79 | $ | 1,728,182 |
| Marketing & Renders | 1.25% | $ | 2.69 | $ | 336,798 |
| Builders Risk | 1.00% | $ | 2.15 | $ | 269,438 |
| Flood Insurance | | $ | - | $ | - |
| General Liability Insurance | 1.00% | $ | 2.15 | $ | 269,438 |
| Hard Cost | $ | 215.00 | $ | 215.00 | $ | 26,943,800 |
| Sustainability Program | | $ | 7.98 | $ | 1,000,000 |
| Hard Cost Contingency | 10.00% | $ | 21.50 | $ | 2,694,380 |
| Soft Cost Contingency | 5.00% | $ | 2.59 | $ | 324,945 |
| Leasing Office / Model | | $ | - | $ | - |
| FF&E (Common; Units; Pool Area) | $ | 500,000.00 | $ | 19.95 | $ | 2,500,000 |
| Developer Administration; Project Mgt | | $ | 19.95 | $ | 2,500,000 |
| Impact Fees | | $ | 1.99 | $ | 250,000 |
| Water & Sewer Fees | | $ | 1.99 | $ | 250,000 |
| Architect; MEP & Structural Engineering | 4.00% | $ | 9.78 | $ | 1,225,527 |
| Home Technology & Lighting Design | | $ | 0.40 | $ | 50,000 |
| Landscape Architect | | $ | 0.16 | $ | 20,000 |
| Interior Designer | | $ | 1.60 | $ | 200,000 |
| Civil Engineer | | $ | 0.16 | $ | 20,000 |
| Appraisal - Loans | | $ | 0.08 | $ | 10,000 |
| Real Estate Taxes (until construction complete) | 2.00% | $ | 4.35 | $ | 545,700 |
| Phase 1 Environmental | | $ | 0.04 | $ | 5,000 |
| Phase 2 Environmental | | $ | - | $ | - |
| Soils | | $ | - | $ | - |
| Surveys (Acquisition) | | $ | 0.04 | $ | 5,000 |
| Surveys (Construction) | | $ | 0.08 | $ | 10,000 |
| Septic Tank - Pumpout HRS | | $ | - | $ | - |
| Inspections & Testing (Third Parties + Construction Admin) | | $ | 1.97 | $ | 247,000 |
| Permits (City of Miami Process) | | $ | 1.99 | $ | 250,000 |
| Permit Runner | | $ | 0.04 | $ | 5,000 |
| Accounting / Audits | | $ | 0.24 | $ | 30,000 |
| Miscellaneous / Admin | | $ | 0.24 | $ | 30,000 |
| Utilities (through development) | | $ | 1.60 | $ | 200,000 |
| Purchase Title & Recording | 1.50% | $ | 1.28 | $ | 160,500 |
| Loan Origination Fee/Exit Fee | 1.75% | $ | 11.09 | $ | 1,389,812 |
| Legal Acquisition & Loan Closing | 0.30% | $ | 1.03 | $ | 129,280 |
| Construction Loan Interest | 8.00% | $ | 24.60 | $ | 3,082,519 |
| Debt Fund Interest (In lieu of equity) | 15.00% | $ | - | $ | - |
| Acquisition Loan Interest (then rolled up) | 10.00% | $ | 21.66 | $ | 2,714,469 |
| Purchaser Interest Reserve | | $ | 9.98 | $ | 1,250,896 |
| Total Cost | | | $ | 491.24 | $ | 61,561,663 |

**EXHIBIT E – WCSH SCHEDULE**

LIVE SITE 1

MONTHLY SCHEDULE

| | | | SPENT TO DATE | | | | | | | | | | | CONST. START |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INTEREST + LOAN FEES** | $3,275,315 | $3,275,315 | $888,854 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $308,214 |
| ACQUISITION LOAN ORIGINATION FEE | $100,625 | $100,625 | $100,625 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACQUISITION LOAN FEE | $1,407,552 | $1,407,552 | $788,229 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 | $56,302 |
| CONSTRUCTION LOAN ORIGINATION FEE/EXIT FEE | $364,870 | $364,870 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $232,190 |
| CONSTRUCTION LOAN INTEREST | $1,047,279 | $1,047,279 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEBT FUND INTEREST (IN LIEU OF EQUITY) | $0 | $0 | | | | | | | | | | | | |
| PURCHASER INTEREST RESERVE | $354,990 | $354,990 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $19,722 |
| | | | | | | | | | | | | | | |
| **ACQUISITION / LAND PURCHASE** | $8,581,804 | $8,581,804 | $7,783,070 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $798,734 |
| LAND PURCHASE | $8,200,000 | $8,200,000 | $7,450,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $750,000 | $0 |
| ACQUISITION FEE | $164,000 | $164,000 | $149,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $15,000 | $0 |
| PURCHASE TITLE & RECORDING | $123,000 | $123,000 | $111,750 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,250 | $0 |
| LEGAL ACQUISITION & LOAN CLOSING | $39,804 | $39,804 | $22,350 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $17,454 | $0 |
| ACQUISITION DUE DILIGENCE COSTS | $55,000 | $55,000 | $49,970 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,030 | $0 |
| GROUND LEASE (THROUGH DEVELOPMENT) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | |
| **HARD COST** | $4,103,209 | $4,103,209 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $23,333 |
| HARD COST | $3,730,190 | $3,730,190 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,610 |
| HARD COST CONTINGENCY (10%) | $373,019 | $373,019 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,723 |
| | | | | | | | | | | | | | | |
| **SOFT COST** | $2,993,953 | $2,993,953 | $638,284 | $22,236 | $23,569 | $23,569 | $30,979 | $30,979 | $42,439 | $42,439 | $109,314 | $109,314 | $104,604 | $200,284 |
| ARCHITECT, MEP & STRUCTURAL ENGINEERING | $320,000 | $320,000 | $192,000 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 |
| HOME TECHNOLOGY & LIGHTING DESIGN | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LANDSCAPE ARCHITECT | $19,800 | $19,800 | $0 | $0 | $0 | $0 | $0 | $0 | $3,960 | $3,960 | $3,960 | $3,960 | $3,960 | $3,960 |
| INTERIOR DESIGNER (GYM + COMMON AREAS + POOL DECK) | $150,000 | $150,000 | $0 | $0 | $0 | $0 | $0 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 |
| CIVIL ENGINEER | $30,000 | $30,000 | $6,000 | $0 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 |
| INSPECTIONS & TESTING (THIRD PARTIES + CONSTRUCTION ADMIN) | $222,000 | $222,000 | $0 | $0 | $0 | $0 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 |
| SOILS | $0 | $0 | $0 | | | | | | | | | | | |
| PERMITS | $75,000 | $75,000 | $7,500 | $0 | $0 | $0 | $0 | $0 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 | $16,875 |
| PERMIT RUNNER | $5,000 | $5,000 | $500 | $0 | $0 | $0 | $0 | $750 | $750 | $750 | $750 | $750 | $750 | $750 |
| IMPACT FEES | $100,000 | $100,000 | $0 | $0 | $0 | $0 | $0 | $0 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| WATER & SEWER FEES | $100,000 | $100,000 | $0 | $0 | $0 | $0 | $0 | $0 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| FF&E (COMMON; UNITS; POOL AREA) | $498,000 | $498,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEVELOPER ADMINISTRATION; PROJECT MGT | $700,000 | $700,000 | $272,222 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 |
| MARKETING & RENDERS | $46,627 | $46,627 | $54,863 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 |
| SEPTIC TANK - PUMPOUT HRS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACCOUNTING / AUDITS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| MISCELLANEOUS / ADMIN | $5,000 | $5,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| UTILITIES (THROUGH DEVELOPMENT) | $25,000 | $25,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| SUSTAINABILITY PROGRAM | $200,000 | $200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| SALES OFFICE / MODEL | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BUILDERS RISK | $37,302 | $37,302 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,072 |
| FLOOD INSURANCE | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| GENERAL LIABILITY INSURANCE | $37,302 | $37,302 | $12,433 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 |
| REAL ESTATE TAXES (UNTIL CONSTRUCTION COMPLETE) | $262,400 | $262,400 | $87,467 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $87,467 |
| SOFT COST CONTINGENCY | $110,522 | $110,522 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,140 |
| | | | | | | | | | | | | | | |
| **TOTAL CONSTRUCTION COSTS - PRE-INTEREST RESERVE & FEES** | $15,678,966 | $15,678,966 | $8,421,854 | $22,236 | $23,569 | $23,569 | $30,979 | $30,979 | $42,439 | $42,439 | $109,314 | $109,314 | $903,339 | $223,617 |
| | | | | | | | | | | | | | | |
| **TOTAL CONSTRUCTION COSTS** | $18,954,281 | $18,954,281 | $9,310,208 | $78,538 | $79,872 | $79,872 | $87,282 | $87,282 | $98,742 | $98,742 | $165,617 | $165,617 | $959,641 | $531,830 |

|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | COMPLETION |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | |
| 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | |
| 12/1/2021 | 1/1/2022 | 2/1/2022 | 3/1/2022 | 4/1/2022 | 5/1/2022 | 6/1/2022 | 7/1/2022 | 8/1/2022 | 9/1/2022 | 10/1/2022 | 11/1/2022 | 12/1/2022 | 1/1/2023 | 2/1/2023 | 3/1/2023 | 4/1/2023 |
| $60,101 | $61,094 | $62,200 | $63,550 | $65,353 | $67,860 | $71,253 | $75,505 | $80,308 | $85,154 | $89,469 | $93,593 | $98,846 | $99,483 | $101,693 | $105,630 | $238,158 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $132,680 |
| $40,380 | $41,372 | $42,478 | $43,828 | $45,632 | $48,139 | $51,531 | $55,783 | $60,586 | $65,412 | $69,748 | $73,872 | $77,125 | $79,761 | $81,971 | $83,908 | $85,752 |
| $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 | $19,722 |
| | | | | | | | | | | | | | | | | |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $29,345 | $45,254 | $80,828 | $147,556 | $251,228 | $381,517 | $507,102 | $585,441 | $585,441 | $507,102 | $381,517 | $251,228 | $147,556 | $80,828 | $45,254 | $29,345 | $23,333 |
| $8,622 | $24,530 | $60,105 | $126,833 | $230,505 | $360,793 | $486,379 | $564,718 | $564,718 | $486,379 | $360,793 | $230,505 | $126,833 | $60,105 | $24,530 | $8,622 | $2,610 |
| $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 | $20,723 |
| $59,471 | $59,471 | $59,471 | $59,471 | $59,471 | $59,471 | $59,471 | $59,471 | $58,138 | $58,138 | $147,585 | $143,118 | $151,138 | $151,138 | $143,638 | $143,638 | $143,638 |
| $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 | $4,571 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,980 | $1,980 | $0 | $0 | $0 | $0 | $0 |
| $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $7,500 | $0 | $0 | $0 |
| $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $1,333 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 | $6,660 |
| | | | | | | | | | | | | | | | | |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $15,278 | $83,000 | $83,000 | $83,000 | $83,000 | $83,000 |
| $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 | $1,499 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 | $294 |
| $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 | $1,471 |
| $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 | $11,765 |
| $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 | $2,072 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 | $888 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $87,467 | $0 | $0 | $0 | $0 | $0 |
| $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 | $6,140 |
| $88,816 | $104,725 | $140,300 | $207,028 | $310,699 | $440,988 | $566,573 | $644,913 | $643,579 | $565,240 | $529,101 | $394,346 | $298,694 | $231,966 | $188,892 | $172,983 | $166,971 |
| | | | | | | | | | | | | | | | | |
| $148,918 | $165,819 | $202,499 | $270,577 | $376,053 | $508,848 | $637,826 | $720,418 | $723,887 | $650,374 | $618,571 | $487,939 | $395,541 | $331,449 | $290,584 | $276,613 | $405,125 |

