**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

SECURITIES AND EXCHANGE COMMISSION,

                     Plaintiff,

v.

RISHI KAPOOR *et al.*,

                     Defendant.

                  CASE NO. 23-24903-CIV-JB

_____/

**NON-PARTY MIRONEST CG, LLC'S OBJECTION AND RESERVATON OF RIGHTS IN RESPONSE TO THE RECEIVER'S MOTION TO APPROVE SETTLEMENT AGREEMENT WITH HALPERN PARTIES AND SALE OF VILLA VALENCIA UNIT <u>1301 PROPERTY TO HALPERN BUYER FREE AND CLEAR</u>**

Non-party Mironest CG, LLC ("Mironest") respectfully submits this Objection and Reservation of Rights (the "Objection") in Response to the Receiver's Motion to Approve Settlement Agreement with Halpern Parties and Sale of Villa Valencia Unit 1301 Property to Halpern Buyer Free and Clear [ECF No. 556] (the "Sale Motion"), and in support thereof, states as follows:

**<u>PRELIMINARY STATEMENT</u>**

1. The Sale Motion should be denied because it seeks to irreversibly transfer over $5 million of the estate's real property to an entity controlled by an insider -- Martin I. Halpern ("Halpern") -- who irrefutably participated in fraud at the Villa Valencia condominium project ("Valencia"). Even worse, because Halpern would pay for Unit 1301's purchase via a credit bid of his fraudulent claims (which should be equitably subordinated or recharacterized), the Receivership will not receive any distributable value from the proposed sale.

2. From the outset of this case, both the SEC and the Receiver advised the Court that

the Halpern Parties -- a series of entities controlled by Halpern -- were not just creditors, but were "intertwined" with the Receivership Entities, acting as equity investors in, lenders to, and purchasers of assets from a large number of the Receivership Entities. The Halpern Parties admit this in the Settlement Agreement attached to the Sale Motion.[1] More than two years ago, both the SEC and the Receiver expressed concern that the extent of the Halpern Parties' involvement with the Receivership Entities may have enabled them to commingle and divert millions of dollars, and the Receiver promised the Court she would conduct a full investigation. (*See* [ECF No. 146] at 8.) Rishi Kapoor ("Kapoor") confirmed that the commingling occurred when he plead guilty in May 2026, stating that, among other things, he and other "co-conspirators" defrauded investors and diverted their deposits and the proceeds of construction loans to other Location Ventures Projects. (Ex. A, Kapoor's Factual Proffer, ¶¶ 11, 17.) Kapoor specifically confessed to using construction loans for Commodore to pay off a large shareholder in Location Ventures who had discovered the fraud (*id.* ¶ 17), and former Location Ventures CFO Greg Brooks confirmed that those loans came from the Halpern Parties, who knowingly transferred the funds to Location Capital, not Commodore. (Ex. B, Transcript of Deposition of Former Location Ventures CFO Greg Brooks, at 26:2-27:18.)[2] Nonetheless, Halpern was granted a lien against Commodore, and

---

[1] The Halpern Parties represent that they and/or their affiliated parties are (i) creditors of the Commodore Properties *and* an investor in Urbin Coconut Grove Partners LLC, (ii) creditors of 515 Valencia SPE, LLC based on $31,000,000 in loans, and funds provided for Units 1004, 1104, 802 and 803, *and* an investor in 515 Valencia Partners LLC, (iii) creditors of Stewart Grove 1, LLC, (iv) lenders to CG Office SPE, (v) creditors of Redlands Phase I, LLC with respect to a $2,000,000 promissory note, (vi) equity investors in Urbin LLC, Location Ventures LLC, 619 Breakers SPE LLC and LV Montana Phase I LLC, and (vii) lenders to Rishi Kapoor in his individual capacity in the amount of $2,000,000. (*See* [ECF No. 556-1], § 4.)

[2] When a group of investors and other involved parties met with Kapoor to address his failure to pay them, it was Halpern who organized the meeting. (*See* Ex. C, Excerpt of Transcript of Deposition of Alex Kleyner, at 217:8-220:18.) Mironest specifically raised these issues to the Receiver multiple times, which is one of the reasons Mironest insisted on -- and the Receiver

the Receiver allowed Halpern to credit bid that claim to purchase Commodore prior to Kapoor's confession.

3.      The Halpern Parties involvement with Villa Valencia -- the first of the Location Ventures Projects -- was particularly harmful to the Receivership Estate, as it facilitated much of the fraudulent activity that followed.  The Halpern Parties not only owned equity in 515 Valencia Partners, LLC ("515 Valencia") and loaned $31 million to 515 Valencia , they entered into illusory purchase "option" contracts for four units at Valencia in May 2020 at the height of the COVID-19 pandemic that concealed and enabled fraud.  (*See* Ex. D at 4-7 (emails referring to Halpern's purchase "option" deposit on Unit 802 and refund of Halpern's "deposits" to pay down Halpern's loan balance.)  These "contracts," which permitted the Halpern Parties to cancel them at any time and receive a full refund of their deposits, were amplified in press releases, articles and social media posts.  (*See* Exs. E and F.)  Thus, they artificially inflated the Valencia's unit sales figures and allowed Valencia to seemingly remain in compliance with its $12 million first lien loan.[3]

4.      These "sales" concealed the fraud at Villa Valencia and enabled the frauds at the subsequent Location Ventures Projects.  Indeed, absent the inflated sales figures, there likely would have been a default under the first lien loan, and the first lien lender could have foreclosed on the Project or demanded a sale of the land.  Since the first lien loan balance was only $12 million at the time and the land had been purchased for $17 million, the first lien lender was fully secured.