**LIVE SITE 2**

**MONTHLY SCHEDULE**

| LINE ITEM | BUDGET | TOTAL | SPENT TO DATE 12/1/2020 | 1/1/2021 | 2/1/2021 | 3/1/2021 | 4/1/2021 | 5/1/2021 | 6/1/2021 | 7/1/2021 | 8/1/2021 | 9/1/2021 | 10/1/2021 | 11/1/2021 | 12/1/2021 | 1/1/2022 | 2/1/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INTEREST + LOAN FEES** | $1,599,559 | $1,599,559 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,726 | $24,402 | $24,948 |
| ACQUISITION LOAN ORIGINATION FEE | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACQUISITION LOAN INTEREST | $114,800 | $114,800 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $19,133 | $19,133 |
| CONSTRUCTION LOAN ORIGINATION FEE/EXIT FEE | $348,565 | $348,565 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| CONSTRUCTION LOAN INTEREST | $780,126 | $780,126 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEBT FUND INTEREST (IN LIEU OF EQUITY) | $0 | $0 | $0 | | | | | | | | | | | | | | |
| PURCHASER INTEREST RESERVE | $356,048 | $356,048 | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,726 | $5,268 | $5,815 |
| | | | | | | | | | | | | | | | | | |
| **ACQUISITION / LAND PURCHASE** | $5,089,089 | $5,089,089 | $262,180 | $140,760 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $10,200 | $4,584,149 | $0 | $0 |
| LAND PURCHASE | $4,772,000 | $4,772,000 | $234,000 | $138,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $4,300,000 | $0 | $0 |
| ACQUISITION FEE | $95,440 | $95,440 | $4,680 | $2,760 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $200 | $86,000 | $0 | $0 |
| PURCHASE TITLE & RECORDING | $71,580 | $71,580 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $71,580 | $0 | $0 |
| LEGAL ACQUISITION & LOAN CLOSING | $95,069 | $95,069 | $8,500 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $86,569 | $0 | $0 |
| ACQUISITION DUE DILIGENCE COSTS | $55,000 | $55,000 | $15,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $40,000 | $0 | $0 |
| GROUND LEASE (THROUGH DEVELOPMENT) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | | | | |
| **HARD COST** | $8,073,668 | $8,073,668 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HARD COST | $7,339,698 | $7,339,698 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| HARD COST CONTINGENCY (10%) | $733,970 | $733,970 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | | | | |
| **SOFT COST** | $3,345,977 | $3,345,977 | $124,120 | $40,417 | $40,417 | $40,417 | $40,417 | $40,417 | $51,277 | $60,999 | $60,999 | $64,058 | $99,580 | $60,098 | $68,664 | $68,664 | $68,664 |
| ARCHITECT; MEP & STRUCTURAL ENGINEERING | $320,000 | $320,000 | $36,000 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 |
| HOME TECHNOLOGY & LIGHTING DESIGN | $115,000 | $115,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LANDSCAPE ARCHITECT | $19,800 | $19,800 | $0 | $0 | $0 | $0 | $0 | $0 | $3,960 | $3,960 | $3,960 | $3,960 | $0 | $0 | $0 | $0 | $0 |
| INTERIOR DESIGNER (GYM + COMMON AREAS + POOL DECK) | $75,000 | $75,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| CIVIL ENGINEER | $35,000 | $35,000 | $0 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 | $2,333 |
| INSPECTIONS & TESTING (THIRD PARTIES + CONSTRUCTION ADMIN) | $222,000 | $222,000 | $15,000 | $0 | $0 | $0 | $0 | $0 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 |
| SOILS | $0 | $0 | $0 | | | | | | | | | | | | | | |
| PERMITS (CITY OF MIAMI PROCESS) | $150,000 | $150,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| PERMIT RUNNER | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,556 | $5,556 | $5,556 | $5,556 | $5,556 | $5,556 | $5,556 | $5,556 |
| IMPACT FEES (COCONUT GROVE FEE?) | $125,000 | $125,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| WATER & SEWER FEES | $100,000 | $100,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| FF&E (COMMON; UNITS; POOL AREA) | $625,000 | $625,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEVELOPER ADMINISTRATION; PROJECT MGT | $1,000,000 | $1,000,000 | $0 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 |
| MARKETING & RENDERS | $91,746 | $91,746 | $9,175 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 |
| SEPTIC TANK - PUMPOUT HRS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACCOUNTING / AUDITS | $20,000 | $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| MISCELLANEOUS / ADMIN | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| UTILITIES (THROUGH DEVELOPMENT) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| SUSTAINABILITY PROGRAM | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| SALES OFFICE / MODEL | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BUILDERS RISK | $73,397 | $73,397 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,058 | $3,058 | $3,058 |
| FLOOD INSURANCE | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| GENERAL LIABILITY INSURANCE | $73,397 | $73,397 | $24,463 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 |
| REAL ESTATE TAXES (UNTIL CONSTRUCTION COMPLETE) | $118,447 | $118,447 | $39,482 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $39,482 | $0 | $0 | $0 | $0 |
| SOFT COST CONTINGENCY | $132,169 | $132,169 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,508 | $5,508 | $5,508 |
| | | | | | | | | | | | | | | | | | |
| **TOTAL CONSTRUCTION COSTS - PRE-INTEREST RESERVE & FEES** | $16,508,733 | $16,508,733 | $386,300 | $181,177 | $50,617 | $50,617 | $50,617 | $50,617 | $61,477 | $71,199 | $71,199 | $74,258 | $109,780 | $70,298 | $4,652,812 | $68,664 | $68,664 |
| | | | | | | | | | | | | | | | | | |
| **TOTAL CONSTRUCTION COSTS** | $18,108,292 | $18,108,292 | $386,300 | $181,177 | $50,617 | $50,617 | $50,617 | $50,617 | $61,477 | $71,199 | $71,199 | $74,258 | $109,780 | $70,298 | $4,657,538 | $93,066 | $93,612 |

|  | CONT. START |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | COMPLETION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |  |  |  |
| 3 | 3 | 3 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 2 |  |  |  |
| $26,231 | $27,475 | $28,726 | $252,655 | $31,713 | $32,783 | $34,283 | $36,561 | $37,957 | $40,588 | $46,276 | $53,621 | $62,041 | $70,521 | $78,038 | $83,937 | $88,872 | $92,632 | $95,345 | $98,006 | $277,035 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $19,133 | $19,133 | $19,133 | $19,133 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $126,758 |  |  |
| $0 | $0 | $0 | $0 | $19,133 | $19,133 | $19,133 | $19,133 | $19,133 | $21,764 | $27,452 | $34,797 | $43,219 | $51,697 | $59,204 | $65,114 | $70,048 | $73,809 | $76,719 | $79,182 | $81,453 |  |  |
| $7,097 | $8,341 | $9,592 | $11,695 | $12,578 | $13,650 | $15,150 | $17,429 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 | $18,824 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $45,911 | $57,741 | $89,043 | $139,041 | $290,339 | $494,328 | $750,890 | $997,798 | $1,151,942 | $1,151,942 | $997,798 | $750,890 | $494,328 | $290,339 | $139,041 | $89,043 | $57,741 | $45,911 |  |  |  |
| $0 | $0 | $0 | $5,135 | $16,965 | $48,267 | $118,265 | $249,563 | $453,552 | $709,914 | $957,022 | $1,111,166 | $1,111,166 | $957,022 | $709,914 | $453,552 | $249,563 | $118,265 | $48,267 | $16,965 | $5,135 |  |  |  |
| $0 | $0 | $0 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 | $40,776 |  |  |  |
| $193,664 | $185,775 | $185,775 | $61,886 | $61,886 | $61,886 | $63,866 | $63,866 | $101,368 | $61,886 | $57,719 | $57,719 | $57,719 | $57,719 | $57,719 | $161,886 | $184,886 | $184,886 | $184,886 | $184,886 | $184,886 |  |  |  |
| $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $8,114 | $114,285714 | $114,285714 | $8,114 | $8,114 | $8,114 | $8,114 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $23,000 | $23,000 | $23,000 | $23,000 | $23,000 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $1,980 | $1,980 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $2,333 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 | $6,900 |  |  |  |
| $50,000 | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $5,556 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $41,667 | $41,667 | $41,667 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $33,333 | $33,333 | $33,333 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $104,167 | $104,167 | $104,167 | $104,167 | $104,167 | $104,167 |  |  |  |
| $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 | $28,571 |  |  |  |
| $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 | $1,111 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 | $3,058 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 | $1,398 |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $39,481 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |  |  |  |
| $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 | $5,508 |  |  |  |
| $193,664 | $185,775 | $185,775 | $107,797 | $119,627 | $150,929 | $222,907 | $354,205 | $595,096 | $812,576 | $1,055,517 | $1,209,662 | $1,209,662 | $1,055,517 | $808,409 | $656,214 | $475,225 | $343,927 | $273,929 | $242,627 | $230,797 |  |  |  |
| $219,894 | $213,249 | $214,501 | $360,452 | $151,338 | $183,712 | $257,191 | $390,768 | $633,053 | $859,164 | $1,101,793 | $1,263,282 | $1,271,704 | $1,126,038 | $886,487 | $740,151 | $564,097 | $436,560 | $369,472 | $340,633 | $457,832 |  |  |  |

**WORK SITE**

**MONTHLY SCHEDULE**

| LINE ITEM | BUDGET | TOTAL | SPENT TO DATE 12/1/2020 | 1/1/2021 | 2/1/2021 | 3/1/2021 | 4/1/2021 | 5/1/2021 | 6/1/2021 | 7/1/2021 | 8/1/2021 | 9/1/2021 | 10/1/2021 | 11/1/2021 | 12/1/2021 | 1/1/2022 | 2/1/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INTEREST + LOAN FEES** | $8,437,696 | $8,437,696 | $1,217,650 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $90,832 | $94,558 | $97,735 | $100,287 |
| ACQUISITION LOAN ORIGINATION FEE | $204,750 | $204,750 | $204,750 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACQUISITION LOAN INTEREST | $2,714,469 | $2,714,469 | $1,012,900 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 | $89,556 |
| CONSTRUCTION LOAN ORIGINATION FEE/EXIT FEE | $1,185,062 | $1,185,062 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| CONSTRUCTION LOAN INTEREST | $3,082,519 | $3,082,519 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEBT FUND INTEREST (IN LIEU OF EQUITY) | $0 | $0 | | | | | | | | | | | | | | | |
| PURCHASER INTEREST RESERVE | $1,250,896 | $1,250,896 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,276 | $5,002 | $8,179 | $10,730 |
| **ACQUISITION / LAND PURCHASE** | $12,961,961 | $12,961,961 | $11,735,172 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $129,454 | $32,275 | $32,275 |
| LAND PURCHASE | $10,700,000 | $10,700,000 | $10,700,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACQUISITION FEE | $214,000 | $214,000 | $214,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| PURCHASE TITLE & RECORDING | $160,500 | $160,500 | $160,500 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LEGAL ACQUISITION & LOAN CLOSING | $129,280 | $129,280 | $32,100 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $97,180 | $0 | $0 |
| ACQUISITION DUE DILIGENCE COSTS | $30,000 | $30,000 | $30,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| GROUND LEASE (THROUGH DEVELOPMENT) | $1,728,182 | $1,728,182 | $598,572 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 |
| **HARD COST** | $29,638,180 | $29,638,180 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $123,989 |
| HARD COST | $26,943,800 | $26,943,800 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,723 |
| HARD COST CONTINGENCY (10%) | $2,694,380 | $2,694,380 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $112,266 |
| **SOFT COST** | $10,523,846 | $10,523,846 | $1,074,745 | $110,229 | $110,229 | $110,229 | $110,229 | $110,229 | $110,229 | $110,729 | $114,062 | $124,515 | $124,515 | $548,081 | $414,643 | $414,643 | $180,808 |
| ARCHITECT, MEP & STRUCTURAL ENGINEERING | $1,225,527 | $1,225,527 | $192,000 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 |
| HOME TECHNOLOGY & LIGHTING DESIGN | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| LANDSCAPE ARCHITECT | $20,000 | $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 |
| INTERIOR DESIGNER (GYM + COMMON AREAS + POOL DECK) | $200,000 | $200,000 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| CIVIL ENGINEER | $20,000 | $20,000 | $4,000 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 | $889 |
| INSPECTIONS & TESTING (THIRD PARTIES + CONSTRUCTION ADMIN) | $247,000 | $247,000 | $61,750 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 |
| SOILS | $0 | $0 | $0 | | | | | | | | | | | | | | |
| PERMITS (CITY OF MIAMI PROCESS) | $250,000 | $250,000 | $25,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $75,000 | $75,000 | $75,000 | $0 |
| PERMIT RUNNER | $5,000 | $5,000 | $500 | $0 | $0 | $0 | $0 | $0 | $0 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| IMPACT FEES (COCONUT GROVE FEET) | $250,000 | $250,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $83,333 | $83,333 | $83,333 | $0 |
| WATER & SEWER FEES | $250,000 | $250,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $83,333 | $83,333 | $83,333 | $0 |
| FF&E (COMMON; UNITS; POOL AREA) | $2,500,000 | $2,500,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| DEVELOPER ADMINISTRATION; PROJECT MGT | $2,500,000 | $2,500,000 | $486,111 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 |
| MARKETING & RENDERS | $336,798 | $336,798 | $33,680 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 |
| SEPTIC TANK - PUMPOUT HRS | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| ACCOUNTING / AUDITS | $30,000 | $30,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,154 | $1,154 | $1,154 |
| MISCELLANEOUS / ADMIN | $30,000 | $30,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,154 | $1,154 | $1,154 |
| UTILITIES (THROUGH DEVELOPMENT) | $200,000 | $200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $7,692 | $7,692 | $7,692 |
| SUSTAINABILITY PROGRAM | $1,000,000 | $1,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $38,462 | $38,462 | $38,462 |
| LEASING OFFICE / MODEL | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| BUILDERS RISK | $269,418 | $269,418 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,227 |
| FLOOD INSURANCE | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| GENERAL LIABILITY INSURANCE | $269,418 | $269,418 | $89,804 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 |
| REAL ESTATE TAXES (UNTIL CONSTRUCTION COMPLETE) | $545,700 | $545,700 | $181,900 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $181,900 | $0 | $0 | $0 |
| SOFT COST CONTINGENCY | $324,945 | $324,945 | $0 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 |
| **TOTAL CONSTRUCTION COSTS - PRE-INTEREST RESERVE & FEES** | $53,123,987 | $53,123,987 | $12,809,916 | $142,503 | $142,503 | $142,503 | $142,503 | $142,503 | $143,003 | $143,003 | $146,337 | $156,789 | $156,789 | $580,356 | $544,097 | $446,917 | $337,133 |
| **TOTAL CONSTRUCTION COSTS** | $61,561,683 | $61,561,683 | $14,027,566 | $232,060 | $232,060 | $232,060 | $232,060 | $232,060 | $232,560 | $232,560 | $235,893 | $246,345 | $246,345 | $671,188 | $638,655 | $544,652 | $437,420 |