---

agreed to -- a claw back of the repayments to first priority lender 515 Valencia SPE, LLC (the "Senior Lender").

[3] This fraudulent scheme also was perpetrated by Juan Gronlier, the owner of the tile company that sold tiles to Valencia (*see* Ex. G, Complaint in *Gronlier v. 515 Valencia SPE, LLC et al.*, "Gronlier Compl.," at ¶11), and possibly others.  Mironest has sought information about the extent of other fraudulent sales beyond the sales to Gronlier (Unit 501) and the Halpern Parties (Units 802, 803, 1004 and 1104), but has been unable to obtain such information as a result of the litigation stay entered in this case.

However, Halpern's $11 million second lien loan would almost certainly have been severely impaired. Thus, to protect their $1.3 million equity investment and their $11 million second lien loan, the Halpern Parties -- with co-conspirators Kapoor and 515 Valencia -- defrauded Mironest and other buyers into believing that sales at Valencia were strong, and induced Mironest and other innocent victims to enter into purchase agreements at inflated purchase prices. In short, absent these fake sales to Halpern, it is highly likely that the fraud at Villa Valencia would have collapsed on itself long before Mironest, and others, could be defrauded.

5.          Even if the Halpern Parties were not active participants in the fraud prior to May 2020 (and they may have been), at least the $20 million in loans that the Halpern Parties funded after May 2020 should be disallowed, equitably subordinated and/or recharacterized as equity if and when the Receiver completes the full investigation she promised this Court. But by permitting the Halpern Parties to credit bid their tainted claims to acquire estate property, the Sale Motion essentially cleanses the Halpern Parties' misconduct, with no way to recover the value of Unit 1301 for the benefit of the Receivership Estate and its innocent stakeholders. In this regard, the harm would be particularly severe for Mironest, which has the largest and most senior remaining claim against the 515 Valencia estate in the form of a $2.4 million vendee's lien, $600,000 in a security deposit held in escrow, $1.4 million in fixtures and fittings, and millions more in other damages.

6.          The Sale Motion should also be denied because it provides no basis for the Court to determine whether the value being provided by the Halpern Buyer reflects the greatest possible value to the 515 Valencia estate for Unit 1301 or whether the amount of the Halpern Buyer's claim is even sufficient to credit bid $7 million. It is apparent that Unit 1301 has never been properly marketed. Nearly two years ago, it was listed by the Receiver at $10,185,000, 73% above the

latest list price of $5.9 million, then was reduced to $8.5 million, then to $7.35 million, and then to $5.9 million, which, according to the Receiver, still has only elicited proposals "meaningfully below the list price". (Sale Motion ¶ 13.) Thus, the Receiver has completely missed the mark on the market value of Unit 1301 by repeatedly listing the unit at unreasonably high prices and chilling potential buyer interest. The objectively unreasonable listing price has resulted in two additional years of default rate interest that the Halpern Buyer now seeks to credit bid in a circular transaction that provides no benefit to the estate given the invalidity of the Halpern Buyer's underlying claim.

7.      Worse still, the Sale Motion grossly overstates the benefit to the estate of accepting a $7 million credit bid from the Halpern Buyer by asserting that the Halpern Parties are somehow owed $13.6 million, even though the Sale Motion suggests that by January 2023 the Halpern principal balance was paid down to $1.47 million (after over $29 million in "repayments"). (Sale Motion ¶ 17.) Although the Receiver "disputes" the amount of the Halpern Parties' claim, she fails to explain how she could arrive at that number or whether she has even conducted the investigation she promised to conduct more than two years ago. Instead, the Receiver cites to the Halpern Parties' unsubstantiated and obviously inflated claim in order to create the appearance that the proposed sale confers significant value to the estate.

8.      In this regard, the vast difference between the $7 million "sale" price proposed in the Sale Motion and the apparent market value of Unit 1301 raises -- at a minimum -- serious red flags concerning the proposed transaction. Indeed, no legitimate, arms-length purchaser would pay $1.1 million over a list price, particularly when that price did not elicit a single offer (and only elicited "proposals…meaningfully below" the list price that the Receiver deemed insufficient). Nor would a legitimate, arms-length purchaser pay such an exorbitant price AND compromise $8.7 million of its claims if those claims were legitimate. That the Halpern Buyer is willing to do

both of these things confirms that it is seeking to essentially launder its fraudulent claims through the Court approval process.

9.      The Court should not permit the Halpern Buyer to do so, particularly where the proposed "sale" will materially harm the Receivership Estate's innocent stakeholders.  The Sale Motion should be denied.