CONST. END

| 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| $102,956 | $105,871 | $108,267 | $113,539 | $871,721 | $503,915 | $114,230 | $126,547 | $129,123 | $148,146 | $170,242 | $194,099 | $218,116 | $240,622 | $260,354 | $276,594 | $289,403 | $299,248 | $309,619 | $318,569 | $526,827 | $634,214 | $772,306 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $89,556 | $89,556 | $89,556 | $89,556 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $754,131 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $430,932 |
| $0 | $0 | $0 | $0 | $0 | $62,300 | $62,300 | $62,300 | $65,076 | $84,099 | $106,195 | $130,052 | $154,069 | $176,575 | $196,287 | $212,547 | $225,355 | $235,196 | $245,572 | $254,522 | $262,580 | $270,167 | $277,327 |
| $13,400 | $16,316 | $19,710 | $23,962 | $34,034 | $41,611 | $51,920 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 | $64,047 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $32,275 | $0 | $0 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| $141,956 | $181,368 | $260,064 | $402,774 | $637,021 | $983,365 | $1,441,164 | $1,975,339 | $2,512,661 | $2,954,447 | $3,204,947 | $3,204,947 | $2,954,442 | $2,512,661 | $1,975,339 | $1,441,164 | $983,365 | $637,021 | $402,774 | $260,064 | $181,368 | $141,956 | $123,989 |
| $29,691 | $69,102 | $147,798 | $290,508 | $524,755 | $871,099 | $1,328,898 | $1,863,073 | $2,400,395 | $2,842,177 | $3,092,681 | $3,092,681 | $2,842,177 | $2,400,395 | $1,863,073 | $1,328,898 | $871,099 | $524,755 | $290,508 | $147,798 | $69,102 | $29,691 | $11,723 |
| $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 | $112,266 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| $180,369 | $180,369 | $180,369 | $180,369 | $179,480 | $179,480 | $361,380 | $179,480 | $179,480 | $171,147 | $171,147 | $171,147 | $171,147 | $171,147 | $171,147 | $171,147 | $171,147 | $587,814 | $597,814 | $597,814 | $597,814 | $597,814 | $597,814 |
| $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933.16757 | $27,933.16757 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 | $27,933 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $889 | $889 | $889 | $889 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 | $5,007 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $416,667 | $416,667 | $416,667 | $416,667 | $416,667 |
| $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 | $54,429 |
| $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 | $10,452 |
| $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 | $1,154 |
| $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 | $7,692 |
| $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 | $38,462 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 | $11,227 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $183,900 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 | $4,855 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 | $8,782 |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| $354,600 | $394,012 | $472,708 | $615,418 | $848,776 | $1,195,120 | $1,652,919 | $2,368,994 | $2,724,416 | $3,166,197 | $3,408,368 | $3,408,368 | $3,157,864 | $2,716,083 | $2,178,760 | $1,644,586 | $1,186,787 | $1,257,109 | $1,032,862 | $890,153 | $811,456 | $788,770 | $723,803 |

| $457,556 | $499,884 | $581,975 | $728,956 | $1,726,407 | $1,299,031 | $1,767,139 | $2,495,341 | $2,853,539 | $3,514,344 | $3,578,610 | $3,602,488 | $3,375,980 | $2,956,705 | $2,439,094 | $1,921,180 | $1,476,189 | $1,556,353 | $1,342,481 | $1,208,722 | $1,138,085 | $1,075,985 | $1,464,109 |

## **EXHIBIT F – ORGANIZATIONAL CHART**



## EXHIBIT 1

| Name of Member | Membership Units/% |
|---|---|
| Kapoor Capital, LLC | 7.14%/Class A |
| | 7.14%/Class A |
| | 7.14%/Class A |
| | 7.14%/Class A |
| | 7.14%/Class A |
| | 7.14%/Class A |
| | 7.14%/Class A |
| | 0.268% Class A |
| | 0.89%/Class A |

# EXHIBIT 2

| Name of Member | Membership Units/% |
|---|---|
| | 9.09% |
| | 9.09% |
| | 9.09% |
| | 9.09% |
| | 9.09% |
| | 9.09% |

# EXHIBIT 3
## (Ownership of Location Ventures, LLC)



# EXHIBIT 3A

| Name of Member | Membership Units/% |
|---|---|
| | 3.00 Membership Units/2.515% |
| | 5.00 Membership Units/4.191% |
| | 2.00 Membership Units/1.677% |
| | 0.75 Membership Units/0.629% |
| | 0.50 Membership Units/0.419% |
| | 0.625 Membership Units/0.524% |
| Vivian Bonet | 1.00 Membership Units/0.838% |
| | 2.50 Membership Units/2.096% |
| | 6.00 Membership Units/5.030% |
| | 36.002 Membership Units/30.180% |
| | 0.120 Membership Units/0.101% |
| | 0.180 Membership Units/0.151% |
| | 0.180 Membership Units/0.151% |
| | 0.500 Membership Units/0.419% |
| | 0.971 Membership Units/0.814% |
| | 0.485 Membership Units/0.407% |



U R B I N

LIVE · WORK · WELLNESS

OFFERING MEMORANDUM · URBIN · COCONUT GROVE

- 2021 -

EXHIBIT

B

# DISCLAIMER

THIS DOCUMENT SERVES AS AN OFFERING MEMORANDUM. REAL ESTATE INVESTMENT IS ALWAYS SPECULATIVE AND RISKY, AND, THEREFORE, NOTHING CONTAINED HEREIN NOR IN ANY OTHER WRITTEN OR VERBAL STATEMENT FROM URBIN, URBIN COCONUT GROVE, LOCATION CAPITAL, LOCATION DEVELOPMENT, LOCATION VENTURES ANY MEMBERS, LIMITED PARTNERS AND/OR ANY OF THE GENERAL PARTNERS (OR ANY OTHER PERSON OR ENTITY ON THEIR BEHALF) SHALL BE DEEMED TO IMPLY GUARANTEED PROFIT OR RETURN OF THE CAPITAL INVESTMENT. ALL INTERESTED INVESTORS ARE STRONGLY ENCOURAGED TO ANALYZE AND MAKE THEIR INVESTMENTS DECISION(S) ONLY AFTER CONSULTATION WITH THEIR LEGAL AND FINANCIAL PROFESSIONALS. INFORMATION IS CURRENT AS OF 05/01/18 AND PRESUMED TO BE ACCURATE FROM 3RD PARTY SOURCES. FINANCIAL SUMMARIES, SUBSCRIPTION AGREEMENTS AND OTHER INVESTMENT & LEGAL DOCUMENTATION AVAILABLE UPON REQUEST. EXACT PROJECT FEATURES, SIZES AND BUDGETS ARE SUBJECT TO CHANGES AT THE DEVELOPER'S DISCRETION



*The next generation is evolving what it wants to call home, prices are prohibitive in many core urban markets, and we need to reduce or eliminate the environmental impact of dense housing. These are the three great challenges of our time, and U R B I N offers a solution.*

*RISHI KAPOOR*

# PROJECT SUMMARY

OVERVIEW · DEAL SUMMARY · DEAL STRUCTURE



*3120 & 3138 COMMODORE PLAZA – CO-WORKING BUILDING*

# WE NEED A NEW URBAN LIVING SOLUTION

**URBIN OFFERS AFFORDABLE GLOBAL MOBILITY THROUGH RESPONSIBLE GREEN LIVING AND WORKING IN URBAN CENTERS**

URBIN offers a solution for the lack of mobility, affordability, and sustainability experienced in high demand urban centers globally. The vision fosters creativity and ignites connections through small units, big amenities, and peer-to-peer socialization. We are a circular community that provides a responsible, authentic and portable lifestyle aligned with the gig/ freelance economy of today and tomorrow.



# THE PROGRAM SUMMARY



## WORK SITE

**ADDRESS** 3120-3138 COMMODORE PLAZA, MIAMI, FL 33133

The Work Site is a ground up development which consists primarily of co-working space with ground floor retail. The rooftop will be activated as an amenity/breakout area for the building's guests/tenants. The retail at grade will offer a food market with a variety of food and beverage options.

## LIVE SITE 1

**ADDRESS** 3120-3138 COMMODORE PLAZA, MIAMI, FL 33133

The Live Site 1 project is a renovation of an existing mixed-use building with traditional residential and commercial uses to a co-living and extended stay operation. The building will include curated amenities along with an activated rooftop deck.

## LIVE SITE 2

**ADDRESS** 3166-3170 COMMODORE PLAZA, MIAMI, FL 33133

The Live Site 2 project is a ground up development which consists of retail at grade, co-living and extended stay uses. The building will include curated amenities along with an activated rooftop deck.

### *SF BREAKDOWN*

- **WORK SITE**
  GROSS SF  125,000          RENTABLE SF 53,000

- **LIVE SITE 1**
  GROSS SF 28,000          RENTABLE SF 18,000

- **LIVE SITE 2**
  GROSS SF  49,000          RENTABLE SF 20,000

# THE PROJECT

LOCATION · ARCHITECTURE & DESIGN



# THE VISION

## AFFORDABILITY

Central to the concept is to create an **URBIN** habitat of furnished monthly bedrooms where young professionals, students, and service professionals can live and work in a prime location that will no longer cost upwards of half of their monthly income. The ultimate objective is to offer one easy subscription price for our members to cover personal overhead costs for living, working, and so much more.

## SUSTAINABILITY

Furthermore, we aim to introduce sustainability measures as a commitment to our brand mission of environmentally responsible development that will offset carbon impact through renewable energy and water strategies.

## MOBILITY

Freed by technology, our requirements to live in a specific place are changing. With this in mind, we aim to become a global platform allowing our members the opportunity to relocate & travel from location to location throughout the company's network.

**URBIN** **HABITATS** will be located in prime neighborhoods of major metro markets.
**URBIN** **RETREAT** resorts will be found in vacation-oriented locations.
**URBIN** **CAMPUS** will be found in cities with a strong college and university-oriented culture.

# THE PROJECT

The Project is anticipated to deliver 202,000 gross SF, comprised of co-living, co-working, extended stay lodging and retail at grade situated in the heart of Coconut Grove. Activation on the ground floor will primarily include F&B options. The rooftop of all sites will be activated for social gatherings. URBIN Coconut Grove is situated on Commodore Plaza, an active thoroughfare which is also home to popular shops of some of the areas most well known restaurants. Cocowalk, one of the most popular retail destinations in the City of Miami, is located within a few blocks of the Project. To add, parks and marinas are also located within a walking distance.