<b><u>FACTUAL BACKGROUND</u></b>

### A.  <u>The Fraud At Villa Valencia.</u>

10.     Mironest -- the purchaser under an active, pre-receivership Purchase Agreement for Unit 1202 (the "Unit") at Villa Valencia -- is an innocent victim of the fraud perpetrated at Villa Valencia.  The extent of the fraud is detailed in Mironest's pre-receivership lawsuit against 515 Valencia, Location Ventures, LLC ("Location Ventures"), the Halpern Parties, 515 Valencia SPE, LLC ("Gutlohn"), Winmar Construction ("Winmar"), ONE Sotheby's, and others (the "Mironest Lawsuit").  (*See* Ex. H.)  In the Mironest Lawsuit, Mironest alleges that defendants made a number of fraudulent misrepresentations and omissions to induce Mironest to purchase the Unit, and to do so at an inflated price.  Defendants then laundered and diverted funds meant for construction to other projects and themselves, entered into more than $30 million in predatory loans with Halpern and his affiliates, who continually lent tens of millions of dollars to a project Halpern knew was suffused with fraud, while receiving fraudulent and/or inequitable liens and improper paydowns from sales deposits.[4]

---

[4] The Senior Lender also made approximately $35 million in loans with, at the very least, constructive knowledge of the fraud.  For its part, Winmar falsified invoices for construction that never occurred, but are being used to support more than $3 million in fraudulent liens at 515 Valencia.  Filed liens and other publicly available information reflect that Winmar billed $70.1 million (or 45% more than budgeted), and was actually paid $66.8 million (or $18.5 million more than budgeted), but never came close to completing Units 1201, 1202 or 1301, which remain unfinished, bare-shell units.  Notwithstanding, Winmar was paid $8.8 million (and billed over $10

11.     In 2021, being unaware of the fraud, Mironest entered into a Purchase Agreement (the "Purchase Agreement") for the purchase price of $6 million, with a stated completion date by 515 Valencia of June 2022 (with the ability to extend until August 2022).  (*See* Ex. I.)  Upon signing the Purchase Agreement, Mironest paid a total of $3 million in cash to 515 Valencia, $2.4 million of which was supposed to be used to complete Unit 1202's fit out, with the remaining $600,000 still held in escrow.  The $2.4 million was never spent on the Unit and was siphoned off as part of the fraud.

12.     In August 2022, Mironest sent 515 Valencia a Notice of Default due to its failure to complete Unit 1202.  In response, 515 Valencia -- through its counsel Goodkind & Florio -- represented that it had received additional funding, and that Unit 1202 would be completed shortly, so long as Mironest paid or committed to pay an additional $1.4 million to complete the custom build-out of Unit 1202.[5]  Because Mironest's principals were unaware of the fraud and were eager to move from rented accommodations into their new home, Mironest wired the additional amounts.

13.     Thus, Mironest has millions of dollars in claims against the Villa Valencia Estate, including its $2.4 million in deposits (which are secured by a vendee's lien on Unit 1202), $1.4 million in additional deposits, and more than $2 million in legal fees and other costs incurred as a result of the 4-year delay.[6]

---

million) for work that was never done on the units.  On November 12, 2025, the Receiver served Winmar with a subpoena, but for some reason, has not served Halpern, the Senior Lender or any other parties with a subpoena.

[5] 515 Valencia also promised that it and its principals would provide guarantees in exchange for Mironest's agreement to subordinate their interests -- including their vendee's lien -- to any loans that were used to fund or refinance construction.  Those guarantees were never provided; thus, Mironest's agreement to subordinate its lien is unenforceable.

[6]  Mironest has the right to terminate the Purchase Agreement due to, among other things, 515 Valencia's failure to meet the completion deadline, but Mironest has not done so.  Mironest and

**B. The Halpern Parties' Participation in the Kapoor Fraud.**

14.     The Halpern Parties are not arms-length secured lenders to the Project and the other Receivership Entities.  As the Receiver knows, Halpern is an insider of the Project and/or the Receivership Estate.  Indeed, more than two years ago, the Receiver advised this Court:  "The Halpern Parties are *intertwined* with the Receivership Property and Rishi Kapoor through numerous transactions and arrangements as purported lenders, investors, and purchasers of condominium units." (Receiver's Response in Opposition to Halpern Parties' Verified Motion to Intervene [ECF No. 146], at 5) (emphasis added).  At that early period in the Receivership, the Receiver informed the Court that the Halpern Parties owned equity in numerous Receivership Entities, had made secured loans to Receivership properties, supposedly had purchased 4 units at Valencia, and had wired $2 million dollars to Kapoor's personal account.  (*See id.* at 5-6; *see also* Plaintiff Securities and Exchange Commission's Response in Opposition to Martin I. Halpern's Verified Motion to Intervene [ECF No. 145], at 1:  "Halpern is not a mere creditor.  He is also an investor who, personally, and through his Trusts, invested millions of dollars in several real estate projects Defendant Kapoor and others used to defraud investors and misappropriate millions of dollars as part of a complex real estate investment scheme that is the subject of the Commission's enforcement action."; Ex. B, at 33:1-4:  "Q. Was Halpern Rishi's main investor?  A. He was the largest investor for sure.  And he was certainly the provider of this bailout capital exclusively.")