21

# WORK SITE

### *3120-3138 COMMODORE PLAZA*

The Work Site is an assemblage of two contiguous sites. The business plan for the Work Site is to demolish both existing structures and develop an office building dedicated to coworking space with a food market along with dry goods focused retail on the ground level. The co-working space will feature an array of uses including creative/artistic spaces, a technology incubator along with co-working space for small business including executive offices. The ground floor area will house a collection of spaces curated around a market concept, serving a variety of foods beginning at breakfast and continuing through late evening while also providing retail offerings that compliment daily life.





# LIVE SITE 1

## *3162 COMMODORE PLAZA*

This site is currently operating as a six-story condominium building consisting of residential and commercial units. Live Site 1 will include co-living and extended stay lodging. Amenities include an activated rooftop deck. The building will offer purpose built co-living suites in which each bedroom will have its own bathroom and closet space which is the primary differentiator between our offering and other developments in the co-living space. Unrelated individuals sharing a suite are provided the comfort and privacy of their own room and their own bathroom while sharing the common areas within the unit such as kitchens, living rooms and washers/dryers. All co-living units will include premium furnishings and amenities. The intent is to provide our targeted end-users an opportunity to move-in to a meticulously curated space with just their essentials that offers upscale finishes and programming without commensurate upscale pricing.

The extended-stay suites measure 331 to 627 SF and are efficiently designed with high-end finishes. The suites offer end users a longer term stay option situated directly on Commodore Plaza, which is lined with Coconut Grove's most popular restaurants and within walking distance of many of the neighborhood's amenities. In total, the Live Site 1 will offer 44 co-living beds and 18 extended stay suites.





23

# LIVE SITE 2

## *3162 COMMODORE PLAZA*

The site is currently under contract and currently operating as retail space. The business plan is to demolish the existing structures and develop a complimentary building to the adjacent Live Site 1 project. Live Site 2 is slated to include ground floor retail that is anticipated to be food and beverage centric, with co-living and extended stay lodging suites in the upper floors. Like Live Site 1, the co-living offering will be purposed built delivering a 1:1 ratio of bedroom to bathrooms. The rooftop of the building will be activated and designed to create a social atmosphere for the building's guests and residents. The business plan of this site is the same as Live Site 1 the primary difference being Live Site 2 will include retail at grade.

Said retail will be structured as a condominium and is under contract to be purchased by a 3rd party upon construction completion reducing the Project's cost basis.





# THE RIGHT NEIGHBORHOOD

Miami's original neighborhood was founded in 1873 by an eclectic mix of pioneers, artists, intellectuals and adventurers and is known for its warm, laid-back atmosphere with charming boutiques, galleries, gourmet restaurants, and sidewalk cafes. Anchored by the bay, the neighborhood is a distinct enclave that is a favorite for locals and visitors alike.

A perfect location for **URBIN**, Coconut Grove has the structure of an established neighborhood with the spirit of one that is experiencing a renaissance, and it's already attracting the right audience that is in need of office, retail and residential space all in walking distance. Well-priced in the heart of a vibrant scene, the **URBIN** development site will be the new home for the Coconut Grove changemakers.

"Established in 1825, Coconut Grove is one of Miami's oldest neighborhoods; rich in history and a sense of place that attracts people from all over the world."

- LOCATED ON A CENTRAL COCONUT GROVE THOROUGHFARE
- ONE BLOCK TO NEWLY DEVELOPED COCOWALK
- DIRECT ACCESS TO OUTDOOR PARKS AND ACTIVITIES SUCH AS SAILING
- 5 MINUTES TO MAIN HIGHWAYS
- 10 MINUTES TO OTHER POPULAR DADE COUNTY AREAS: SOUTH MIAMI, CORAL GABLES, AND BRICKELL



25

# THE AREA

The established downtown Coconut Grove area is one of South Florida's most popular neighborhoods and one that is currently experiencing a birth of new developments.

The area is home to long-standing cultural institutions, a diverse banking and business district and vibrant dining and entertainment scene. It's a place people want to be, and demand for affordable new living options is on the rise. With explosive growth happening all around it, Coconut Grove is experiencing its own rebirth.

The neighborhood is roughly bound by South Dixie Highway (US 1) to the north and Biscayne Bay to the east. Centrally located to major pockets of Miami, the location puts occupants in close proximity to Brickell/Downtown, Coral Gables, and South Miami as well as major transportation hubs like the Miami International Airport.



**AERIAL VIEW OF PROJECT SUBMARKET
COMPARED TO THE MIAMI METRO AREA**

# BUILDING RENDERINGS



*WORK SITE - 3120-3138 Commodore Plaza*

*LIVE  SITE 1 - 3162 Commodore Plaza*



*LIVE  SITE 2 - 3166-3170 Commodore Plaza*

# DESIGN & PLANNING

LIVE · WORK · STAY

# BUILDING DESIGN & LAYOUT

Everything we do is meant to provide a place for a life well lived, meaning our buildings reflect their environment, emphasize green space, natural light, and are full of common areas that enhance our philosophies of live, work, and wellness.





# WORK INTERIOR DESIGN & LAYOUT

The work site is designed to accommodate multiple types of business, from artists and solopreneurs to tech startups and established corporate companies. Spaces and offices are thoughtfully-planned to maximize space, provide multiple break out areas and ensure and have high-level services that address various operative needs.

| | | |
|---|---|---|
| | ROOF TERRACE | |
| **CORPORATE** | | LEVEL 05 |
| **TECH & SMALL BUSINESS** | | LEVEL 04 |
| **COWORKING** | | LEVEL 03 |
| **CREATIVE STUDIO & WORK** | | LEVEL 02 |
| **MARKET** | | LEVEL 01 |
| BASEMENT PARKING LEVEL 1 | | |
| BASEMENT PARKING LEVEL 2 | | |

# WORK SITE

The following are mood images that illustrate the style and mood of the exterior of the building.









# WORK SITE ELEVATION





WORK SITE ELEVATION

# WORK SITE ELEVATION



# WORK SITE ELEVATION



# WORK SITE PLANS  *GROUND FLOOR*



# WORK SITE PLANS *MEZZANINE*



# WORK SITE PLANS *LEVEL 2-3*



# WORK SITE PLANS   *LEVELS 4-5*



# LIVING SPACE DESIGN & LAYOUT

From the moment you walk in the door, you know you're home. Our unit layouts are thoughtfully planned and make use of eco-friendly building finishes, maximize space and ensure that everything you need is provided for.



*SAMPLE RENDERING OF CO-LIVE RESIDENCE INTERIOR*

# BEDROOM DESIGN & LAYOUT



*SAMPLE RENDERING OF CO-LIVE RESIDENCE INTERIOR*

# LIVE SITE 1 - LEVEL 4



# LIVE SITE 1 - LEVEL 5



# LIVE SITE 1 - LEVEL 6



# LIVE SITE 1 - ROOF



# LIVE SITE 2 - BASEMENT



LIVE SITE 2 - GROUND FLOOR

# LIVE SITE 2 - MEZZANINE



# LIVE SITE 2 - LEVELS 2-3



# LIVE SITE 2 - LEVELS 4-5



# LIVE SITE 2 - ROOF PLAN



# BLOW-UP UNIT PLANS

# RESIDENCE DESIGN & LAYOUT

Every unit has its own bathroom, laundry, and kitchenette. Floors dedicated to co-living have a common kitchen, dining and living areas



**SAMPLE LAYOUT & DESIGN OF 350 SF COLIVE RESIDENCE**

# SUITES DESIGN & LAYOUT

Suites are designed as a pod of three, four or six residences sharing a common kitchen, dining and living space. Each bedroom has its own bathroom.



**SAMPLE LAYOUT & DESIGN OF 4 BEDROOM SUITE**



**SAMPLE LAYOUT & DESIGN OF 3 BEDROOM SUITE**

57

# STUDIOS DESIGN & LAYOUT

Studios are designed for those who want all the benefits of co-living with a bit more space. Residences are private with a living area, kitchen, laundry and bathroom.



**SAMPLE LAYOUT & DESIGN OF STUDIO**

58

# THE PROGRAM

LIVE · WORK · STAY · ENGAGE

# A COMMUNITY FOR LIFE OUTSIDE THE HOME

**URBIN** offers a space to deepen connections to self and community — a place for engaging with others, growing professionally, exploring the city and having authentic experiences. As a niche, mixed-use opportunity, we are building a brand and product dedicated to addressing real-world concerns of community and connection in all aspects of life.



### CO-LIVING
· 70+ BEDROOMS

### CO-WORKING
· 800+ DESKS

### EXTENDED-STAY
· 38 SUITES

### PARKING
· 200+ SPACES

### OPERATIONS
· MANAGED IN-HOUSE

60

# WORK *INSPIRATIONS*



# WORK



**TAILORED FOR THE NEEDS OF TODAY'S FLEX WORKERS**

We offer a modern, collaborative co-working environment curated around a community of entrepreneurs and creative early-stage companies that appeals to today's forward-thinkers. Our spaces are flexible, furnished, and meet a variety of needs at affordable rates, all while maintaining a sense of community.



## *SHARED CO-WORKING SPACE*

- DESKS, SHARED OFFICES, SHARED MEETING ROOMS, CALL ROOMS AND BREAKOUT SPACE

## *RESERVED DESKS*

- DEDICATED PRIVATE SPACE FOR 1 - 2 MEMBERS, MEETING ROOM ACCESS

## *PRIVATE OFFICES*

- DESIGNED FOR EARLY-STAGE COMPANIES WITH 15 EMPLOYEES OR LESS
- FOCUSED OFFICES DESIGNED FOR SMALL COMPANIES AND EARLY-STAGE STARTUPS

## *OFFICE SUITES*

- LARGER OFFICE SPACES AVAILABLE FOR COMPANIES WITH MORE SPACE NEEDS
- EXECUTIVE OFFICE SPACES AVAILABLE FOR FORWARD THINKING GROWING COMPANIES

### OFFICE FEATURES

- MODERN STYLE REFLECTIVE OF OUR MEMBERS
- SUPER-FAST WIRED AND WIRELESS INTERNET
- EXPANSIVE FLOOR-TO-CEILING WINDOW WALLS
- EXCLUSIVE OPEN-AIR OUTDOOR COMMON AREAS
- LOUNGE AREA WITH COFFEE AND TEA BAR
- OPEN KITCHEN AREAS ON EACH FLOOR
- STORAGE SPACE
- SMALL AND LARGE CONFERENCE ROOMS
- MEETING AND BREAKOUT SPACES
- CALL ROOMS
- EVENT SPACES

# LIVE *INSPIRATIONS*



# LIVE



**DESIGNED TO ADDRESS THE LIFESTYLE NEEDS OF TODAY'S URBAN RENTERS**

They love design, but don't want to furnish, clean and maintain a large space. And forget the big kitchen—they regularly eat out or use ready-made meal services. They want a cozy, convenient, stress-free living space that meets their needs for a comfortable price.



## *PRIVATE BEDROOMS*

- AVERAGE 300+ SF
- EACH WITH PRIVATE BATH, KITCHENETTE AND LAUNDRY
- COMMON AREA, DINING, COMMERCIAL KITCHEN

## *SHARED SUITES*

- 1,200 TO 2,400 SF // 4 TO 6 PRIVATE BEDROOMS
- EACH WITH A PRIVATE BATHROOM
- SEMI-PRIVATE LAUNDRY, COMMON AREA, DINING, KITCHENETTE

## RESIDENTIAL FEATURES

- FULLY FURNISHED
- UPGRADED UNIT FINISHES
- ENERGY STAR STAINLESS APPLIANCES
- GREEN AREAS ON EVERY LIVING LEVEL
- OPEN LIVING AND LOUNGE AREAS
- WELLNESS AMENITIES, SUCH AS POOL, GYM AND SPA

# EXTENDED STAY *INSPIRATIONS*









# EXTENDED STAY

## A DESTINATION FOR A TEMPORARY HOMEBASE
An extended stay home for wanderers with purpose, looking to relax, rewind and reconnect.