15.     Early in the Receivership, the Receiver had serious concerns relating to the Halpern Parties' apparent involvement with the commingling and diversion of estate assets underlying the fraud in this case.  For example, the Receiver advised the Court that the Halpern Family Trust

---

the Receiver currently are negotiating the terms under which Mironest may "repurchase" Unit 1202.

provided a $4 million secured loan to the Stewart Property, even though "a significant portion of the construction had already occurred at the time the loan was made and $4 million was not needed to complete the Stewart Property," and that the funds were not wired to the alleged borrower, but to Location Capital, LLC.  ([ECF No. 146] at 7.)  Thus, the Receiver promised more than two years ago that it was "continuing to investigate both the use of the funds and the extent of the lender's knowledge or inquiry regarding their use." (*Id.*)

16.     Similarly, the Receiver observed highly suspicious activity by the Halpern Parties with respect to an alleged $2.4 million loan to the Urbin Coconut Grove property, stating that "the movement of funds from the Halpern Parties is not straightforward," and that the funds were transferred to parties other than the borrower.  (*See* [ECF No. 146] at 8.)[7]  Again, the Receiver promised that it was "continuing to investigate both the use of the funds and the lender's knowledge or inquiry regarding the use of the funds." (*Id.*)

17.     In the intervening two-plus years, the Receiver has not disclosed what, if anything, she did to "investigate" the Halpern Parties' involvement, and what, if anything, she concluded. Nor does she disclose any of this information in the Sale Motion, which seeks to irreversibly provide the Halpern Parties with millions of dollars of estate property, to the detriment of Mironest and the estate's other innocent victims, even though Kapoor's confession and the available evidence now confirms the Halpern Parties' participation in the fraud.

---

[7] Mr. Brooks testified during his deposition that the Halpern Entities owned at least 7.42% of equity in the Urbin Coconut Grove project and also funded a buyout of another significant equity owner, Zanzuri.  (Ex. B, at 17:5-20.)  The amount of the equity buyout that the Halpern Entities funded was so significant that Kapoor apparently commented that he no longer needed shareholder consent for additional loans because "we have majority now that Marty had bought out -- that Halpern had bought out that Zanzuri piece." (*See id*. 26:2-28:24.)

### C.  **The Halpern Parties' "Fake" Purchases At Villa Valencia.**

18.  During the height of the Covid-19 pandemic, 515 Valencia was saddled with $12 million in first lien debt and $11 million in second lien debt (Halpern Entities), but had only sold 5 out of 39 units and, as a result, was already on the verge of default under its loan documents. (*See* Ex. G, at ¶11.)  Thus, Halpern -- who had just funded an additional $6 million in loans -- entered into option contracts to "purchase" four additional units in May 2020 to cure the default. But those sales contracts with Halpern -- like the one with Gronlier -- were, in fact, purchase "options" that permitted the buyers to cancel their contracts, with a full return of their deposits. (*See* Ex. D at 4-7; Ex. G, at ¶¶11-20 and Ex. A.)[8]

19.  After entering into the fake sales contracts, which concealed the fraud at Villa Valencia and artificially prolonged the project, Halpern made an additional $20 million in purportedly secured "loans" (he was repaid on all but $1.47 million of his aggregate $31 million in "loans" to 515 Valencia).

### D.  **The Global Interest Purchase Agreement.**

20.  On December 31, 2022, Kapoor entered into an agreement (the "Global Interest Purchase Agreement") in which Kapoor agreed that Location Ventures and other Receivership Entities would repurchase the equity interests of two shareholders of Location Ventures and other Receivership Entities (the "Global Interest Purchase Agreement Shareholders") for approximately $45 million pursuant to a payment plan.  Between January and March 2023, 515 Valencia and other Receivership Entities incurred millions of dollars of "loans" that -- rather than being used

---

[8] The Halpern Parties' agreement with the Receiver to abandon their $3.18 million in "deposits" with respect to Units 802, 803 and 1104 confirms their culpability.  (Motion ¶ 26(c).)  Given the patently fraudulent nature of these illusory purchases, and the resulting harm to the estate, the Halpern Parties' agreement in this regard is not a legitimate concession and does not provide the Receivership Estate with any meaningful value (beyond the avoidance of nuisance costs).

for construction -- were used to partially fund the purchase of these worthless equity interests.

21.     During this period the Global Interest Purchase Agreement Shareholders received approximately $20 million in payments, while 515 Valencia and Location Ventures were insolvent.  These purchases provided no benefit to the estate and its stakeholders, but saddled 515 Valencia and other Receivership Entities with purported loans that shortly thereafter began to accrue default rate interest.[9]

22.     In May 2023, after Kapoor defaulted under his obligations under the Global Interest Purchase Agreement, Kapoor met with two investors to discuss his "options":  Alex Kleyner and Halpern.  (*See* Ex. C, at 217:8-220:18.)  Thereafter, it was Halpern who organized a meeting with Kapoor, Kleyner and other investors.  (*See id.*)

### E. <u>The Marketing Of Unit 1301 And The Sale Motion.</u>

23.     The Sale Motion indicates that Unit 1301 was not properly marketed by the Receiver.  The Unit was listed in September 2024 for $10.19 million, reduced to $8.5 million three months later, further reduced to $7.35 million three months after that, and then reduced to $5.9 million  nearly a year after that.  (Sale Motion ¶¶ 11-14.)  And even at a 58% discount off of the initial list price, the Receiver asserts that she did not receive cash offers that she was willing to accept.  (*Id.* ¶13.)  The Receiver does not explain in the Sale Motion how she allowed Unit 1301 to languish on the market for nearly two years at such a grossly inflated price, while default rate interest continued to accrue at 18% on the Halpern Parties' purported loans and at 25% on the Senior Lender's loans.  In this regard, the unreasonable manner in which Unit 1301 was marketed

---

[9] Moreover, emails between Kapoor and Gutlohn discuss additional potential "loans" to 515 Valencia, where the proceeds would be used for purposes other than construction on the project, such as "to pay off Kleiner timely on 3/15 (drop dead)" under the Global Interest Purchase Agreement and "to give Marty [Halpern] some liquidity".  (*See* Ex. J at 3, 5.)

only inflated the artificial value that the Halpern Parties' could credit bid, to the detriment of the Receivership Estate's innocent creditors.