### *STAY*

- ROOMS HAVE COMFY FULL OR QUEEN BEDS, ENSUITE BATHROOMS AND IN ROOM SERVICES

### FEATURES

- FULLY FURNISHED WITH BEAUITFUL FINISHES
- SMART LOCK ENTRY
- PLUSH DUVETS AND COMFY COTTON LINENS
- WALK-IN RAIN SHOWER
- FLAT SCREEN HDTV WITH FULL CABLE AND ACCESS TO FREE STREAMING APPS INCLUDING NETFLIX & HULU
- FURIOUSLY FAST & FREE WI-FI
- MULTIPLE USB PORTS & POWER OUTLETS
- INDIVIDUAL CLIMATE CONTROL
- HAIR DRYER AND GARMENT STEAMER
- IN-ROOM PERSONAL SAFE
- PET FRIENDLY
- DAILY HOUSEKEEPING AVAILABLE





# ENGAGE

**AN AMENITY PROGRAM FULL OF OF OPPORTUNITIES FOCUSED ON INTERACTION**
A home to a mindful mix of services and amenities. The below list is a sample of what we have in store.

*SHOP*  CURATED GROUND-FLOOR RETAIL  LOCAL BOUTIQUES · HIP NATIONAL SHOPS · PRESTIGE SERVICES

*TASTE*  DESTINATION DINING  HEALTHY FAST CASUAL CAFE · LOUNGE · ROOFTOP DECK

*SHARE*  PERKS FOR CREATIVE CO-LIVING  ENTERTAINMENT DECK WITH BAR · OUTDOOR LOUNGE AREA
FULL PROGRAM OF COMMUNITY EVENTS · COMMUNITY MOBILE APP

*WELLNESS*  PLACES TO RELAX AND RETREAT  POOL · SPA · GYM WITH STRENGTH, CARDIO, NUTRITION & MOBILITY · BICYCLES

*UPGRADE*  NEXT-LEVEL LIFESTYLE SERVICES  TECHNOLOGY PACKAGES · LAUNDRY · DRY-CLEANING · HOUSEKEEPING
COOKING & GROCERY · DELIVERY OPTIONS · PARKING / VALET · CAR & BIKE-SHARE SERVICES · COMMUNITY MANAGERS




# SUSTAIN

SUSTAINABILITY · RESILIENCY

# SUSTAIN

**URBIN** is thoughtfully-planned with elegant solutions for food, wellness, technology, transportation and work. The sustainability program includes plans for passive cooling, on-site water capture and treatment and the use of rooftop solar and on-site gardens food sources following the Cradle to Cradle philosophy of William McDonough.

## CRADLE TO CRADLE IS CHARACTERIZED BY THREE PRINCIPLES DERIVED FROM NATURE

1. Everything is a Resource for Something Else
2. Use Renewable Energy
3. Celebrate Diversity



## *CRADLE TO CRADLE CONCEPT*

### MATERIAL HEALTH
IN BIOLOGICAL AND TECHNICAL METABOLISMS

### CIRCULAR ECONOMY
MATERIAL REUTILIZATION AND CONTINUOUS ASSETS

### RENEWABLE ENERGY
CLEAN ENERGY AND RESTORATIVE CARBON BALANCES

### WATER STEWARDSHIP
CLEAN WATER IN PRODUCTION AND USE CYCLES

### SOCIAL FAIRNESS
SHARED ABUNDANCE

69

# DESIGNING LIKE A TREE

**URBIN** adheres to a responsible sustainability plan that is design positive. To do this, we think of **URBIN** like a tree – energy positive, economy positive, water positive, people positive, and material positive. By implementing structures for these systems we work towards a circular economy that works at every level.



**SOLAR ENERGY CAPTURE**
leaves capture solar energy through photosynthesis

**FOG HARVESTING**
morning dew on leaves drips to water understory

**HABITAT CREATION**
other flora and fauna live in ecosystem created by the tree

**NUTRIENT RECAPTURE**
falling leaves revitalize soil

**EVAPORATIVE COOLING**
transpiration increases humidity and cools the air

**FOOD PRODUCTION**
acorns feed local fauna

**SHADING**
leaves block solar radiation

**METABOLISM**
convection of energy and nutrients into an ecosystem

**RAINWATER CAPTURE**
roots absorb rainwater and nutrients

**THERMAL MASS**
shaded earth stays cool

**NATURAL VENTILATION**
tree shape channels winds underneath boughs

70

# POSITIVE STRATEGIES



### ENERGY POSITIVE

Living things thrive on energy and can utilize renewable energy in many forms – such as solar, wind, geothermal and gravitational energy. Energy strategies include reducing east and west exposures, utilizing natural ventilation when possible, increasing shade openings, and reducing humidity.

### MATERIAL POSITIVE

Throughout the project, we will prioritize the use of products and materials considered to be 'biological nutrients' or 'technological nutrients'. Biological nutrients are those that are biodegradable and improve soil health, while technological nutrients are those that can be fully recycled.

### ECONOMY POSITIVE

To remain economy positive, construction practices will facilitate material reuse and building assembly. We plan on building long-term relationships with product manufacturers to bring them into the ecosystem of maintaining, reusing and refurbishing materials.

### WATER POSITIVE

The symbiotic nature of using both industrial and natural systems in our plan will create a new model for regeneration of air, water, soil and **URBIN**. Using an integrated system of green roofs, vegetated swales, and porous paving structures captures, cleanses and releases clean water.

71

# THE IDEAL CLIMATE

Coconut Grove is located in one of the most solar-friendly parts of the United States, allowing **URBIN** to use solar as a main resource of energy. Wind speed is cited as 10 mph, so it does not make a use case for wind power, so wind will instead be considered in passive cooling strategies employed throughout the property. Since relative humidity is at 60 percent and below in the afternoon from December to May, passive cooling will work best during these months.

## AVERAGE CLIMATE



## TOTAL PRECIPITATION



# CLIMATE CHANGE RESILIENCE

We can't discuss sustainability, without discussing the future effects of climate change. In the greater Miami area, the effects of climate change can be seen throughout the city and local and state governments are implementing programs and infrastructure to combat these changes and limit the damage. We will go steps beyond this by planning for resilience against climate change, natural disasters, and other incidental acts.



## *SITE AND BUILDING STRATEGIES*

- ENERGY AND WATER INDEPENDENCE
- BUILT FOR LESS RELIANCE ON FOSSIL FUELS
- FLOOD PROTECTION AT GROUND FLOOR
- SITE ENERGY STORAGE IN GRID SCALE BATTERIES AND VEHICLE BATTERIES
- HURRICANE RESILIENT
- UTILIZATION OF STORM RESISTANT ENVELOPE
- BUILT TO SERVE THE NEIGHBORHOOD IN CASE OF DISASTER

# DESIGN POSITIVE AT EVERY LEVEL

We are committed to our sustainability program at every level and have listed additional features that will be implemented throughout the property to ensure we are working towards our goal of being completely carbon-neutral.



## ENERGY EFFICIENCY & WATER CONSERVATION

- ENERGY-CONSERVING BUSINESS PRACTICES THROUGHOUT
- ENERGY-EFFICIENT INTERIOR FLUORESCENT LIGHTING
- ENERGY-EFFICIENT LIGHTING THROUGHOUT THE COMMUNITY
- ENERGY STAR APPLIANCES
- WATER-CONSERVING SHOWER HEADS, FAUCETS & TOILETS

## SUSTAINABLE BUILDING

- GREEN BUILDING CERTIFICATION FROM FLORIDA GREEN BUILDING COALITION (FGBC) AND NATIONAL GREEN BUILDING STANDARDS (NGBS) SILVER FOR ZONE 1
- RECYCLED MATERIALS USED DURING CONSTRUCTION
- ELECTRIC VEHICLE CHARGING STATIONS

## AIR QUALITY

- LOW-VOC PAINT USED IN APARTMENT HOMES
- DOUBLE-PANED WINDOWS & THE USE OF LOW-E GLASS TO REDUCE SOLAR HEAT GAIN & IMPROVE ENERGY EFFICIENCY
- FRESH AIR CIRCULATION SYSTEM
- PROGRAMMABLE THERMOSTATS TO HELP IMPROVE ENERGY EFFICIENCY

## LANDSCAPING

- MULCHED LANDSCAPING FOR MOISTURE RETENTION
- NATURAL STATE LAWNS DURING ALL SEASONS
- LANDSCAPING AND IRRIGATION SYSTEM INCORPORATED TO LIMIT WATER & ENERGY USE
- EROSION CONTROLLED SITE PLANNING

## RECYCLING

- CLOSED-LOOP RECYCLING PROGRAM THROUGHOUT BUILDING
- ECO-FRIENDLY CLEANING PRODUCTS
- CHLORINE-FREE SALINE POOL TREATMENT

# THE EXPERIENCE

LIFESTYLE · CULTURE · COMMUNITY · CONNECTION

# LIFESTYLE



**URBIN** aims to reflect the lifestyle of the future: a forward-thinking structure packed with elegant solutions for food, wellness, technology, transportation and work.



76

# CULTURE

**URBIN** is a place to live, a place to work, and a place to engage. Focused on positive impact in community, **URBIN** offers an opportunity to live better for anyone and everyone who interact with touchpoints in the platform. The platform is warm, friendly and open to everyone who is looking for a place to be culturally minded, thoughtful and make an impact in their lives and the lives of others.



77

# COMMUNITY

The **URBIN** community is a diverse group of freethinkers, enterprising creatives, and entrepreneurs trying to change the world and push the status quo. The community is digitally active but the true bonding experience comes from interactions within the physical space. From introductions on our app to enjoying pizza night in the common lounge or sharing startup business ideas, there is a variety of community activities that our members can partake in.



# CONNECTION

**URBIN** offers a unique living experience that reflects how people today really live. Our units provide all the expected modern conveniences in a design-forward, efficient space while offering a wide variety of exterior building amenities that encourages connection to the community and to the outdoors for a more engaged, nature-filled experience.



# OPERATIONS

INTEGRATED MANAGEMENT SERVICES




# 360-DEGREE INTEGRATED SERVICES

Our in-house operating and leasing company will provide integrated property management and leasing services to all **URBIN** branded developments. Rather than give this role away to an outside operator, we believe that the best people to execute our community vision are right here with our in-house team.

## LEASING & MANAGEMENT

**URBIN** manages the leasing and operations of the entire **URBIN** property, from resident spaces to our commercial and community facing areas. In addition to back-of-house, day-to-day utilities and maintenance, we also manage front- desk service and employ a group of engaged community managers that embody the **URBIN** philosophy and plan an array of in-house events and neighborhood activities that nurture our community.

## TECHNOLOGY

To provide a smooth end-to-end experience we have partnered with a technology platform that facilitates operations at every touchpoint, facilitating every interaction between residents, members, staff, visitors, and the back-of-house.

*For more about operations, please see our operations deck.

81

# MARKET OVERVIEW

COCONUT GROVE MARKET · COCONUT GROVE RENTAL MARKET
DEMOGRAPHIC TRENDS · COCONUT GROVE OVERVIEW · COMPARABLE PROJECTS



# THE CHANGING FACE OF MIAMI

**MIAMI IS A RESILIENT MARKET THAT THRIVES ON CONSTANT REINVENTION AND EXPERIMENTATION.**

Our ever-changing city attracts thriving and diverse people from all over the world, and the normal rules simply do not apply here. The area has changed dramatically over the past 10-15 years, fueled by the forces of globalization, an influx of wealth and rapidly changing consumer tastes.

### FLORIDA

- THIRD MOST POPULOUS STATE IN THE NATION
- SINCE THE 2010 CENSUS, THE POPULATION HAS INCREASED BY 12.8%.

### SOUTH FLORIDA

- THE 4TH LARGEST URBAN AREA IN THE U.S.
- 6.1 MILLION PEOPLE
- 4,400 PEOPLE/SQUARE MILE
- 335,405 NEW JOBS ADDED IN THE PAST 5 YEARS

### MIAMI DADE COUNTY

- POPULATION                           2.7 MILLION
- POPULATION % CHANGE 2010-2018        8.8%
- UNEMPLOYMENT                         2.4% (PRE-PANDEMIC ANNUAL AVG)

# SHIFTING DEMOGRAPHICS



**URBIN** is the result of a reaction to a growing change in the population's habits and lifestyle needs. As more people rent and traffic increases, there is a focus on living and working in an area that suits both budget and daily life. Miami now tops the list of cost-burdened American rental markets and the county is one of the top for Millennials, at 27% of the population and growing.