24.     To that end, the Sale Motion also indicates that the Halpern Parties may not be providing fair value -- let alone the highest available value -- for Unit 1301.  In the Sale Motion, the Receiver appears to simply accept the Halpern Parties' representations concerning how much they loaned ($31 million) and how much they were repaid (approximately $29.5 million).  (Sale Motion ¶¶ 11-14.)  But even accepting those representations as true, the Halpern Parties only would be owed less than $1.5 million in principal, and perhaps some unspecific amount of unpaid interest. Yet the Sale Motion provides that the Halpern Parties claim they are owed $9,450,753 in principal and $4,147,019 in accrued interest.  (Sale Motion ¶ 14.)  The Receiver asserts that she "disputes" that amount (*id.*), but fails to explain the incredible disparity or whether she has even investigated the Halpern Parties' claims or their conduct.  Accordingly, even if the Halpern Parties' claims are not subordinated, disallowed or recharacterized as a result of their conduct, it is not apparent from the Sale Motion that the Halpern Parties even have $7 million in legitimate claims to credit against the purchase of Unit 1301.[10]

## MEMORANDUM OF LAW

### I.     Applicable Standard

A "district court has broad powers and wide discretion to determine relief in an equity receivership." *SEC v. Elliott,* 953 F.2d 1560, 1566 (11th Cir. 1992).  This discretion derives from the inherent powers granted an equity court to fashion relief. *Id.* (citing *SEC v. Safety Finance Service, Inc.,* 674 F.2d 368, 372 (5th Cir. 1982)); *accord John W. Bendall, Jr. v. Lancer*

---

[10] By contrast, the Receiver has refused to permit Mironest to credit bid its $2.4 million in indisputable deposits to "repurchase" Unit 1202.

*Management Group, LLC*, 523 F. App'x 554, 558-59 (11th Cir. 2013). While the Order Appointing Receiver in this case provides the Receiver with broad discretion in exercising her powers to preserve and protect assets of the Receivership Estate, it is the Court that retains the ultimate discretion in how those powers are exercised. *See FTC v. On Point Global, LLC*, No. 19-25046-CIV-Scola, 2020 U.S. Dist. LEXIS 180255 \*10 (S.D. Fla. Sept. 30, 2020).

"Receivership courts have the general power to use summary procedures in allowing, disallowing, or subordinating the claims of creditors." *Sec. & Exch. Comm'n v. Complete Bus. Sols. Grp., Inc.,* 2024 WL 5348580, at \*26 (S.D. Fla. Dec. 16, 2024), *appeal dismissed*, 2025 WL 1950916 (11th Cir. Apr. 30, 2025) (citations omitted). In exercising that power, receivership courts often apply bankruptcy principles because both receivership and bankruptcy proceedings share the goal of orderly estate administration for the benefit of creditors. *See, e.g., S.E.C. v. Wells Fargo Bank, N.A.,* 848 F.3d 1339, 1344 (11th Cir. 2017); *Elliott*, 953 F.2d at 1567, 1572-73;*Bendell*, 523 F. App'x at 559.

## II. The Halpern Buyer Should Not Be Permitted To Credit Bid Its Claims Because They Are Likely To Be Disallowed Or Subordinated.

In bankruptcy proceedings, a secured creditor has the right to credit bid on property that is the subject of its secured lien unless the court orders otherwise for cause. *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 593 (Bankr. S.D.N.Y. 2024) (quoting *In re Aeropostale, Inc.,* 555 B.R. 369, 414-15 (Bankr. S.D.N.Y. 2016)). Thus, the Court has the broad discretion to deny a secured creditor the opportunity to credit bid. *Id.*; *In re Fisker Auto. Holdings, Inc.,* 510 B.R. 55, 61 (Bankr. D.Del. 2014) (refusing to permit credit bid of disputed portion of alleged secured claim).[11]

---

[11] The same equitable principle applies in receiverships. *See, e.g., United States Sec. & Exch. Comm'n v. Equitybuild, Inc.,* 2019 WL 10371626, at \*3 (N.D. Ill. July 9, 2019).

Because only holders of valid security interests and allowed claims are permitted to credit bid, courts in this and other circuits routinely deny purportedly secured lenders the opportunity to credit bid when a sufficient dispute exists regarding the extent or validity of the lien forming the basis for a credit bid. *See In re Heritage Hotel Assocs., LLC*, 2020 WL 8611083, at *3 (Bankr. M.D. Fla. Sept. 11, 2020) (creditor not permitted to include disputed default interest in its credit bid); *In re D.A.B. Constructors, Inc.*, 2022 WL 854777, *3 (Bankr. M.D. Fla. Mar. 15, 2022) (sustaining objection to a surety's right to credit bid where there was a bona fide dispute concerning the surety's claims); *Weiss Multi-Strategy Advisers LLC*, 665 B.R. at 593 (secured creditor not entitled to credit bid because the validity of its lien was "hotly contested"); *In re Daufuskie Island Props., LLC*, 441 B.R. 60, 64 (Bankr. D.S.C. 2010) (denying putative mortgage holder the right to credit bid because, among other things, adversary proceedings had been filed to invalidate and/or subordinate the asserted mortgage); *In re McMullan*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996), *subsequently aff'd sub nom. McMullan v. Nat'l Bank of Com.*, 162 F.3d 1164 (8th Cir. 1998) (lender not permitted to credit bid disputed liens or security interest).[12]