## WHO ARE MIAMI MILLENNIALS?

- 23-38 YEAR OLDS
- RECENTLY PASSED BABY BOOMERS IN TOTAL SIZE
- DIGITAL NATIVES – GREW UP ONLINE
- 27% OF MIAMI'S POPULATION AND GROWING
- MEDIAN INCOME: $20,000 (33% BELOW OVERALL MEDIAN MIAMI INCOME)

## MILLENNIALS ARE LOOKING FOR URBAN LIVING SOLUTIONS

- 46% OF MILLENNIALS PREFER CITIES BUT CITE AFFORDABILITY AS AN ISSUE
- 54% RANKED WALKABILITY AS IMPORTANT
- 39% RANKED CONVENIENT PUBLIC TRANSPORTATION HIGHLY
- 44% RANKED ACCESS TO SHOPPING AND ENTERTAINMENT AS ONE OF THEIR TOP PRIORITIES

# OUR AUDIENCE

**URBIN**'s audience is an exceptional blend of people, perspectives and pursuits. The thread is the desire to live in an urban environment, the need for affordable housing, access to flexible working space, and a lifestyle that holds community, engagement, and wellness as a priority.









# WORK AUDIENCE

The **URBIN** work community is an exceptional mix of people, perspectives, and pursuits with common characteristics, including the need for flexible workspace, the ability to feel comfortable in a social environment and a want for an enriched lifestyle where work, life, and wellness are a priority.

## *NOMAD*

For freelancers, telecommuters, and those with a small footprint, access to working space, meeting rooms and a community of like-minded individuals is the perfect place for prosperity.

## *HIGH FLYER*

For workers who have a second job or a passion project, **URBIN** is a space to focus on the work, envision the future and connect with other like-minded individuals.

## *ENTREPRENEUR*

For corporate users who need to travel to Miami for an extended period of time, we offer a seamless live/work solution at an affordable price with the comforts of home.

## *CORPORATE*

For serious companies that require privacy but want the benefits of shared, flexible workspace and a community environment, we offer a seamless work solution.

## *COMPANY*

For companies small and large, our space accommodates growing teams. All-inclusive rates and turn-key services allow companies to focus on the business—we manage the rest.

# LIVE AUDIENCE

Our live audience wants both the privacy of their own home and a community at their doorstep. By offering flexible terms to suit unique schedules, both long and short **URBIN** offers a living solution that allows residents to feel right at home.

### *YOUNG PROFESSIONALS*

For young professionals who are looking to live their lives outside of the home, the affordability of a single bedroom space and the social community perfectly fits the lifestyle needs of an early to mid-20s professional looking to experience culture and engage with others.

### *STUDENTS*

Perfect for students who want to live off campus but still have a small budget and a small footprint. The lifestyle of the concept directly aligns with how many students are already accustomed to living, surrounded by fellow collegiates and in need of spaces that facilitate their home and study needs.

### *SERVICE COMMUNITY*

For service workers who have income constraints but want to avoid long commutes and stay close to work and the community they service, we offer a solution that fits their needs for affordable housing while offering access to lifestyle-enriching amenities.

### *CORPORATE*

For corporate users who need to travel to Miami for an extended period of time, we offer a seamless live/work solution at a affordable price with the comforts of home.

### *THE NOMAD*

For freelancers, digital nomads or travelers, the small footprint, access to working space, and access to working space and community make Coconut Grove an attractive place to touch down for awhile.

87

# EXTENDED STAY AUDIENCE

By offering extended stays with hotel amenities and apartment comforts, URBIN offers a living solution that allows travelers to ease right in to living like a local.

### *TRAVELERS*

For travelers looking for the quintessential Miami Beach experience, URBIN offers affordable hospitality with a standout social community that blends the guest and resident experience.

### *CORPORATE*

For corporate users traveling to Miami for an extended stay, URBIN offers a seamless all-in-one home away from home solution with the conveniences of the office, and just steps to the beach.

### *THE NOMAD*

For freelancers and digital nomads looking for a small footprint, access to workspace, and a community to plug in to at touchdown, URBIN Retreat is the ideal place to stay a while.

# COCONUT GROVE DEMOGRAPHICS

**URBIN** Coconut Grove is right place, right time. It's a cutting-edge product in the perfect location that stands to be a major win-win for investors and tenants alike. Our project offers a premium co-live/cowork experience in a premier destination to a growing population of renters.



89

# DEMOGRAPHICS

## Population

| | 2 mile | 5 mile | 10 mile |
|---|---|---|---|
| 2010 Population | 59,530 | 391,092 | 1,133,572 |
| 2020 Population | 66,649 | 448,740 | 1,263,373 |
| 2025 Population Projection | 69,172 | 467,101 | 1,309,216 |
| Annual Growth 2010-2020 | 1.2% | 1.5% | 1.1% |
| Annual Growth 2020-2025 | 0.8% | 0.8% | 0.7% |
| Median Age | 43.2 | 41.7 | 41.7 |
| Bachelor's Degree or Higher | 47% | 32% | 29% |
| U.S. Armed Forces | 25 | 187 | 445 |

## Income

| | 2 mile | 5 mile | 10 mile |
|---|---|---|---|
| Avg Household Income | $114,553 | $83,728 | $79,584 |
| Median Household Income | $80,892 | $52,611 | $51,722 |
| < $25,000 | 4,335 | 47,476 | 125,444 |
| $25,000 - 50,000 | 4,584 | 36,463 | 101,429 |
| $50,000 - 75,000 | 3,761 | 26,034 | 74,774 |
| $75,000 - 100,000 | 2,798 | 16,904 | 48,111 |
| $100,000 - 125,000 | 2,784 | 12,515 | 31,911 |
| $125,000 - 150,000 | 1,315 | 6,675 | 18,060 |

## Households

| | 2 mile | 5 mile | 10 mile |
|---|---|---|---|
| 2010 Households | 25,072 | 154,777 | 421,505 |
| 2020 Households | 26,678 | 173,870 | 465,218 |
| 2025 Household Projection | 27,445 | 180,324 | 481,073 |
| Annual Growth 2010-2020 | 0% | 0.5% | 0.4% |
| Annual Growth 2020-2025 | 0.6% | 0.7% | 0.7% |
| Owner Occupied | 14,068 | 68,381 | 217,206 |
| Renter Occupied | 12,610 | 105,488 | 248,013 |
| Avg Household Size | 2.4 | 2.4 | 2.6 |

## Housing

| | 2 mile | 5 mile | 10 mile |
|---|---|---|---|
| Median Home Value | $622,246 | $416,891 | $366,012 |
| Median Year Built | 1967 | 1972 | 1973 |

# DISCLAIMER

THIS DOCUMENT SERVES AS AN OFFERING MEMORANDUM. REAL ESTATE INVESTMENT IS ALWAYS SPECULATIVE AND RISKY, AND, THEREFORE, NOTHING CONTAINED HEREIN NOR IN ANY OTHER WRITTEN OR VERBAL STATEMENT FROM URBIN, URBIN COCONUT GROVE, LOCATION CAPITAL, LOCATION DEVELOPMENT, LOCATION VENTURES ANY MEMBERS, LIMITED PARTNERS AND/OR ANY OF THE GENERAL PARTNERS (OR ANY OTHER PERSON OR ENTITY ON THEIR BEHALF) SHALL BE DEEMED TO IMPLY GUARANTEED PROFIT OR RETURN OF THE CAPITAL INVESTMENT. ALL INTERESTED INVESTORS ARE STRONGLY ENCOURAGED TO ANALYZE AND MAKE THEIR INVESTMENTS DECISION(S) ONLY AFTER CONSULTATION WITH THEIR LEGAL AND FINANCIAL PROFESSIONALS. INFORMATION IS CURRENT AS OF 05/01/18 AND PRESUMED TO BE ACCURATE FROM 3RD PARTY SOURCES. FINANCIAL SUMMARIES, SUBSCRIPTION AGREEMENTS AND OTHER INVESTMENT & LEGAL DOCUMENTATION AVAILABLE UPON REQUEST. EXACT PROJECT FEATURES, SIZES AND BUDGETS ARE SUBJECT TO CHANGES AT THE DEVELOPER'S DISCRETION





LOCATION
V E N T U R E S

SPONSOR RESUME
2020

EXHIBIT
C



# THE HOME OF TOMORROW

Location, they say, is the most important thing in real estate. But for us, this isn't where the story ends. It's only the first step in a unique journey. Rather than replicate the same product on every site, we craft one-of-a-kind living experiences that make the highest and best use of unique development locations.

For some projects, this means an ultra-luxury single-family home. For others, it may be a hip urban tower where young professionals live and work at one address. The common thread woven through all Location Ventures projects is our relentless desire to build one thing—the home of tomorrow.



# BUSINESS AREAS





### LOCATION CAPITAL

A private real estate investment and asset management division that raises capital to invest in premium locations and premier developers.



### LOCATION DEVELOPMENT

Focused on developing architecturally significant living experiences to key markets in South Florida.



### LOCATION PROPERTIES

A full-service real estate sales and marketing team that offers comprehensive buyer, seller, and investor services to both property owners and developers.

# DIVERSIFIED DEVELOPMENT DIVISIONS



## URBIN

A forward-thinking co-live, co-work and wellness platform focused in the urban core.



## MULTI-FAMILY

Our multi-family projects range from boutique condos with niche targets to luxury high-rises.



## SINGLE-FAMILY

Location Development is active in the residential space with a focus on ultra-luxury single-family homes. Current projects include homes designed by Cesar Molina and Max Strang.



## RENOVATIONS

Part of our development ethos includes the rehabilitation of existing property to market standard through thoughtful design and well executed plans.



# OUR PROCESS

Our development process starts from acquiring property and extends through the design process to construction, while remaining on schedule, minimizing risk and maximizing value. From end-to-end construction and management, Location Development does it all.

## 01



### ACQUIRE

We identify market opportunities in premium locations while striving to practice financial discipline, conservative risk assessment, and flexibility to deliver value to our projects.

## 02



### DESIGN

Our experienced project managers work a with our partners to create a design and program for projects that add value to the property and align with our core philosophy.

## 03



### BUILD

Construction is closely overseen to ensure quality, on-time delivery and cost-effectiveness, and to maximize owner investment while also taking into consideration of the project's needs.

## 04



### MANAGE

Location Development is a fully-integrated build-manage operator and we take an active management role of multi-family and commercial projects, ensuring that investments are optimally performing long after they are constructed.

**URBIN** MIAMI BEACH  |  **URBIN** COCONUT GROVE  |  **URBIN** CORAL GABLES

**VILLA VALENCIA** CORAL GABLES  |  **537 BAYSHORE** FORT LAUDERDALE

**ORDUNA COURT** CORAL GABLES  |  **COMMODORE INN THE GROVE** COCONUT GROVE

**CHERYL LANE** CORAL GABLES  |  **STEWART AVENUE** CORAL GABLES

**LEUCADENDRA DRIVE** CORAL GABLES



# CURRENT VENTUERS

CURRENT VENTURES



# URBIN

**MIAMI BEACH | COCONUT GROVE | CORAL GABLES**

1234-1260 WASHINGTON AVENUE, MIAMI BEACH, FL

# U R B I N  MIAMI BEACH

**PURCHASE PRICE**

$20.0M or $597 per lot SF.

**PROJECT CAPITALIZATION**

$58.0M (Incl. purchase, hard, soft and interest cost)

### ASSET SUMMARY

1234-60 Washington Avenue (the "Property") is comprised of two income-producing commercial properties situated on a 33,493 SF lot. The property is improved with 27,012 square feet of leasable space spread between two buildings utilized as traditional office and strip retail that houses food and beverage businesses.

**ENTITLEMENTS**

The City of Miami Beach recently approved the project. Per architectural plans, subject to change, the project is anticipated to be 6 stories with a gross area of I.) 19,200 SF of existing space; and II.) 82,622 SF of new construction.

### TRANSACTION SUMMARY

Off market opportunity to acquire an income producing property situated on a premier corner in the heart of South Beach offering upside via a redevelopment opportunity. The asset is currently under contract and is anticipated to close in Nov. 2020.

### BUSINESS PLAN

I.) Repositioning the existing office building from traditional to co-working use with wellness oriented retail at grade and rooftop break out space; and II.) redeveloping the existing retail building to co-living and extended stay use with F&B options located at grade and on the roof deck that includes a pool amongst other activations.



1234-1260 WASHINGTON AVENUE, MIAMI BEACH, FL

# URBIN MIAMI BEACH



### WORK SITE PROGRAMMING

Renovation of an existing traditional office building to coworking space, with ground-floor retail and rooftop breakout space. The building is anticipated to comprise of 139 revenue generating desk spaces. The ground floor will house a robust wellness program that will be accessible to co-living residents and extended stay guests.