Here, as set forth in the Mironest Lawsuit, there is at the very least a *bona fide* dispute concerning the validity and extent of those liens. (*See* Ex. H.)  Moreover, even absent the Mironest Lawsuit, the publicly available evidence -- including, among other things, the Halpern Buyer's

---

[12] Critically, the court does not need to resolve the underlying dispute, but only determine "whether there is an objective basis for either a factual or legal dispute as to the validity of the debt." *In re D.A.B. Constructors,* 2022 WL 854777 at *3, n. 23 (citations omitted); *see also In re Heritage Hotel Assocs., LLC,* No. 8:19-BK-09946-CED, 2020 WL 8611083, at *3 (Bankr. M.D. Fla. Sept. 11, 2020) (creditor not permitted to include disputed default interest in its credit bid); *In re Akard St. Fuels, L.P.*, No. CIV.A.3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (cause existed to prohibit purported secured creditor from credit bidding where the challenge to its liens constituted a *bona fide* dispute); *In re L.L. Murphrey Co.*, No. 12-03837-8-JRL, 2013 WL 2451368, at *5 (Bankr. E.D.N.C. June 6, 2013) (denying creditor the right to credit bid because the basis the asserted liens were disputed).

illusory purchase contracts that were used to conceal and prolong the fraud after Halpern had loaned $11 million to Valencia -- strongly supports the disallowance or subordination of at least $20 million of the Halpern Parties' claims.

### A.  The Halpern Buyer's Claims Should Be Equitably Subordinated.

When circumstances warrant, the Court is authorized to subordinate claims pursuant to its broad equitable powers.  *Complete Business Solutions,* 2024 WL 5348580, *26 (S.D.Fla. Dec. 16, 2024) (citing *SEC v. Ariz. Fuels Corp.*, 739 F.2d 455, 458 (9th Cir. 1984)).   Equitable subordination is warranted where: (i) the claimant engaged in inequitable conduct; (ii) such inequitable conduct resulted in injury to other creditors or an unfair advantage to the claimant; and (iii) equitable subordination of the claim is not inconsistent with any provisions of the bankruptcy code.  *In re N & D Props., Inc.*, 799 F.2d 726, 731 (11th Cir. 1986) (citing *In re Mobile Steel,* 563 F.3d 692 (5th Cir. 1977)).  As courts within the Eleventh Circuit have recognized, however, the third prong of the *Mobile Steel* test is now moot or of minimal significance.  *See In re Diasonics, Inc.,* 121 B.R. 626 (Bankr. N.D. Fla. 1990).[13]

Critically, equitable subordination does not require that the misconduct at issue be related to the acquisition or assertion of the claim.  *See Mobile Steel,* 563 F.2d at 700 (citing *In re Kansas City Journal–Post Co.,* 144 F.2d 791 (8th Cir.1944)). The requisite inequitable conduct "may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate."  *In re Mahan*, 373 B.R. 177, 183 (Bankr. M.D. Fla. 2007), *aff'd,* 2008 WL 11336387 (M.D. Fla. June 6, 2008) (quoting *Kansas City Journal-Post,* 144 F.2d at 804); *see*

---

[13] Principles of equitable subordination also are applicable in receiverships. *See S.E.C. v. Spongetech Delivery Sys., Inc.*, 98 F. Supp. 3d 530, 551 (E.D.N.Y. 2015).

*also In re Lemco Gypsum, Inc.,* 911 F.2d 1553, 1557 (11th Cir. 1990).  Thus, subordination of a claim is particularly appropriate where, as here, the claimant has engaged in misconduct or participated in, or was intimately aware of, the fraudulent scheme of the debtor.  *See Complete Business Solutions,* 2024 WL 5348580, at *26 (citations omitted).

Where the claimant is an insider, the party seeking subordination must only present material evidence of the creditor's unfair conduct.  *In re N&D Props.,* 799 F.2d at 731 (citation omitted).  And where material evidence of unfair conduct is provided, the burden shifts to the insider, who "can rescue its claims from subordination only by proving the good faith and fairness of its dealings."  *Id*; *see also In re Eddy,* 572 B.R. 774, 782-83 (Bankr. S.D. Fla. 2017) (an insider's claim may be equitably subordinated if the creditor engaged in "any unfair conduct" over its course of dealings with the debtor.)  If the claimant is not an insider or fiduciary, more egregious conduct such as fraud, spoliation, or overreaching must be demonstrated.  *Id.*

1.   The Halpern Buyer Is An Insider.

In the Eleventh Circuit, whether a creditor obtains "insider status should be answered by considering (1) the closeness of the relationship between the transferee and the debtor, and (2) whether the transaction between the parties was conducted at arm's length."  *In re Island One,* 2013 WL 593365, *2 (Bankr. M.D.Fla. Feb. 22, 2013) ("insider" status requires a sufficiently close relationship with the defendants "so as to subject the relationship to careful scrutiny"); *In re Fla. Fund of Coral Gables, Ltd.,* 144 F. App'x 72, 75 (11th Cir. 2005).  With respect to the closeness of the relationship, "[t]here must be enough influence or control over a debtor to improperly influence the transfers in dispute."  *Island One,* 2013 WL 593365 at *2.  Where such influence or control exists, an insider-claimant's dealings are subject to "special scrutiny" and are to be examined "with a large measure of watchful care."  *Lemco Gypsum,* 911 F.2d at 1557 (quoting *In*

*re Mobile Steel,* 563 F.2d 692, 702 (5th Cir.1977)).