### CO-LIVE/EXT. STAY SITE PROGRAMMING

Ground-up development consists of co-live and extended stay lodging units with micro-retail and F&B at grade along with a rooftop pool and bar or restaurant. Levels two (2) and three (3) are dedicated co-living floors. Level four (4) can be utilized as either co-living or extended-stay lodging and levels five (5) and six (6) are strictly dedicated to hotel use. Total revenue-generating units, including co-living and hotel rooms, equates to a total of 107 units. The ground floor will house F&B options including a cafe, grab and go meals/snacks and a bar fronting Washington Avenue offering entertainment to guests and residents.

### STATUS

Approved project in the design development phase of the architectural/design process. The project is anticipated to break ground in the 3rd qtr. of 2021 with completion slated for 3rd qtr. of 2023.

### VALUATION

Estimated value of $98.8M

1234-1260 WASHINGTON AVENUE, MIAMI BEACH, FL

# U R B I N MIAMI BEACH

THE NEXT GENERATION IS EVOLVING WHAT IT WANTS TO CALL HOME, PRICES ARE PROHIBITIVE IN MANY CORE URBAN MARKETS, AND WE NEED TO REDUCE OR ELIMINATE THE ENVIRONMENTAL IMPACT OF DENSE HOUSING. THESE ARE THE THREE GREAT CHALLENGES OF OUR TIME, AND URBIN OFFERS A SOLUTION.

RISHI KAPOOR



3120, 3138, 3162, 3166, 3170 **COMMODORE PLAZA**, COCONUT GROVE, FL

# URBIN COCONUT GROVE

**PURCHASE PRICE**

$23.3M

**PROJECT CAPITALIZATION**

$88.6M

**ENTITLEMENTS**

The entitlement process has commenced.

**ASSET
SUMMARY**

3120-3170 Commodore Plaza (the "Property") is comprised of five contiguous properties situated on 45,788 SF of land. The existing parcels are comprised of various uses including, a closed vocational school, retail, and mixed use (office/multifamily). 3162 Commodore Plaza is currently being utilized as extended stay lodging with office use and said revenue is being utilized to offset predevelopment cost.

**TRANSACTION
SUMMARY**

Sponsorship has closed on 3120, 3138, 3162 Commodore Plaza. 3166, 3170 Commodore Plaza are under contract including an option to close as early as Dec. 2020.

**BUSINESS
PLAN**

I.) 3138, 3120 Commodore Plaza: The property will be redeveloped into an office building with retail at grade. The specific use will be co-working space with market/food hall located at grade including roof deck activation offering F&B options. II.) 3162 Commodore Plaza: The property will repositioned to co-living and extended stay use with commercial uses on lower levels including roof deck activation. III.) 3166, 3170 will be redeveloped as a multifamily property with co-living and extended stay uses with retail uses at grade along with roof deck activation.



3120, 3138, 3162, 3166, 3170 COMMODORE PLAZA, COCONUT GROVE, FL

# U R B I N COCONUT GROVE



**WORK SITE PROGRAMMING**

Ground up development of co-working and F&B oriented retail on the ground floor. The building is anticipated to comprise of 754 revenue generating desk spaces. Rentable SF is forecasted in the amount of 50,672 SF with 13,000 of retail bifurcated between the ground level and the rooftop.

**CO-LIVE/EXT. STAY SITE PROGRAMMING**

The live component of this project is bifurcated between two buildings. The first building is an existing asset that will be repositioned to co-living use with a combination of studios and co-living suites. Building two, will include extended stay lodging along with co-living suites and studios apartments. Both assets will include retail on the ground floor and rooftop activation.

## STATUS

The redevelopment of the Property is in the planned stages meaning architectural plans are in a position of meaningful percentage completion. The entitlements regarding co-living legislation continues to undergo the legislative process with the City of Miami. During said process Sponsorship continues to move forward with predevelopment work.

## VALUATION

Estimated Value of $187.2M

3120, 3138, 3162, 3166, 3170 COMMODORE PLAZA, COCONUT GROVE, FL

# U R B I N COCONUT GROVE

WE NEED A NEW URBAN LIVING SOLUTION. URBIN OFFERS AFFORDABLE GLOBAL MOBILITY THROUGH RESPONSIBLE GREEN LIVING AND WORKING IN URBAN CENTERS.



299 ALHAMBRA CIRCLE, 255-273 MINORCA AVENUE, CORAL GABLES, FL

# U R B I N CORAL GABLES

## PURCHASE PRICE
Phase 1: $12.5M; Phase 2: $11.5M (Target)

## PROJECT CAPITALIZATION
$110.4M (Incl. purchase, hard, soft and interest cost)

## ENTITLEMENTS
The entitlement process has commenced.

**ASSET SUMMARY**

The Project is comprised of two phases. (1) 299 Alhambra Circle is an existing 52,000 SF office building. A subsidiary of the Sponsor, Forum, which is a co-working operation, has opened on the ground floor the remainder of the building is currently traditional office use. There is also retail use on the ground floor. (2) 255-273 Minorca Avenue is 28,000 SF land assemblage to be developed into ground floor retail, parking for both phases, and co-living residential use.

**TRANSACTION SUMMARY**

Sponsorship has closed on 299 Alhambra Circle. Sponsorship holds an option to purchase Phase 2, which will be acquired at a future date.

**BUSINESS PLAN**

The Project is comprised of two phases and across the two phases, Sponsorship anticipates the creation of ~300 bedrooms, ~600 desks, 355 parking spaces and retail dedicated to health and wellness. Together, the combined ~250,000 SF project is located in one of the most desirable areas of Downtown Coral Gables within walking distance of Miracle Mile and the area's best amenities.



299 ALHAMBRA CIRCLE, 255-273 MINORCA AVENUE, CORAL GABLES, FL

# U R B I N CORAL GABLES



### WORK SITE PROGRAMMING

Phase 1: The Work Site, which is anticipated to provide 600 desks, is designed to accommodate multiple types of business, from artists and solopreneurs to tech startups and establish corporate companies. Spaces and offices are thoughtfully-planned to maximize space, provide multiple break out areas and ensure that everything is provided for.

### CO-LIVE/EXT. STAY SITE PROGRAMMING

Phase 2: Programming includes private bedrooms, in a co-living setting, and studios and micro studios. Bedrooms in shared suites each have a private bathroom. All studios have their own laundry, common area and kitchenette.

### STATUS

Phase 1: The ground floor has been repositioned to co-working space and the remainder of the building will be converted from traditional use to co-working use via phased process. Phase 2: This project is in the planned phase.

### VALUATION

Estimated Value of $135.9M

299 ALHAMBRA CIRCLE, 255-273 MINORCA AVENUE, CORAL GABLES, FL

# U R B I N CORAL GABLES

URBIN OFFERS A COMMUNITY FOR LIFE OUTSIDE—ENGAGING WITH OTHERS, GROWING PROFESSIONALLY, EXPLORING THE CITY AND HAVING AUTHENTIC EXPERIENCES. AS A NICHE MULTI-FAMILY OPPORTUNITY, WE ARE BUILDING A BRAND AND PRODUCT DEDICATED TO SOLVING REAL-WORLD PROBLEMS.



SOR

16

CURRENT VENTURES



# LUXURY CONDOMINIUMS

**CORAL GABLES  |  FORT LAUDERDALE**

501-525 VALENCIA AVENUE, CORAL GABLES, FL

# VILLA VALENCIA



**ASSET SUMMARY**

501-525 Valencia Avenue (the "Property") is a 45,299 SF site with an approved FAR of 135,687 SF with an additional 50,000 SF of garage space.c

**BUSINESS PLAN**

Ground-up development of boutique condominium building with 39 luxury units. Sizes range from 2300 – 6000 SF (ac) + terraces up to 3000 SF. Zoning & Land Use approvals & entitlements are in place with the City of Coral Gables.

**PURCHASE PRICE**

$16.0M or $353 per lot SF.

**PROJECT CAPITALIZATION**

$95.2M (Incl. purchase, hard, soft and interest cost)

**ENTITLEMENTS**

The City of Coral Gables has approved the Project.

501-525 VALENCIA AVENUE, CORAL GABLES, FL

# VILLA VALENCIA

WEBSITE VILLAVALENCIA.COM

## STATUS

The Property is under construction and the 6th level has been poured. Top of is anticipated with February of 2021 and TCO is expected in October of 2021.

## VALUATION

Projected Gross Sellout of $123.0M



501-525 VALENCIA AVENUE, CORAL GABLES, FL

SITUATED ON THE PRIVATE SIDE OF CORAL GABLES, VILLA VALENCIA FEATURES THIRTY-NINE LUXURY CONDOMINIUM RESIDENCES THAT OFFER A RICH CITY LIFESTYLE WITH THE PRIVACY OF BOUTIQUE LIVING.



VILLA VALENCIA

BAYSHORE DRIVE, FORT LAUDERDALE, FL

# 537
# BAYSHORE



| | |
|---|---|
| **ASSET SUMMARY** | 537 Bayshore Drive is a 67,000 SF site currently undergoing the entitlement process.  Based on the latest architectural drawings the project will consist of 384,000 gross square feet with 174,000 sellable square feet of space spread between two buildings that 11 levels in height including an activated roof deck. |
| **BUSINESS PLAN** | Ground-up development of a boutique condominium building comprised of 65 units with an average size of 1,200 SF per lower level villas and 2,800 SF per condominium. |
| **PURCHASE PRICE** | $25.0M or $373 per lot SF |
| **PROJECT CAPITALIZATION** | $100.2M (Incl. purchase, hard, soft, and interest cost) |
| **ENTITLEMENTS** | Currently in progress |
| **STATUS** | The project is undergoing the entitlement process with approvals expected in the near term |
| **VALUATION** | Projected Gross Sellout of $163.2M. |



CURRENT VENTURES



# MULTI-FAMILY

CORAL GABLES | COCONUT GROVE

800 SOUTH DIXIE HIGHWAY, CORAL GABLES, FL

# ORDUNA
# C O U R T



### ASSET SUMMARY

Orduna Court, a 24-unit modern co-living property in a boutique setting located within walking distance to the prestigious University of Miami. The residences are equipped with smart technology and thoughtful amenities. The property is made up of 24 spacious 2- and 3-bedroom newly renovated apartments, which feature generous balconies. This four-story building was constructed in 1982 and recently was renovated and modernized. In addition, the building has one level of covered parking. The property includes 42 surface parking spaces with a resort style swimming pool.

### TRANSACTION SUMMARY

The Property was purchased in 2017 based on value add strategy to convert traditional rental apartments to co-living use. Said use aligned with the asset's location across the street from the University of Miami.

### BUSINESS PLAN

The Property is an existing asset that was repositioned from traditional apartments to co-living use. The residences were renovated to include technology packages and thoughtful finishes. The renovations have been completed and the property was recently stabilized and recapitalized.

### PURCHASE PRICE

$7.8M or $304 per gross SF

### PROJECT CAPITALIZATION

$11.0M (Incl. purchase, hard, soft and interest cost)

800 SOUTH DIXIE HIGHWAY, CORAL GABLES, FL

# ORDUNA
# COURT

## STATUS

Business plan completed project; currently stabilized

## VALUATION

$18.0M



800 SOUTH DIXIE HIGHWAY, CORAL GABLES, FL

# ORDUNA
# COURT

MODERN LIVING IN THE HEART OF THE GABLES. WELCOME TO
YOUR TROPICAL-MODERN BOUTIQUE BUILDING EQUIPPED WITH
SMART TECHNOLOGY AND THOUGHTFUL AMENITIES LOCATED IN
THE HEART OF CORAL GABLES NEAR THE UNIVERSITY OF MIAMI.

WEBSITE

## ORDUNACOURT.COM



**3162 COMMODORE PLAZA, COCONUT GROVE, FL**



Commodore Inn The Grove in Miami, Florida, is the primary choice for extended-stay housing. Located in the heart of Coconut Grove, we offer long-term and short-term apartments in a relaxed, full-service environment you'll love.

Our warm and friendly staff are on hand to welcome you for your stay, where rentals include on-site parking, maid service, mail and package storage, secure access, balcony space and so much more. At Commodore Inn the Grove you'll have all you need so you feel right at home.