Here, the Halpern Parties were insiders of the Receivership Estate whose claims should be subordinated at the very least, if not disallowed in their entirety. The Halpern Parties acted as non-arm's length lenders of tens of millions of dollars to a number of Receivership properties and to Kapoor himself, equity investors in numerous Receivership Entities, and purported purchasers of millions of dollars of condominium units at Villa Valencia. ([ECF No. 556-1], § 4.) The extent of the Halpern Parties' financing activities were so "intertwined" with, and critical to, the Receivership Entities' business that the Halpern Entities were able to exercise enough influence and control over the entities to improperly influence the transfers in dispute. Thus, when the Halpern Parties needed liquidity, Kapoor sought to leverage the assets of the Receivership Entities to provide it to Halpern. When Kapoor and 515 Valencia needed to inflate sales figures at Villa Valencia to remain in compliance with their construction loan, the Halpern Buyer pretended to "purchase" four separate condominium units pursuant to illusory purchase contracts. And when Kapoor defaulted on his obligations under the Global Interest Purchase Agreement, it was Halpern who directed and organized a meeting with investors and other stakeholders to address the options. Accordingly, Halpern should be deemed an "insider" by the Court. *See Island One, supra.*

Moreover, as an "insider" of the Receivership Estate, the Halpern Buyer cannot satisfy its burden to demonstrate that its actions were taken in good faith and were fair. To the contrary, the Halpern Parties burdened the estate with tens of millions of dollars of loans, some of which plainly were not used for the Project, and the Halpern Parties entered into facially improper purchase contracts to conceal the fraud at the Project and defraud prospective buyers. Under these circumstances, the Halpern Buyer's claims should be subordinated at the very least. *See In re Eddy,* 572 B.R. at 778 (subordinating insider-claimant who participated in the debtor's fraud by

advancing funds to the debtor and obtaining a security interest in hidden assets); *see also In re Fabricators, Inc.*, 926 F.2d 1458, 1467-68 (5th Cir. 1991) (subordinating claim of insider who improperly obtained a lien on the debtor's assets to secure its capital contributions and caused other creditors to extend new credit, when the insider knew or should have known that the debtor was in financial trouble); *In re Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir. 1993) (affirming equitable subordination of insider's claim, where insider continued to advance funds to the insolvent debtor corporation, despite knowing of debtor's precarious financial condition).[14]

> 2. The Halpern Buyer's Claims Are Subject To Subordination Even If The Halpern Parties Are Not Insiders.

A party seeking to equitably subordinate the claim of a non-insider must demonstrate conduct more egregious than simply unfair conduct, such as fraud, spoliation, or overreaching. *N & D Props., Inc.*, 799 F.2d at 731; *see also In re Granite Partners, L.P.,* 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) (recognizing equitable subordination of an ordinary creditor's claims is appropriate based upon a finding of actionable wrongdoing, including conduct that is "tantamount to fraud").[15]  In this regard, fraudulent acts or misrepresentations that induce additional investment or extension of further credit are undoubtedly "tantamount to fraud," and support equitable subordination of non-insider claims. *See Granite Partners*, 210 B.R. at 515 (allegation that broker-

---

[14] At a minimum, the Halpern Buyer's claim should be subordinated to Mironest's claim, given the vendee's lien resulting from Mironest's purchase deposits (which were induced by the Halpern Buyer's actions). *See In re Laketown Wharf Mktg. Corp.*, 433 B.R. 401, 414–15 (Bankr.N.D. Fla. 2010) ("Florida law recognizes a vendee's lien as a remedy afforded to real estate purchasers in their recovery for money paid on the contract"); *In re Ecoventure Wiggins Pass, Ltd.*, 419 B.R. 875, 880 (Bankr. M.D.Fla. 2009) (vendee's lien appropriate where deposits paid and contract canceled by developer in bankruptcy).

[15] While fraud or misrepresentation "are the most frequent justifications for equitable subordination" of a non-insider, they are not required. *See In re 604 Columbus Ave. Realty Tr.*, 968 F.2d 1332, 1361, 1363 (1st Cir. 1992) (affirming equitable subordination of bank's secured claim where bank improperly withdrew loan proceeds in excess of the limit in the loan documents, depleting available assets).

dealer aided and abetted hedge funds' scheme to fraudulently induce investment in the funds sufficiently pleaded a claim for equitable subordination); *In re Osborne*, 42 B.R. 988, 1000 (W.D.Wis. 1984) (subordinating claim of secured lender who made misrepresentations that induced another creditor to continue fund the debtor); *In re Sepco, Inc*., 36 B.R. 279, 286 (Bankr.D.S.D. 1984) (subordinating bank's junior lien where the bank fraudulently induced the holder of a senior lien to sign a subordination agreement); *In re Just for the Fun of It of Tennessee, Inc*., 7 B.R. 166, 180-81 (Bankr. E.D.Tenn. 1980) (subordinating claim of a general contractor who filed a false notice of completion that induced bank to extend additional loans to debtor).