**WEBSITE**

COMMODOREINNTHEGROVE.COM





3162 COMMODORE PLAZA, COCONUT GROVE, FL



## FEATURES & AMENITIES

- Studios, 1 and 2-bedroom furnished apartments
- Parking inside covered secure garage
- Complimentary weekly housekeeping
- Full-Size Equipped Kitchens
- High Speed WIFI
- Flat Screen TV and Stereo System
- Pet Friendly up to 25 pounds, a non-refundable fee applies
- Mail receiving and package delivery service
- Washer & Dryer In Unit





CURRENT VENTURES



# SINGLE FAMILY

CHERYL LANE  |  STEWART AVENUE  |  LEUCADENDRA DRIVE

8325 CHERYL LANE, CORAL GABLES, FL

| LISTED AT | $12.9M |
| DESIGNED BY | CMA DESIGN STUDIO |
| WEBSITE | 8325CHERYLLANE.COM |

# CHERYL LANE

Cheryl Lane is a luxury personal resort located in Ponce Davis, Miami, and designed by CMA Design Studio. This truly exceptional, high-quality residence embodies the South Florida lifestyle, inside and out. Spanning two floors, the home features 6 bedrooms, including a master suite and three guest suites, 7 bathrooms, 3 half bathrooms, a media room, and suite of thoughtful-amenities. A singular blend of the natural environment and sophisticated timeless design, Cheryl Lane offers residents the ultimate personal resort in a private setting.



8325 CHERYL LANE, CORAL GABLES, FL

# CHERYL LANE

## FEATURES & AMENITIES

- Integrated Indoor/ Outdoor Lifestyle
- Lush Landscaping and Gardens
- Elegant European Fixtures & Finishes
- Subzero and Wolf appliances
- Designer Vanities and Custom Closets
- Customized Savant Home Technology System
- Hurricane Impact Resistant, Energy-Efficient Windows
- Temperature-Controlled Wine Room
- Outdoor Entertainment Area
- Home Spa Program with Hammam and Hydrotherapy Pool
- Gym & Fitness Area with Massage Room
- 360-Master Suite Program





3620 STEWART AVENUE, CORAL GABLES, FL

# STEWART AVENUE

Stewart Avenue is a four-floor luxury personal resort in a gated area of Coconut Grove in Miami, Florida. Spanning 10,000 square feet, the home has 4 bedrooms and 4 bathrooms alongside open plan living and dining as well a media study and master apartment. On the ground level, the hydrotherapy program includes a hammam, wet spa, and resort-style pool. The multi-level home is ideal for entertaining with indoor / outdoor spaces on every living level – a rooftop sky terrace places residents in the treetops for a truly unique home living experience. The home was designed by modernist and leading architect Max Strang of [STRANG] architecture.

DESIGNED BY STRANG DESIGN



3620 STEWART AVENUE, CORAL GABLES, FL

# STEWART AVENUE

## FEATURES & AMENITIES

- Integrated Indoor/ Outdoor Lifestyle
- Lush Landscaping and Gardens
- Elegant European Fixtures & Finishes
- Subzero and Wolf appliances
- Designer Vanities and Custom Closets
- Customized Savant Home Technology System
- Hurricane Impact Resistant, Energy-Efficient Windows
- Rooftop Entertainment Area
- Home Spa Program with Hammam
- Gym & Fitness Area
- 360-Master Suite Program





650 LEUCADENDRA DRIVE, CORAL GABLES FL

# LEUCADENDRA DRIVE

| | |
|---|---|
| **LOT SIZE** | 37,696 SF |
| **PURCHASE PRICE** | $6M |
| **ARCHITECT** | STRANG Design |
| **EXPECTED SF** | 12,423 SF Gross<br>8,757 SF A/C |
| **EXPECTED LIST PRICE** | $19.5M |





# THE TEAM

LOCATION DEVELOPMENT

# THE TEAM



## RISHI KAPOOR
**FOUNDER & CEO**
**LOCATION VENTURES**

Rishi has spent the last ten years focused on residential real estate, primarily in the luxury sector with a strong background in sales & marketing, prior to focusing on sponsoring development. Upon founding Location Ventures, he set out to create awesome living experiences in premium locations centered around nature and technology. To date, Rishi is responsible for leading the development of a $1B portfolio including: high-end, custom single-family homes; rehabilitation of multi-family properties; development of boutique condominiums; and is the Managing Partner of URBIN, a company dedicated to co-living, co-working and wellness.

Rishi first and foremost takes great pride in fostering close relationships with the company's partners & team. His day-to-day role centers around identifying unique opportunities, capital formation and setting the product vision for our projects while working closely with the development team on proper execution. He received business degrees in Finance, Marketing & Management from the University of Miami, and is also a non-practicing attorney, having graduated from UM Law. Rishi comes from a real estate family that has developed & invested in hotels, SFHs, and offices throughout the Southeast United States and New Delhi, India over the last 40 years.

## DANIEL MOTHA
**PARTNER & CFO**
**LOCATION VENTURES**

Daniel "DJ" Motha. CFO + Partner, Location Ventures. Daniel is responsible for the financial management, capital formation and acquisitions/dispositions for Location Ventures. Prior to becoming Partner at Location Ventures, his investments in real estate included renovating and leasing units in Coconut Grove, FL, renovating and leasing multi-family properties in the Boston area, as well as the development and sale of single family homes. Previously as an employee of LNR, he managed non-performing CMBS assets of all property types across the US, underwrote and acquired loan pools of performing and non-performing loans, and helped create a lending platform for customers to borrow funds to purchase properties on Auction.com. As an employee of BF Group, LLC, Daniel lead the acquisitions team, managed property development and re-development focusing on SFH and TH development, condo conversions, and other opportunistic deals. Daniel received a business degree in Finance & Accounting from the University of Miami.

# THE TEAM



## VIVIAN BONET
**PARTNER, CDO**
**LOCATION VENTURES**

Partner and Chief Development Officer Vivian Bonet is responsible for leading the company's design & construction efforts. With more than two decades of experience as an architect before focusing on development management, she is well-versed in the full lifecycle of a project from design to groundbreaking through completion. Vivian is responsible for GC management, consultant coordination, permitting, product specifications, contract documents and construction administration for the company's projects. Prior to joining Location Ventures, Vivian worked for Ocean Land Investments, The Y Group and CM Consulting Group. She has designed and developed more than 20 complex projects throughout her career, including a variety of luxury residential buildings, commercial projects and educational facilities. With residential development credits including AquaVita, AquaLuna, AquaMar, AquaBlu, Infinity at Brickell, the W Fort Lauderdale Hotel and Residences, and Ocean House, Vivian has a strong understanding of what drives buyers to South Florida's luxury market. Vivian earned her Bachelor of Architecture from the University of Miami. She is bilingual in English and Spanish.



| | |
|---|---|
| PROJECT | W FORT LAUDERDALE HOTEL & RESIDENCES |
| PRODUCT | 5-STAR HOTEL AND 171 LUXURY RESIDENCES |
| LOCATION | FT. LAUDERDALE, FL |



| | |
|---|---|
| PROJECT | AQUAVITA |
| PRODUCT | BOUTIQUE 22-UNIT ULTRA-LUXURY CONDO |
| LOCATION | EAST LAS OLAS ISLES, FT. LAUDERDALE, FL |



| | |
|---|---|
| PROJECT | INFINITY AT BRICKELL |
| PRODUCT | 452 LUXURY CONDO BUILDING |
| LOCATION | BRICKELL / MIAMI, FL |



| | |
|---|---|
| PROJECT | AQUALUNA |
| PRODUCT | BOUTIQUE 16-UNIT ULTRA-LUXURY CONDO |
| LOCATION | EAST LAS OLAS ISLES / FT. LAUDERDALE, FL |




| | |
|---|---|
| PROJECT | RIVA RESIDENCES |
| PRODUCT | 99 LUXURY CONDO BUILDING |
| LOCATION | FT. LAUDERDALE, FL |



| | |
|---|---|
| PROJECT | AQUABLU |
| PRODUCT | BOUTIQUE 16-UNIT ULTRA-LUXURY CONDO |
| LOCATION | FT. LAUDERDALE, FL |

| | |
|---|---|
| PROJECT | OCEAN HOUSE |
| PRODUCT | BOUTIQUE 18-UNIT ULTRA-LUXURY CONDO |
| LOCATION | MIAMI BEACH, FL |



# THE TEAM



## CLAUDIA MEZERHANE
**CHIEF OPERATIONS OFFICER**
**LOCATION VENTURES**

Claudia Mezerhane is Chief Operations Officer of Location Ventures. As the mastermind of the day-to-day operations of our company and our developments, Claudia is directly involved with our single-family home developments. She coordinates with our partners and ensures projects are on schedule and on budget. She holds an MBA from the University of Miami and is bilingual in Spanish and English.

## JOANNA DAVILA
**CHIEF MARKETING OFFICER**
**LOCATION VENTURES**

Chief Marketing Officer Joanna Davila leads all marketing and brand strategy and initiatives for the company and projects. With over 10 years of sales and marketing experience in the luxury and lifestyle sector, she ensures that our development vision resonates with the public. She has managed multi-million dollar businesses and has overseen global marketing campaigns for global luxury brands. Joanna is active in the Miami cultural scene and is working on several projects meant to engage local community. She is a graduate of the University of Miami and holds a B.A. in Journalism with a minor in Anthropology.

## RAYMOND GONZALEZ
**CHIEF TECHNOLOGY OFFICER**
**LOCATION VENTURES**

Our Chief Technology Officer, Raymond Gonzalez has over 15 years in the tech field with a focus on web development and digital marketing. As a full-stack web developer and web system administrator, he has worked on over 100 websites for small businesses to multi-million dollar corporations. Ray's current work also includes developing immersive 360-degree virtual experiences for our developments. He is also well-versed in digital marketing, using modern analytics to make data driven marketing decisions with continuous optimization. At the age of 13, Ray built his first computer and at 15, was the youngest person in the state of Florida to be Oracle PL/SQL certified. He is continually learning new programming frameworks, cryptocurrencies, machine learning, electronics and microcontroller programming

# THE TEAM



### ROMY KAPOOR
**GENERAL COUNSEL**
**LOCATION VENTURES**

Romy K. Kapoor is our active general counsel and go-to for all things legal. Romy is a founding partner of Kapoor Luther & Loftman Immigration Partners and has practiced U.S. immigration and nationality law since 1992. He received his B.S. degree in management from Georgia Tech, and shortly after earned his J.D. attending Georgia State University College of Law and the Atlanta Law School. He is listed as a Leading Business Immigration Lawyer in Chambers USA, Who's Who Legal of Corporate Immigration Lawyers, and The Best Lawyers in America. He has been honored in Georgia Super Lawyers each year since 2006.

### FRANK ASTOR
**VP OF DEVELOPMENT**
**LOCATION VENTURES**

Frank Astor is Location Venture's Development Manager, overseeing and helping to implement at all phases of development. He has over 10 years of operational management experience and is PMP certified with several years of project management experience from Ericsson. He has a Bachelors of Business Administration from University of Miami and holds a MBA from Texas A&M Mays Business School. Frank is bilingual in Spanish and English.

### ANGEL GARCIA
**VP OF DEVELOPMENT**
**LOCATION VENTURES**

Angel Garcia leads the underwriting, acquisitions, market research and project management for Location Ventures. With an eye on company growth objectives, Angel works closely with company leadership to establish Location Venture's expansion strategies. Prior to joining our firm, Angel was a senior acquisitions associate for BH3, a South Florida and New York City development firm. During his tenure, he sourced opportunities that presented excellent financial opportunities, underwriting over $500 million in transactions. As an employee of LNR Property (now Starwood Capital), he was an asset manager responsible for managing a portfolio of distressed assets along with underwriting note pools of non-performing notes. Angel has over 15 years of commercial real estate experience and earned a Master of Science in Real Estate from Florida International University.

### SELENA VENIZELOS
**VP, ASSET MANAGEMENT**
**LOCATION VENTURES**

Selena Venizelos leads the Asset Management department for Location Ventures. She is responsible for financial management, underwriting, and acquisition/disposition of assets. She also oversees much of the day-to-day operations of our properties to ensure functionality and to maximize profitability. Prior to joining our team, Selena spent six years working in Asset Management for Starwood Property Trust in Miami Beach. She holds a B.A. in Economics and Political Science from the George Washington University.



# OUR
# PARTNERS

LOCATION DEVELOPMENT

# OUR PARTNERS



We work alongside Miami's leaders in the real estate market from financiers to the fields of design and architecture, to create a truly unique living experience seldom seen in the South Florida market.

   

    

# THANK YOU

FOR MORE INFORMATION VISIT LOCATION.VENTURES

OR CONTACT US AT HELLO@LOCATION.PROPERTIES