Here, as discussed *supra*, the publicly available evidence strongly suggests that the Halpern Parties engaged in actions -- including sham "option" purchase contracts -- that induced others, including Mironest, to extend credit to the estate in the form of loans and/or purchase deposits, and that enabled Kapoor and others to continue to commingle assets among the Location Ventures Projects and siphon assets for their personal use.  As such, the Halpern Buyer appears to have engaged in the type of fraudulent and inequitable conduct that rises to the level necessary to warrant subordination of non-insider claims.  Accordingly, the Halpern Parties' claims should be subordinated even if the Halpern Buyer is not deemed to be an insider.[16]

---

[16] Alternatively, even if the Halpern Buyer's claims are not subject to equitable subordination, the loans should be recharacterized as the capital contributions that they effectively were.  *See In re N & D Properties, Inc.,* 799 F.2d at 733 (recognizing broad power of bankruptcy court to recharacterize debt as equity); *In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 879 (Bankr. S.D. Fla. 2008) (recognizing the court's "authority to recharacterize loans that are in substance equity, regardless of whether the putative lender was or was not a shareholder of the debtor at the time of the transaction"); *Fabricators,* 926 F.2d at 1469 ("When an insider makes a loan to an undercapitalized corporation, a court may recast the loans as contributions to capital."); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626 (Bankr. N.D. Fla. 1990) (recharacterizing loans as capital contributions).

**B. If The Halpern Buyer Is Permitted to Credit Bid, It Should Be Required To Post Security.**

Even where the opportunity to credit bid is not denied to a secured creditor, courts require the posting of security as a condition to the credit bid if the lien is disputed.  In this regard, courts have required secured creditors to post a bond, place cash in escrow, pay a portion of the bid in cash or furnish a letter of credit when the amount and validity of an alleged lien is in dispute.  *See Erkal Uluslararasi Nakliyat ve Tic A.S. v. Transatlantic Lines, LLC*, 2017 WL 10841699, *2 (M.D.Fla. Oct. 6, 2017) (requiring a bond as a condition to mortgagee's credit bid where the priority of the mortgage claim was contested); *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991) (requiring creditor to post an irrevocable letter of credit); *In re RML Dev., Inc.*, 528 B.R. 150, 155-57 (Bankr. W.D. Tenn. 2014) (requiring funds to be paid into escrow); *United States Sec. & Exch. Comm'n v. Equitybuild, Inc.,* No. 18 CV 5587, 2019 WL 1953117 at *3 (N.D. Ill. May 2, 2019) (where a *bona fide* dispute as to the validity of a lender's debt existed, the lender must post an escrow payment of up to the amount of the credit bid); *Equitybuild, Inc.,* 2019 WL 10371626, at *3 (rejecting challenge to credit bid procedures); *In re Diebart Bancroft,* 1993 WL 21423, *5 (E.D.La. Jan. 26, 1993) (requiring portion of sale price to be paid into escrow).

Here, there is at the very least a *bona fide* dispute concerning the extent and validity of the Halpern Parties' liens.  Both the Receiver and the SEC articulated their concerns more than two years ago, and the publicly available evidence -- *e.g.*, Kapoor's confession, liens, lawsuits, illusory purchase agreements and emails -- confirms the merit of their concerns.  Given the significant evidence concerning the Halpern Parties' misconduct, the Halpern Buyer should, at a minimum, be required to either post a bond or escrow the full purchase price of the unit so that the Receivership Estate and its innocent creditors are not left without a remedy if and when the Receiver successfully prosecutes her claims against the Halpern Parties.

## CONCLUSION

WHEREFORE, Mironest respectfully requests that the Court enter an Order sustaining the Objection, denying the Sale Motion, and granting such further relief as the Court deems just and proper.

### Local Rule 7.1 Certification

On July 20, 2026, Mironest's counsel sent an email to the Receiver's counsel setting forth the basis for Mironest's objection to the Sale Motion.  Later that day, Mironest's counsel and the Receiver's counsel participated in a telephone call in which they briefly discussed the issue.  Thereafter, on August 9, 2026, Mironest's counsel and its principals participated in a telephone call with the Receiver's counsel in which the Sale Motion and Mironest's objection were discussed.  The parties were unable to resolve Mironest's objection.

Dated:  August 10, 2026                                   MINSKER LAW PLLC


                                                          */s/ Jonathan E. Minsker*
                                                          Jonathan E. Minsker
                                                          Fla. Bar. No. 0038120
                                                          1100 Biscayne Blvd.
                                                          Suite 3701
                                                          Miami, Florida  33132
                                                          Telephone:  (786) 988-1020
                                                          jminsker@minskerlaw.com

                                                          *Attorney for Non-Party Mironest CG, LLC*

- 21 -

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Non-Party Mironest CG, LLC's Objection and Reservation of Rights in Response to the Receiver's Motion to Approve Settlement Agreement with Halpern Parties and Sale of Villa Valencia Unit 1301 Property to Halpern Buyer Free and Clear was served on August 10, 2026, via the Court's ECF system, on all counsel of record.

*/s/ Jonathan E. Minsker*
Jonathan E. Minsker